UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ERIN ALLEN, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>CONAGRA FOODS, INC.,<br><br>                    Defendant. | Case No. 3:13-CV-01279-VC |

**<u>DECLARATION OF KEITH R. UGONE, PH.D.</u>**

**October 10, 2014**

# REDACTED VERSION

## DECLARATION OF KEITH R. UGONE, PH.D.

### October 10, 2014

I.  OVERVIEW OF ASSIGNMENT .................................................................... 1

II.  SUMMARY OF OPINIONS ......................................................................... 3

    A.  Individual Inquiry Is Required To Determine Whether And To What Extent Putative Class Members Suffered Injury Attributable To The Challenged Claims ...... 4

    B.  The Claimed Damages Measures Proposed By Mr. Weir Would Not Yield A Reliable Or Relevant Measure Of Economic Harm ...................................................... 5

III.  QUALIFICATIONS AND EXPERIENCE ................................................. 8

IV.  FACTS, DATA, AND INFORMATION RECEIVED .................................................. 10

V.  OVERVIEW OF PARTIES .......................................................................... 11

    A.  Named Plaintiff .................................................................................... 11

    B.  ConAgra Foods, Inc. ............................................................................ 11

VI.  WHETHER AND TO WHAT EXTENT ANY CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS DEPENDS UPON INDIVIDUALIZED INQUIRY ................................................................... 12

    A.  Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing Parkay Spray ...................................................... 13

    B.  Individual Inquiry Is Required To Determine The Specific Price Paid For Parkay Spray By Each Putative Class Member ...................................................... 16

        1.  Description Of Data .................................................................. 17

        2.  Analyses Performed Regarding Retail Prices Of Parkay Spray ................ 19

        3.  Summary ................................................................................. 25

    C.  Lack Of Evidence To Determine Putative Class Members' Alleged Economic Injury .................................................................................................. 26

VII.  OVERVIEW OF MR. WEIR'S PROPOSED APPROACHES TO DETERMINING A CLAIMED CLASS-WIDE PRICE PREMIUM ........................ 27

VIII.  THE CLAIMED PRICE PREMIUM APPROACHES PROPOSED BY MR. WEIR DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS ............................................. 29

    A.  Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Individualized Factors That Must Be Evaluated To Determine Economic Injury .................................................................................................. 30

    B.  Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Variations In Market Conditions Determining Retail Prices ................... 32

    C.  Mr. Weir's Proposed Approaches At Best Would Measure An Average Willingness To Pay, Not An Actual Price Premium Paid ...................................... 33

    D.  Mr. Weir Failed To Explain How He Would Overcome Common Flaws In His Proposed Conjoint Analysis And Contingent Valuation Approaches ................... 36

1. Proposed Survey Approaches Are Likely To Overstate Consumers' Willingness To Pay For The Challenged Claims, Let Alone An Actual Price Premium Paid ............................................................ 37

2. Proposed Survey Approaches Draw Attention To Features That May Not Be Considered By Customers When Making Actual Purchase Decisions................. 39

3. Proposed Survey Approaches Cannot Provide A Value Tied To The Putative Class Period .................................................................................. 39

4. Lack Of Reliable Reference Surveys Or Agreement On Survey Design ............ 40

E. Allocation Of Claimed Damages Measures To Individual Putative Class Members Would Require Individualized Inquiry And Receipts ................................. 40

IX.     THE DISGORGEMENT MEASURES SPECIFIED BY MR. WEIR DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS........................................................................... 41

## DECLARATION OF KEITH R. UGONE, PH.D.

### October 10, 2014

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by counsel for ConAgra Foods, Inc. ("ConAgra" or "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Erin Allen v. ConAgra Foods, Inc.*  I understand Ms. Erin Allen ("Ms. Allen" or "Named Plaintiff") alleges that ConAgra has engaged in "deceptive practices in its labeling and marketing" of Parkay Spray (the "Challenged Product").[1]   Generally, the Named Plaintiff alleges that:

   a.    "the Parkay Spray label represents the product to be zero fat and zero calories per serving" (the "Challenged Claims");

   b.    "the product actually contains a significant amount of fat and calories"; and

   c.    "ConAgra uses unlawfully small serving sizes" so that "it may round down the actual fat and calories per serving to zero."[2]

2.    As a result of the Challenged Claims, the Named Plaintiff alleges that she and other putative class members were damaged.[3]   The Named Plaintiff "seeks restitution in the form of a full refund or partial refund of the purchase price" of Parkay Spray and "seeks the same type of recovery for all members of the proposed Class."[4]

3.    It is my understanding the Named Plaintiff seeks certification of a multi-state Class and three Subclasses.   The putative multi-state Class is defined as:

> [a]ll persons who purchased Parkay Spray for personal or household use in [various states specified in the Motion for Class Certification] at any time

---

[1]  First Amended Class Action Complaint dated September 20, 2013, p. 1.

[2]  Plaintiff's Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities in Support dated December 4, 2014 ("Motion for Class Certification"), pp. 1 – 2.

[3]  First Amended Class Action Complaint dated September 20, 2013, pp. 10 – 11.

[4]  Motion for Class Certification, pp. 13 and 18.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

from January 1, 2008 to the present and subject to the applicable statutes of limitations.[5]

The three putative Subclasses include (a) the "Consumer Protection Subclass," (b) the "Warranty Subclass," and (c) the "California Subclass."[6]

4.    Mr. Colin B. Weir submitted a declaration on August 11, 2014 in support of class certification in this matter ("Weir Declaration").[7]   Mr. Weir opined that he could "determine [claimed] damages attributable to the Product Claims on a Class-wide basis using common evidence" by using either (a) conjoint analysis or (b) contingent valuation to determine "whether Class Members paid a 'price premium' for the Product because of the Product Claims."[8] (Mr. Weir claimed that neither of his proposed approaches would require "any individual inquiry."[9])   Mr. Weir also opined that he would be able to calculate certain disgorgement measures on a Class-wide basis using common evidence should the Court prescribe such a measure, including disgorgement of "full retail price paid," "wholesale revenues," or ConAgra's "profits from the sale" of Parkay Spray.[10]

_____

[5]  Motion for Class Certification, p. 8.   (Bracketed text added for clarification.)   The putative multi-state Class includes purchasers in Alaska, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Vermont, Virginia, Washington, and West Virginia.

[6]  Motion for Class Certification, pp. 8 – 9.   The "Consumer Protection Subclass" includes putative Class members in Alaska, Arkansas, California, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Maine, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Rhode Island, and Washington.   The "Warranty Subclass" includes putative Class members in California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Kansas, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Vermont, Virginia, Washington, and West Virginia.   The "California Subclass" includes putative Class members in California.

[7]  Declaration of Mr. Colin B. Weir dated August 11, 2014 ("Weir Declaration").

[8]  Weir Declaration, pp. 2 and 4.   (Bracketed text added for clarification.)

[9]  Weir Declaration, p. 4.

[10]  Weir Declaration, p. 3.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

5.    I have been requested by counsel for ConAgra to independently evaluate from an economic perspective:

   a.   whether standard economic analysis can be used to quantify the claimed measures of monetary recovery in this matter on a Class-wide basis using common proof; and

   b.   the opinions contained in the Weir Declaration.

## II.    <u>SUMMARY OF OPINIONS</u>[11]

6.    My evaluation of the Named Plaintiff's Class-wide restitution and damages-related assertions as contained in the Weir Declaration is based upon (a) my economics and damage quantification training and experience, (b) documentary evidence, (c) deposition testimony from ConAgra representatives, (d) deposition testimony from the Named Plaintiff, (e) the Weir Declaration and Mr. Weir's deposition testimony, and (f) sales and retail pricing data collected by Information Resources, Inc. ("IRI").   Based upon a detailed analysis, I have concluded that:

   a.   the claimed injury and/or claimed damages suffered by the putative Class members as a result of the Challenged Claims cannot be evaluated reliably using Class-wide or common proof; and

   b.   the claimed Class-wide (or common proof) approaches proposed by Mr. Weir to calculate a Class-wide monetary recovery would not provide a reliable or relevant measure of the economic injury (if any) suffered by putative Class members.[12, 13]

7.    As presented throughout my declaration (and summarized here), individual inquiry is required to evaluate the claimed injury and/or damages suffered by the putative Class members.

_____

[11]  This Summary of Opinions is intended to be an overview.   A full description of my opinions is contained throughout my declaration (i.e., narrative and associated exhibits).

[12]  Alternatively stated, Mr. Weir has not provided a workable model for evaluating or calculating claimed damages and/or harm suffered by the putative Class members.

[13]  Economic injury or economic harm is measured by the value paid by a consumer for the Challenged Product versus the value received by that consumer.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

A. **Individual Inquiry Is Required To Determine Whether And To What Extent Putative Class Members Suffered Injury Attributable To The Challenged Claims**

8.      Whether and to what extent any putative Class member was injured as a result of the Challenged Claims is not amenable to proof on a Class-wide (or common proof) basis. Proof of alleged injury, if any, would depend upon individualized inquiry into the facts and circumstances associated with each putative Class member's purchase for at least the following reasons.

a.      Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Product.   Documentary evidence and deposition testimony indicate that consumers purchase Parkay Spray for a variety of reasons other than the Challenged Claims, including but not limited to Parkay Spray's taste, convenient spray form, price, and nutrition claims unrelated to the Challenged Claims (e.g., no trans fat, no cholesterol).

    i.      Consumers who purchased Parkay Spray for the aforementioned reasons (solely or in part) were not injured (or were not injured to the same degree) as consumers who purchased solely or in substantial part due to the Challenged Claims.

    ii.      Individual inquiry would be required to evaluate each putative Class member's reasons for purchasing Parkay Spray and whether a corresponding claimed injury exists.

b.      Individual Inquiry Is Required To Determine The Specific Price Paid For Parkay Spray By Each Putative Class Member.   Analysis of aggregate pricing data (which still masks significant variations in the retail prices paid by putative Class members) shows that the price paid by one consumer in one place at one time for Parkay Spray is not indicative of the price paid by another consumer in a different location at a different time.   Under these varied conditions (and varied prices), to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claims) would require consideration of circumstances particular to that transaction.

    i.      There are many individual variables affecting prices and an evaluation of claimed price premiums (including but not limited to sales channel, geographic location, retailer, timing, and promotional discounts).

    ii.      The significant variation in individual actual prices paid by putative Class members negates the ability of a Class-wide damages approach to yield a reliable and accurate estimate of claimed damages.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

9.     Any calculation of claimed damages allegedly suffered by putative Class members absent

       individualized analyses into (a) reasons for purchase and (b) the specific prices paid for

       Parkay Spray would not be reliable from an economic perspective.   Failure to conduct

       such individualized inquiry would result in over-compensation to some Class members

       and under-compensation to other Class members.[14]

       **B.   The Claimed Damages Measures Proposed By Mr. Weir Would Not Yield A
       Reliable Or Relevant Measure Of Economic Harm**

10.    Mr. Weir has not demonstrated that the claimed injury to putative Class members

       resulting from the Challenged Claims (if any) can be reliably or accurately determined on

       a Class-wide basis using common proof.

       a.   **Proposed Restitution Of Claimed Price Premium Would Not Yield A Reliable
            Or Relevant Measure Of Claimed Economic Harm.**  Mr. Weir proposed to use
            "representative survey technique[s]" (i.e., either conjoint analysis or contingent
            valuation) to determine a Class-wide claimed price premium attributed to the
            Challenged Claims.   From an economic perspective, Mr. Weir's proposed "price
            premium" approaches would not yield a reliable or relevant measure of the claimed
            harm suffered by individual putative Class members (i.e., a loss caused by the
            Challenged Claims) for at least the following reasons, among others.

            i.   **Ignores Individualized Factors That Must Be Evaluated To Determine
                 Economic Injury.**  Mr. Weir's proposed determination of a constant (i.e., Class-
                 wide) price premium (or constant percentage price premium) ignores
                 individualized factors that must be evaluated to determine whether and to what
                 extent putative Class members suffered economic injury attributable to the
                 Challenged Claims, including variations in reasons for purchasing Parkay Spray
                 and prices paid for Parkay Spray.

            ii.  **Awards Claimed Damages When None Exist.**  Mr. Weir's proposed approach
                 would award damages (and result in windfall gains) to putative Class members
                 who actually suffered no injury, including: (1) consumers who purchased Parkay

_____

[14] Even on an individual putative Class member basis, there may be a lack of evidence to allow a reliable
determination of the claimed economic injury.   Putative Class members are unlikely to have kept all or any of
the receipts from purchases of the Challenged Product, (b) to remember or otherwise substantiate the prices they
paid for the Challenged Product, and/or (c) to remember or otherwise substantiate the quantities purchased.   In this
matter, not only do the facts and circumstances indicate that the appropriate analyses concerning alleged economic
inquiry are not amenable to Class-wide proof, but this is compounded by a lack of evidence that would be needed to
determine the alleged economic injury on an individual putative Class member basis.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

Spray for reasons unrelated to the Challenged Claims; and (2) consumers who purchased Parkay Spray at a discount exceeding the claimed price premium Mr. Weir proposed to calculate.

iii. **Ignores Variations In Market Conditions Determining Retail Prices Of Parkay Spray (And Any Associated Claimed Price Premiums).**  Mr. Weir's proposed approach assumes that all putative Class members were impacted by the same dollar or percentage amount even though putative Class members paid very different prices for Parkay Spray.  Mr. Weir failed to acknowledge that there is not a single, aggregate market determining a single retail price of Parkay Spray (or an associated claimed price premium) paid by all putative Class members.

- Mr. Weir's suggested approach provides no mechanism for evaluating potentially different claimed price premiums when Parkay Spray is purchased in different sales channels, geographic areas, retailers, and/or at promotional prices.

- The wide range of retail prices paid by putative Class members leads to the necessity of individualized inquiry to evaluate claimed pricing premiums that may have been paid associated with the Challenged Claims.

iv. **Estimates Average Willingness To Pay Rather Than An Actual Price Premium.**  Mr. Weir's proposed conjoint analysis and contingent valuation approaches, at best, would measure an average "willingness to pay" associated with the Challenged Claims rather than an actual price premium paid.

- "Willingness to pay" may have little or no systematic relationship with the prices actually charged by retailers and paid by consumers.

- Mr. Weir provided no methodology that would allow him to convert a "willingness to pay" figure into a claimed price premium (if any) that actually occurred in the marketplace.

v. **Places Overemphasis On Certain Product Features.**  Mr. Weir's proposed survey techniques (i.e., conjoint analysis and contingent valuation) would draw attention to the features used in the survey exercise (e.g., the Challenged Claims) at the expense of features not included in the survey.[15]  By drawing additional attention to the Challenged Claims, Mr. Weir's proposed survey approaches run the risk of assigning a larger value to the feature(s) than that which would be actually observed in the marketplace.

_____

[15] A survey necessarily places emphasis on product attributes that consumers may or may not place emphasis on while shopping.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

- Presented with a description of the Challenged Claims in a survey, respondents may ascribe more value to the Challenged Claims than they would when making actual purchase decisions.

- Mr. Weir did not address how he will overcome this drawback.

    vi. **Calculated Value Would Not Be Applicable To Entire Putative Class Period.** Any average willingness to pay that Mr. Weir would calculate through his proposed "representative survey" would be based upon tastes and preferences that exist at the time his proposed survey is performed.

- The putative Class period began nearly six years ago in March 2009.[16]

- There are no assurances that the average willingness to pay Mr. Weir proposes to calculate at some point in the future would be representative of (or correlated with) putative Class Members' willingness to pay associated with the Challenged Claims (let alone an actual price premium, if any existed) nearly six years prior to Mr. Weir's proposed survey.

    b. **Disgorgement Of Full Retail Purchase Price Paid, Wholesale Revenues, Or ConAgra's Profits Would Not Yield A Reliable Or Relevant Measure Of Claimed Economic Harm.** Mr. Weir claimed that he would be able to calculate certain disgorgement measures on a Class-wide basis using common evidence should the Court prescribe such a measure, including disgorgement of "full retail price paid," "wholesale revenues," or ConAgra's "profits from the sale" of Parkay Spray.[17] However, the specified disgorgement measures do not yield a reliable or relevant estimate of economic harm allegedly suffered by individual putative Class members on a Class-wide basis for at least the following reasons.

    i. **Assumes Consumers Received No Value.** Accurately assessing economic injury suffered by a consumer purchasing the Challenged Product requires that Mr. Weir determine the value paid versus value received by the consumer. The disgorgement measures specified by Mr. Weir ignore the value received by putative Class members from their purchase and use of Parkay Spray. Hence, the full retail price, wholesale price, and/or profits to ConAgra do not represent claimed economic harm.

    ii. **No Economic Causation To Challenged Claims.** Measuring the claimed damages suffered by putative Class members requires identifying the economic losses that are attributable to the alleged wrongful conduct (i.e., caused by the Challenged Claims). There would be no correlation between (or economic causation between) the disgorgement calculations discussed by Mr. Weir and any

---

[16] I understand it is ConAgra's position that the putative Class period began no earlier than March 2009.

[17] Weir Declaration, p. 3. Mr. Weir does not appear to endorse the use of these disgorgement measures as a basis for calculating claimed damages in this matter but stated that he would be able to do so if instructed by the Court.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

claimed economic injury attributable to the Challenged Claims (or suffered by putative Class members).

iii. **<u>No Allocation Approach Presented</u>.**   Mr. Weir asserted that the disgorgement measures he specified could be implemented using Class-wide proof, but he has not provided any mechanism for allocating to individual putative Class members the portion of total retail sales, wholesale revenues, or profits associated with each individual putative Class member's purchase(s).   Mr. Weir failed to acknowledge in his declaration that *any* type of allocation methodology divorced from actual individual purchase patterns will over-compensate some Class members and under-compensate other Class members.[18]

11.   The details of my analyses and the bases for my opinions are contained in the remainder of this declaration.

## III.   <u>QUALIFICATIONS AND EXPERIENCE</u>

12.   I am a Managing Principal at Analysis Group, Inc. ("AG").   AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.   Nationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

13.   My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients.   Throughout my career I have provided these consulting services in class certification matters, breach of contract cases, intellectual property cases, antitrust cases, fraud-related cases, business tort cases, business interruption cases, employment / loss of earnings matters, lender liability cases, and

_____

[18] In order to allocate an aggregated measure of total retail sales, wholesale revenues, or profits to each individual putative Class member's purchase(s), individual inquiry would be necessary to obtain information relating to the purchase price paid and the quantity of Parkay Spray purchased by each putative Class member.   However, putative Class members are unlikely to have retained receipts associated with their purchases of Parkay Spray or to recall the purchase prices paid or total quantities purchased.   Hence, any approach to allocating total retail sales, wholesale revenues, or profits among putative Class members is unlikely to be correlated with actual prices paid or quantity purchased.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

securities-related cases.   I have provided expert testimony in deposition and trial settings numerous times.

14.    In consumer product class action matters, I have addressed economic and damages-related issues relating to class-wide proof of claimed economic harm and price premium claims, including analyses of demand drivers affecting consumer purchase decisions and product pricing patterns observed at wholesale and retail levels.   Pricing analyses I have performed include the examination of pricing patterns across sales channels, geographic areas, retailers, and by promotional activities.   I have submitted reports and provided deposition testimony on class certification issues numerous times in false advertising and commercial matters involving a variety of products and industries.

15.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.   Attached as **Exhibit 1** is a true and correct copy of my current resume.   A listing of publications I have authored is contained in my resume.   Attached as **Exhibit 2** is my trial and deposition testimony experience.   My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas 75219.

16.    AG is being compensated based upon hours incurred and the hourly rates of the personnel involved.   Payment to AG is not contingent upon my findings or the outcome of this matter.   AG is being compensated at a rate of $600 per hour for my time.   Hourly rates for other staff at AG working on this matter range from $190 to $475 per hour, depending upon the level and experience of the staff involved.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

## IV.    FACTS, DATA, AND INFORMATION RECEIVED

17.    The facts, data, and information available to me in forming my opinions are contained in

**Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits).   Contained

in **Exhibit 4** is a listing of the deponents whose deposition transcripts are cited in the text

of my declaration.   Examples of the types of information available to me include the

following:

    a.  legal documents (e.g., First Amended Class Action Complaint; Motion for Class Certification);

    b.  declarations (e.g., Declaration of Colin B. Weir dated August 11, 2014);

    c.  deposition transcripts and associated exhibits (e.g., deposition of Patrick Fitzgerald taken September 4, 2014; deposition of Karl Sears taken June 26, 2014);

    d.  documents produced by ConAgra (e.g., Parkay Spray financial data; internal presentations; consumer studies);

    e.  IRI retail sales and pricing data (e.g., retail dollar sales, unit sales, and average retail prices associated with Parkay Spray in various sales channels, geographic locations, and retailers); and

    f.  information independently obtained (e.g., SEC filings; information from ConAgra's website).

18.    My analyses and opinions are based upon the information available, standard economic

theory, and my education and training.   The information I am relying upon is

information typically relied upon by experts in my field.   I reserve the ability to (a)

review documents, deposition transcripts, expert reports, or other information still to be

produced by the Parties to this dispute and (b) supplement my opinions based upon that

review, if appropriate.   I also reserve the ability to use demonstrative exhibits and/or

other information at hearings/trial to explain and illustrate my opinions.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

## V.    OVERVIEW OF PARTIES

### A.    Named Plaintiff

19.    Ms. Erin Allen resides in the city of Dublin, California.[19]  Ms. Allen testified that she began purchasing Parkay Spray in approximately 2009 and purchased a total of approximately 50 to 60 bottles before ceasing to purchase Parkay Spray around the time that the complaint was filed in this matter.[20]  All of Ms. Allen's purchases of Parkay Spray were made at Wal-Mart stores in the Dublin, California area.[21]  Ms. Allen testified that she does not have receipts or other records reflecting her purchases and cannot recall the prices she paid for Parkay Spray.[22]

### B.    ConAgra Foods, Inc.

20.    ConAgra Foods, Inc. ("ConAgra") is a Delaware corporation with its headquarters in Omaha, Nebraska.[23]  ConAgra initially was incorporated in 1919 and is one of North America's leading packaged food companies, with its branded and private branded foods found in 99% of U.S. households.  ConAgra sells many recognized food brands including Banquet, Chef Boyardee, Hunt's, Marie Callender's, Orville Redenbacher's, and Swiss Miss, among many others.[24]  ConAgra acquired several brands of margarines and spreads from Nabisco Holdings Corporation in 1998, including Parkay, Blue Bonnet,

---

[19]  Deposition of Erin Allen taken on August 28, 2014 ("Allen Deposition"), p. 60.

[20]  Allen Deposition, pp. 7, 24 – 25, and 85.  Ms. Allen testified that she used Parkay Spray as a topping for zucchini, corn, squash, broccoli, popcorn, and toast.   (Allen Deposition, pp. 10, 13, 15 – 17, and 23.)   On a limited number of occasions, Ms. Allen used Parkay Spray when baking or in a frying pan.   (Allen Deposition, p. 10.)

[21]  Allen Deposition, pp. 25 – 27.

[22]  Allen Deposition, pp. 27 – 28 and 54.

[23]  ConAgra Foods, Inc. Form 10-K for the fiscal year ended May 25, 2014 ("ConAgra 2014 10-K"), pp. 1 and 13.

[24]  ConAgra 2014 10-K, p. 1.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

and Fleischmann's, among others.[25]   ConAgra currently sells several varieties of Parkay

products, including Parkay Original Stick, Parkay Original Spread, Parkay Light Spread,

Parkay Squeeze, and Parkay Spray.[26]   According to ConAgra, "Parkay margarine has an

unbeatable farm-fresh, creamy taste because it's made with real nonfat milk."[27]

## VI.   WHETHER AND TO WHAT EXTENT ANY CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS DEPENDS UPON INDIVIDUALIZED INQUIRY

21.   Determining whether a putative Class member suffered any economic injury as a result of

the Challenged Claims requires individualized information relating to each Class

member.   This individualized information includes, *inter alia*: (a) the putative Class

member's reasons for purchasing Parkay Spray and (b) the price paid by the putative

Class member for Parkay Spray. The above circumstances relating to each individual

putative Class member's purchasing decision must be considered in order to determine

whether or not the individual was injured as a result of the Challenged Claims.[28]

---

[25] "Company News; ConAgra Buys Several Margarine Brands from Nabisco," The New York Times, July 22, 1998.  (http://www.nytimes.com/1998/07/22/business/company-news-conagra-buys-several-margarine-brands-from-nabisco html, viewed on September 11, 2014.)

[26] "Parkay: Our Spreads."  (http://www.parkay.com/our-spreads.jsp, viewed on September 11, 2014.)  Parkay Spray was introduced in 2000.   (Deposition of Patrick Fitzgerald taken on June 23, 2014 ("Fitzgerald Deposition"), p. 107.)

[27] "Parkay margarine:   A fresh and creamy taste."   (http://www.conagrafoods.com/our-food/brands/parkay, viewed on September 11, 2014.)

[28] Mr. Weir asserts that individual inquiry is not required to evaluate or calculate claimed damages associated with the Challenged Claims.

> Individual Class Members have no control over the price of the Product, or the price premium resulting from the Product Claims.   Individual reasons consumers may have for purchasing the Product do not alter this price premium, nor do they alter the injury arising from paying that premium.   The price premium, and economic damages resulting therefrom, exist Class-wide, and can be proven using common evidence.   (Weir Declaration, p. 4.)

However, Mr. Weir's premise prevents him from developing a workable model for evaluating claimed damages. As discussed here and elsewhere in my declaration, some putative Class members purchased Parkay Spray for reasons completely unrelated to the Challenged Claims and received the desired value for the price paid.   Those putative Class members have not been harmed.   In addition, as discussed here and elsewhere in my declaration, while it may be true that individual reasons consumers may have for purchasing the Product do not alter the price

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

### A. **Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing Parkay Spray**

22.   Documentary evidence and deposition testimony indicate that consumers purchase Parkay Spray for a variety of reasons other than the Challenged Claims, including but not limited to Parkay Spray's taste, convenient spray form, price, and nutrition claims unrelated to the Challenged Claims (e.g., no trans fat, no cholesterol).[29]

   a.   <u>Fresh And Creamy Taste</u>.   Deposition testimony and documentary evidence indicate that Parkay Spray's "fresh and creamy taste" is an important purchase driver.

      i.   Mr. Patrick Fitzgerald (Senior Brand Manager, ConAgra Foods, Inc.) testified that taste was "probably the number one" (i.e., most important) product attribute of Parkay Spray to consumers.[30]   Mr. Fitzgerald further testified that Parkay has a "fresh and creamy taste and there are consumers that that's exactly what they're looking for."[31]

      ii.   Each of the Parkay Spray product labels identified in Plaintiff's Motion for Class Certification highlights the "Fresh & Creamy Taste" of Parkay in a prominent position on the front of the product label.[32]

   b.   <u>Convenient Spray Form</u>.   The importance of Parkay Spray's convenient spray form as a driver of consumer purchases is supported by at least the following deposition testimony and documentary evidence.

      i.   Ms. Catherine Bartholomew (Senior Director of Consumer Insights, ConAgra Foods, Inc.) testified that the spray form is "the most unique thing about [Parkay Spray]."[33]

_____

premium (assuming one exists), Mr. Weir has provided no evidence that the price premium applicable to putative Class members that may have been harmed is a constant dollar amount or constant percentage of price amount. This observation especially is important given the significant price differences observed across distribution channels, geographic locations, time, and whether the product is purchased under promotional pricing.

[29] Ms. Catherine Bartholomew testified that fat content is a purchase driver "for some of the consumers some of the time" when choosing margarines or spreads, but "[t]here are other drivers as well."   (Deposition of Catherine Bartholomew dated June 27, 2014 ("Bartholomew Deposition"), p. 273.)

[30] Fitzgerald Deposition, pp. 104 – 105.

[31] Fitzgerald Deposition, pp. 220 – 221.   Mr. Fitzgerald further testified that "in many consumers eyes, [I Can't Believe It's Not Butter] tastes closer to butter than Parkay does, but they pay a premium for that" because "I Can't Believe It's Not Butter is a premium brand relative to Parkay."   (Bracketed text added for clarification.)

[32] Unredacted Declaration of Lee M. Gordon in Support of Plaintiff's Motion for Class Certification, Exhibits 1 – 3.

[33] Bartholomew Deposition, p. 273.   (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

      ii.  Mr. Fitzgerald testified that "the different forms within the different spreads categories are used differently for different reasons on different products."[34]   Mr. Fitzgerald further testified that "[t]he usage occasions are different for soft tub products … than they are for spray," and depending upon the particular "usage occasion," soft tub products are "not nearly as convenient as spray."[35]   Mr. Fitzgerald identified the convenience of the spray form and its allowance for portion control (due to the nature of how the product is applied) as important attributes of Parkay Spray to consumers.[36]

      iii.  According to an internal ConAgra presentation dated 2010, the market segment in which Parkay competes is "[c]onvenience driven."   The same presentation identified the form of the product as an important consideration to consumers in each segment.[37]

      iv.  An undated ConAgra presentation stated that "convenience is just as important" as health to Parkay consumers.   The presentation stated that "[h]ealth is important, but convenience is top of mind" for Parkay consumers.[38]

    c.  <u>Low Price Relative To Alternative Spray Products</u>.   A 2010 IRI pricing and promotion study indicates that on average, Parkay Spray is priced lower than other margarine products in spray form, including I Can't Believe It's Not Butter, Smart Balance, and Olivio margarine sprays.[39]   Similarly, an internal ConAgra presentation stated, "[w]ith the absence of PL [private label] competing in the spray segment, Parkay is the value offering."[40]   Hence, for many consumers seeking to purchase a

---

[34] Fitzgerald Deposition, pp. 102 – 103.   For example, Mr. Fitzgerald testified that Parkay's tub products often are used as a topping for toast, muffins, and bagels due to superior "spreadability" compared to Parkay Spray.

[35] Fitzgerald Deposition, p. 223.

[36] Fitzgerald Deposition, pp. 103 – 105.   Regarding "portion control," Mr. Fitzgerald testified that "because of the nature of how [Parkay Spray] is applied, it is much more – it's controllable as opposed to so much easier to take a big dollop using a knife or something out of a tub."   (Bracketed text added for clarification.)

[37] "Table Spreads: Category Overview," ConAgra presentation dated April 2010.   (Bartholomew Deposition, Exhibit 97.)

[38] "ConAgra Brand Tablespreads Portfolio," ConAgra presentation.   (Bartholomew Deposition, Exhibit 109; CAGAL_007793 – 824 at 809.)

[39] Table Spreads Price and Promotion Study, IRI presentation dated January 6, 2010.   (CAGAL_000956 – 992 at 987.)   Mr. Fitzgerald testified that as the brand manager for Parkay, the only competitor to Parkay Spray that he "ever really watched or was interested in" was I Can't Believe It's Not Butter spray "because they're the only one that really has significant volume in that segment."   (Fitzgerald Deposition, pp. 216 and 218.)   It is my understanding that I Can't Believe It's Not Butter spray, similar to Parkay Spray, is labeled as having 0g fat and 0 calories per serving with serving sizes of either 1 spray or 5 sprays.   *See, e.g.*, "I Can't Believe It's Not Butter! Original Spray."   (http://www.icantbelieveitsnotbutter.com/product/detail/129811/i-can-t-believe-it-s-not-butter-original-butter-spray, viewed on September 29, 2014.)

[40] "Tablespreads Portfolio Analysis," ConAgra presentation.   (Fitzgerald Deposition, Exhibit 41; CAGAL_001847 – 857 at 849.)   (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

margarine spray product, Parkay Spray likely was the lowest priced option among such products.

d.  <u>Other Nutrition Claims</u>.   Parkay Spray is labeled with certain nutrition-related claims other than the Challenged Claims, including "0g trans fat per serving" and "0mg cholesterol per serving."  Documentary evidence indicates that these undisputed claims are important purchase drivers for some consumers.

   i.  According to a ConAgra presentation, "Heart-healthy foods" and "No trans fat" were among the "Top Consumer Health Concerns" as of March 2007.  The presentation stated that margarines and spreads "address consumers' health concerns" and "their shopping behavior reinforces this."  Based upon consumer research, the presentation stated that the "[t]op five things shoppers consider when deciding which margarine/spread to buy" are (in rank order) (1) trans fat, (2) cholesterol, (3) saturated fat, (4) fat, and (5) calories.[41]  The two highest-ranked considerations (i.e., trans fat and cholesterol) are the subject of Parkay Spray's <u>undisputed</u> nutrition claims, not the Challenged Claims.

   ii.  According to a study cited by Mr. Weir regarding consumer perception of nutrient content claims, "zero cholesterol" claims contribute more than "total fat" claims to consumers' overall judgment of food as healthful.[42, 43]

23.  Individual inquiry is required to evaluate each putative Class member's reasons for purchasing Parkay Spray.  Consumers who purchased Parkay Spray solely (or in part) for reasons other than the Challenged Claims were not injured (or were not injured to the

_____

[41] "ConAgra Brand Tablespreads Portfolio," ConAgra presentation.  (Bartholomew Deposition, Exhibit 109; CAGAL_007793 – 824 at 800.)

[42] "Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis," Drewnowski, Adam, et al., Public Health Nutrition: 13(5), 688 – 694 at 692.   (Weir Declaration, Exhibit H.)

[43] Mr. Weir discussed the health benefits associated with Parkay Spray and concluded as follows.

   Indeed, a study performed for ConAgra confirms that Parkay Spray is differentiated, carries a price premium, and that consumers appear to tolerate that price premium because of the health benefits of the Product.   (Weir Declaration, p. 7.)

As discussed in my declaration, Parkay Spray has health benefits beyond the disputed Challenged Claims.   Also, it should be noted that Mr. Weir's use of the term "price premium" in the above citation appears to be at odds with his definition of price premium presented earlier in his declaration.

   As used throughout this declaration, the term "Price Premium" is used to indicate the additional amount that consumers paid for Parkay Spray as a direct result of the nutritional Product Claims only, and not the overall premium that Parkay Spray may command in the marketplace vis-à-vis competitor products.   (Weir Declaration, p. 2, footnote 4.)

_____

same degree) as consumers who purchased solely or in substantial part due to the Challenged Claims.

**B. Individual Inquiry Is Required To Determine The Specific Price Paid For Parkay Spray By Each Putative Class Member**

24. Analyses of IRI pricing data indicate that the prices paid for Parkay Spray vary by large amounts, based in part upon the sales channel in which putative Class members purchased Parkay Spray, the geographic location where they purchased Parkay Spray, and whether they paid full price or a promotional price (among other factors). These pricing variations demonstrate that the price paid by one consumer in one place at one time for Parkay Spray is not indicative of the price paid by another consumer in a different location at a different time.[44]

25. The extent to which any individual putative Class member suffered economic harm, if any, depends in part upon the price paid by that individual. The wide variations in prices paid by individual putative Class members reflect that there are varying market conditions influencing retail prices for Parkay Spray in different sales channels, in different geographic locations, and at different times. Examples of these varying market

_____

[44] This observation goes directly to the issue of whether Mr. Weir has presented a workable model for evaluating claimed Class-wide damages using common proof (and whether Mr. Weir fully considered all of the factors that would be an input into the development of a workable model for evaluating Class-wide damages using common proof). This is especially evident given that Mr. Weir stated in his declaration:

> I have seen no evidence in this litigation that suggests that variations in price across sales channels or sub-geographies, *to the extent they exist*, would influence how the price of the Products would change as a result of the Product Claims. (Weir Declaration, p. 12. Emphasis added.)

Significant price differences do exist across channels of distribution, geographies, time periods, and whether promotional pricing was used. Mr. Weir attempts to overcome this deficiency by stating that:

> Moreover, as a result of calculating the price premium attributable to the Product Claims as a percentage, any such difference is accounted for because the calculated damages is proportional to the price paid and will result in largely similar damages. (Weir Declaration, p. 12.)

Of course, this is an assertion by Mr. Weir and he has provided no analysis in his declaration that this assertion is true – again indicating that he has not provided the framework of a workable model for evaluating claimed Class-wide damages using common proof.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

conditions include differences in consumer preferences, retailer characteristics, and competitive pressures across sales channels, geographic areas, and purchase dates as well as differences in promotional activities or coupon discounts, among other factors. These varying market conditions influence the extent to which the Challenged Claims may contribute to any claimed price premium for Parkay Spray paid by an individual putative Class member. Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claims) would require consideration of circumstances particular to that transaction.

26.    The variability in the IRI pricing data supports the conclusion that knowing the prices paid by individual putative Class members (which differed greatly across the Class members) is an important factor in determining whether an individual Class member suffered economic harm associated with the Challenged Claims. Without individual inquiry, one cannot determine the price an individual Class member paid for Parkay Spray or the extent to which they did or did not pay a "price premium" – rendering attempts to quantify damages on a Class-wide basis inaccurate and unreliable.

## 1. Description Of Data

27.    In conducting my analyses, I relied in part upon Parkay Spray annual retail sales and pricing data provided by IRI for the U.S. as a whole and for various states. The IRI data contains (a) total unit sales, total dollar sales, and average retail prices; (b) promotion-related unit and dollar sales and prices (i.e., on-sale prices); and (c) non-promotion-related unit and dollar sales and prices (i.e., full prices). The following sales channels

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

are included in the IRI data on an annual basis over the time period from 2009 to September 7, 2014:[45]

a.  grocery stores (e.g., Albertsons, Giant Eagle, and Kroger);

b.  drug stores (e.g., CVS);

c.  mass merchandisers (i.e., Target and Kmart);[46] and

d.  military commissaries (i.e., DeCA and NEXCOM).

In addition, the IRI data includes "multi-outlet" sales and pricing data, which is aggregated to include at least Walmart sales in addition to the total sales in other channels listed above.[47]

28.    Total unit sales of Parkay Spray in various U.S. sales channels (as contained in the IRI data) on an annual basis over the time period from January 5, 2009 to September 7, 2014 are provided in **Table 1**.[48]    (**Exhibit 5**.)

---

[45]  I understand it is ConAgra's position that the putative Class period began no earlier than March 2009.   IRI provided data on approximately a calendar year basis (i.e., 52-week periods).   For example, annual data for 2009 is labeled "Calendar Year 2009 Ending 01-03-10."   Annual data for 2014 appears to represent a partial year ending September 7, 2014.   IRI also provided certain data on a weekly basis.

[46]  Sales of Parkay Spray at Target stores ceased in 2011 based upon the IRI data.

[47]  According to an internal ConAgra presentation, Walmart sales represented 48% of ConAgra's Parkay Spray sales volume in ConAgra's fiscal year 2009.   ("Tablespreads Portfolio Analysis," ConAgra presentation.   (Fitzgerald Deposition, Exhibit 41; CAGAL_001847 – 857 at 849.))

[48]  The IRI data also include the dollar stores sales channel.   However, the data indicates that there were no sales of Parkay Spray in the dollar stores sales channel during the time period covered by the data.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014

_____

**2.   Analyses Performed Regarding Retail Prices Of Parkay Spray**

29.

**i.    Parkay Spray Prices Vary Depending Upon Sales Channel**

30.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

■ ████    ██████████████████████████████████████████

████████████████████████████████████████████    █████

███████████████████████████████████████████████████████

████████████████████████████████

31.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

_____

■ Excluding drug stores, military commissaries tend to offer the lowest average retail prices for Parkay Spray. During 2009 – 2011, average retail prices of Parkay Spray were lower in mass merchandisers than in grocery stores. By 2012, Parkay Spray no longer was sold in Target stores, causing the average retail prices in the mass merchandiser channel to increase significantly as Kmart became the only remaining retailer with sales of Parkay Spray reported in the mass merchandiser channel.

[50] "Tablespreads Portfolio Analysis," ConAgra presentation.    (Fitzgerald Deposition, Exhibit 41; CAGAL_001847 – 857 at 849.)

[51] For example, information in ConAgra documents indicates that five Walmart stores in various U.S. cities offered prices ranging from $1.16 to $1.58 per unit of Parkay Spray in January 2009.    (Deposition of Jeremy Attal taken on June 26, 2014 ("Attal Deposition"), pp. 61 – 63 and ConAgra Grocery Foods Retail Pricing Report: Wal-Mart Supercenter (Attal Deposition, Exhibit 93; CAGAL_002061 – 071 at 068).

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____



**ii.  Parkay Spray Prices Vary Depending Upon Geographic Location**

32.



_____

[52]  The 27 states include: Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York,

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Vermont, Virginia, Washington, and West Virginia.    State-specific data was not available for Alaska, District of Columbia, Hawaii, and North Dakota.

[53]  The existence of pricing variation across geographic locations observed in the IRI data is consistent with data provided by ConAgra indicating that even for a given retailer, average retail prices may vary across geographic locations.    For example, five Walmart stores in various U.S. cities offered prices ranging from $1.16 to $1.58 per unit of Parkay Spray in January 2009.    (Attal Deposition, Exhibit 93.)

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014

### iii.  Parkay Spray Prices Vary Depending Upon Retailer

33.



[54] *See* Deposition of Steven Asnes taken on June 26, 2014 ("Asnes Deposition"), p. 43 and Deposition of Karl Sears taken on June 26, 2014 ("Sears Deposition"), p. 53.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014

_____

**iv.  Parkay Spray Prices Vary Depending Upon Promotional Activity**

34.

_____

[55]  An individual putative Class member who received a discount on the purchase price of Parkay Spray greater than a claimed "price premium" associated with the Challenged Claims would not have suffered an economic loss.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014

_____

35.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

### 3.  <u>Summary</u>

36.    Based upon the analyses discussed above, Class-wide proof using aggregate pricing data does not produce a reliable or accurate way to demonstrate the fact of injury or the quantum of injury.  Class-wide proof would not correlate with actual harm, if any, to consumers and likely would yield windfall damages to a significant number of

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

consumers.   Any determination of damages absent individualized analyses would result

in a windfall gain to putative Class members who suffered no injury and would result in

under-compensation to other Class members.

## C. Lack Of Evidence To Determine Putative Class Members' Alleged Economic Injury

37.    Even on an individual basis, there likely would be a lack of evidence that would allow a

reliable determination of the claimed economic injury.   Putative Class members are

unlikely (a) to have kept all or any of the receipts from purchases of the Challenged

Product, (b) to remember the prices they paid for the Challenged Product, or (c) to be

able to substantiate the quantity or the prices associated with their purchases.   In

particular, the Named Plaintiff testified that she did not retain receipts for her purchases

of Parkay Spray and could not recall the prices she paid for Parkay Spray.[56]

38.    In this matter, not only do the facts and circumstances indicate that the appropriate

analyses concerning alleged economic inquiry are not amenable to Class-wide proof, but

this is compounded by a lack of evidence that would be needed to determine the alleged

economic injury on an individual putative Class member basis.   As discussed previously,

sales data indicate that the Challenged Product is sold through different sales channels, at

different geographic locations, at different retailers, and with and without promotions.

Consequently, purchasers of the Challenged Product have paid a wide range of prices for

their purchases.   Complicating this diversity in prices paid is the likelihood that putative

Class members would not be able to produce documentary evidence to substantiate their

purchases of the Challenged Product, including the quantity purchased and the actual

_____
[56]  Allen Deposition, pp. 27 – 28 and 54.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

prices paid.   In the absence of such evidence, it would not be possible to reliably determine the economic damages allegedly suffered by individual putative Class members.

## VII.   OVERVIEW OF MR. WEIR'S PROPOSED APPROACHES TO DETERMINING A CLAIMED CLASS-WIDE PRICE PREMIUM

39.    Mr. Weir's proposed "price premium" approaches involve "the determination of a price premium, if any, that Class Members paid as a result of the Product Claims."[57]   Mr. Weir opined that he could determine claimed "damages attributable to the Product Claims on a Class-wide basis using common evidence" by using either (a) conjoint analysis or (b) contingent valuation to determine "whether Class Members paid a 'price premium' for the Product because of the Product Claims."[58]   Mr. Weir described conjoint analysis and contingent valuation as "representative survey technique[s] that permit[] an economist to analyze the value of various product attributes."[59]

---

[57]  Weir Declaration, p. 4.   In his declaration, Mr. Weir identified the "Product Claims" as "'0 g Fat' (or 'Fat Free') and 'Zero Calories'" and proposed to determine a price premium attributable to those claims.   (*See* Weir Declaration, pp. 1 – 3, 10, and 12.)   However, the Named Plaintiff identified the Challenged Claims in the Motion for Class Certification as "'0g FAT' and 'ZERO CALORIES' per serving" and specifically alleged that "ConAgra uses unlawfully small serving sizes" in order to "round down the actual fat and calories per serving to zero."   (*See* Motion for Class Certification, pp. 1 – 2.   (Emphasis added.))   Hence, from an economic and claimed damages perspective, Mr. Weir's proposed quantification of a claimed price premium attributable to "0 g Fat" and "Zero Calories" claims (without the "per serving" qualifier) is not appropriately tied to the theory of liability proffered by the Named Plaintiff in this matter.   Throughout this declaration, I discuss additional reasons why Mr. Weir's proposed analyses do not yield a reliable or relevant measure of economic harm on a Class-wide basis, even if he had properly identified the Challenged Claims (rather than "Product Claims" that differ from those identified by the Named Plaintiff).

[58]  Weir Declaration, pp. 2 and 4.

[59]  Weir Declaration, pp. 7 and 13.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

40.      Mr. Weir described his proposed survey approaches as follows.[60]

    a.   Conjoint Analysis.   Mr. Weir opined that conjoint analysis is a "suitable technique" for calculating a claimed price premium associated with the Challenged Claims.[61] Mr. Weir's proposed conjoint analysis involves two major steps:

        i.   Online Conjoint Survey.   Mr. Weir stated that he would conduct an online survey to collect data for his analysis.[62] The survey would include "a series of choice-based conjoint questions called 'tasks'" in which each respondent would be asked to "choose amongst two or more product offerings" that have "a variable mix of … product attributes" such as "taste, form, perceived health, brand, and size."[63]

        ii.   Analysis Of Conjoint Survey Data.   Following the online survey, Mr. Weir stated that "the conjoint results would then be analyzed to determine the price premium attributable to the Product Claims."   Mr. Weir stated that "[t]he conversion of dollar values will be done using the standard 'dollars per util' method."[64]

    b.   Contingent Valuation.   Mr. Weir proposed contingent valuation as an alternative to conjoint analysis for determining a claimed price premium associated with Challenged Claims.[65]   According to Mr. Weir, contingent valuation "asks people to directly report their willingness to pay to obtain a specified good or product attribute, rather than inferring these behaviors in regular market places."[66]   Mr. Weir described his proposed contingent valuation approach as follows.

            The basic survey design and implementation would be similar to a conjoint study, substituting contingent valuation questions for the conjoint choices.   Along with screening and warm up questions (similar to those used in conjoint analysis as described above), contingent valuations ask a respondent a referendum question (e.g., which of these two products would you prefer?) and then a series of questions to determine their willingness to pay for a product attribute,

---

[60] According to Mr. Weir, his desired sample for either of his proposed survey approaches would consist of "actual purchasers of spray topping consumers [sic], and be based upon the demographic characteristic [sic] of Parkay purchasers. As such, the sample would consist predominantly of females of mixed household sizes." With respect to his proposed conjoint analysis, Mr. Weir proposed a sample size of "approximately 300 qualified and complete responses." (Weir Declaration, pp. 11 and 14.) For contingent valuation, Mr. Weir testified that his "target" sample size would be 1,000 responses. (Deposition of Colin B. Weir taken on September 30, 2014 ("Weir Deposition"), pp. 58 – 60.)

[61] Weir Declaration, p. 9.

[62] Weir Declaration, p. 11.

[63] Weir Declaration, pp. 10 – 12.

[64] Weir Declaration, p. 12. *See also* Weir Deposition, pp. 179 – 182.

[65] Weir Declaration, pp. 13-15.

[66] Weir Declaration, p. 13.

_____

or how much lower a price would have to be in order for them to accept a product without a particular attribute.[67]

41. According to Mr. Weir, the "ultimate result" of either of his proposed survey approaches would be "a measurement of the price premium attributable to the '0 g Fat' and 'Zero Calories' Product Claims."[68]   Mr. Weir stated that he could determine the claimed price premium either "on a dollar basis" or "on a percentage basis."[69]   Mr. Weir further stated that claimed "damages in this litigation will be a straightforward calculation of the quantity (either in units or dollars) of the Product sold and the price premium for those products."[70]

## VIII.  THE CLAIMED PRICE PREMIUM APPROACHES PROPOSED BY MR. WEIR DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS

42. From an economic and claimed damages perspective, Mr. Weir's proposed price premium approaches do not yield a reliable or relevant measure of the claimed harm suffered by putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

a. Mr. Weir's proposed determination of a Class-wide claimed price premium ignores individualized factors that must be evaluated to determine economic injury.

b. Mr. Weir's proposed determination of a Class-wide claimed price premium ignores variations in market conditions determining retail prices of Parkay Spray.

c. Mr. Weir's proposed conjoint analysis and contingent valuation approaches at best would measure an average willingness to pay, not an actual price premium paid.

---

[67]  Weir Declaration, p. 14.

[68]  Weir Declaration, p. 14.

[69]  Weir Declaration, p. 15.   *See also* Weir Deposition, pp. 181 – 185.   Mr. Weir has not provided a methodology or explanation regarding how he would decide between calculating the claimed price premium "on a dollar basis" or "on a percentage basis."

[70]  Weir Declaration, p. 4.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

      d.  Mr. Weir failed to explain how he would overcome common flaws in conjoint analysis and contingent valuation approaches.

      e.  Mr. Weir's proposed approaches would require individualized inquiry and receipts in order to allocate claimed damages to individual putative Class members.

## A.  <u>Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Individualized Factors That Must Be Evaluated To Determine Economic Injury</u>

43.    Mr. Weir acknowledged in deposition testimony that he has "not examined the issue of how to calculate any individual's damages" but claimed that he would not need to do so to "determine the total class-wide damages."[71]  Mr. Weir asserted that "[t]he [claimed] price premium, and economic damages resulting therefrom, exist Class-wide, and can be proven using common evidence."[72]  However, Mr. Weir's proposed determination of a constant (i.e., Class-wide) price premium (or constant percentage price premium) ignores individualized factors that must be evaluated to determine whether and to what extent putative Class members suffered economic injury attributable to the Challenged Claims. As discussed previously, these individualized factors include variations in (a) reasons for purchasing Parkay Spray and (b) prices paid for Parkay Spray, *inter alia*.

      a.  <u>Failure To Account For Diversity In Reasons For Purchase</u>.  Mr. Weir asserted that "[i]ndividual reasons consumers may have for purchasing the Product do not alter this [claimed] price premium, nor do they alter the injury arising from paying that premium."[73]  Contrary to Mr. Weir's assertion, evaluating individual reasons for purchase is essential to determining whether a putative Class member suffered injury and if so, the extent of the injury.

         i.  Mr. Weir's proposed approaches do not address the fact that consumers who purchased Parkay Spray for reasons entirely unrelated to the Challenged Claims suffered no economic loss.  In economic terms, those consumers received the value that was paid for and were not harmed by the Challenged Claims.

---

[71]  Weir Deposition, p. 199.

[72]  Weir Declaration, p. 4.    (Bracketed text added for clarification.)

[73]  Weir Declaration, p. 4.    (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

ii. Mr. Weir's proposed approaches do not address the fact that even for those purchasers who may have experienced harm as a result of the Challenged Claims, the injuries across this group would not be uniform given variations in consumer purchase considerations and the varying weight placed upon the Challenged Claims relative to other product attributes.[74]

b. <u>Failure To Account For Significant Price Variation</u>.    Mr. Weir asserted that "[i]ndividual Class Members have no control over the price of the Product, or the price premium resulting from the Product Claims."[75]    Contrary to Mr. Weir's assertion, many putative Class members likely had various options for purchasing Parkay Spray at a wide range of retail prices, including options to purchase Parkay Spray in various sales channels (e.g., grocery stores vs. mass merchandisers), at various retailers within each sales channel, and at times when discounts or promotional pricing was offered for Parkay Spray (as opposed to purchasing at everyday prices).    The wide range of retail prices paid by putative Class members leads to the necessity of individualized inquiry to evaluate claimed pricing premiums (if any) that may have been paid associated with the Challenged Claims.    Mr. Weir failed to address how his proposed single price premium (or single percentage price premium) calculation for all putative Class members would overcome the hurdle of potential windfall gains to consumers who purchased Parkay Spray from a low-priced retailer and/or at a significant discount, potentially exceeding the claimed constant "price premium."

44.    Given the diversity of reasons for purchase, and given the diversity in prices paid, there would not be a single, Class-wide price differential (or percentage price differential) attributable to the Challenged Claims paid by all putative Class members.    Attempting to identify a uniform claimed price differential (or percentage price differential) on a Class-wide basis would not yield a reliable measure of claimed damages (especially in light of the reasons for individual inquiry expressed previously).

_____

[74] For example, if two purchasers bought Parkay Spray, but one purchaser valued the spray form attribute and the taste more than the "zero fat and zero calories per serving" claims and the other purchaser valued the "zero fat and zero calories per serving" claims above all else, the former putative Class member received greater benefits unrelated to the Challenged Claims than the latter putative Class member.    Mr. Weir's proposed approaches are not capable of differentiating these likely situations across putative Class members.

[75] Weir Declaration, p. 4.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

### B. **Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Variations In Market Conditions Determining Retail Prices**

45.    Mr. Weir attempted to support his assertion of a constant (i.e., Class-wide) claimed price premium by stating that "[t]he price of the Product, and any price premium resulting from the Product Claims is set by the marketplace" and not influenced by individualized factors.[76]    However, Mr. Weir failed to acknowledge in his declaration that there is not a single, aggregate market determining a single retail price of Parkay Spray paid by all putative Class members.    Rather, the market conditions determining retail prices of Parkay Spray vary depending upon a number of factors, resulting in the wide range of retail prices for Parkay Spray demonstrated earlier in my declaration.    Examples of these varying market conditions include differences in consumer preferences, retailer characteristics, and competitive pressures across sales channels, geographic areas, and purchase dates as well as differences in promotional activities or coupon discounts, among other factors.[77]    These varying market conditions influence the extent to which the Challenged Claims may contribute to any claimed price premium for Parkay Spray paid by an individual putative Class member.

---

[76] Weir Declaration, p. 4.

[77] For example, consumer preferences related to the Challenged Claims are likely to vary across individuals.    A study cited in Mr. Weir's declaration found that on average, "fat free" claims were more important among survey respondents at least 45 years of age than among respondents under age 45 and were more important among females than among males.    Mr. Weir's proposed determination of a single Class-wide claimed price premium does not account for the possibility that the Challenged Claims might command a lower price premium (if one exists at all) in states with a lower percentage of residents over age 45 (e.g., California) compared to states with a higher percentage of residents over age 45 (e.g., Florida).    Similarly, Mr. Weir's proposed Class-wide price premium does not account for the possibility that the Challenged Claims might command different price premiums in different sales channels due to differences in the mix of consumers that prefer to shop in each channel (and their respective preferences related to the Challenged Claims).    ("Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis," Drewnowski, A. et al., Public Health Nutrition: 13(5), 688 – 694 at 692.    (Weir Declaration, Exhibit H.)    *See also* "Age and Sex Composition: 2010," 2010 Census Briefs, p. 7.    (http://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf, viewed on October 6, 2014.))

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

46.    Mr. Weir's suggested approach (i.e., attempting to determine a Class-wide claimed price premium) includes no mechanism for evaluating potentially different claimed price premiums associated with the Challenged Claims when Parkay Spray is purchased in different sales channels, in different geographic areas, from different retailers, or at promotional prices.[78]    Moreover, there is nothing in Mr. Weir's proposed analysis that would allow him to determine whether variations in retail prices of Parkay Spray across markets are due to (a) differences in any claimed price premium associated with the Challenged Claims in different markets or (b) differences in factors unrelated to the Challenged Claims (e.g., differences in retailers' costs of serving each market).    Hence, Mr. Weir cannot provide assurances of an economic causal connection (or nexus) between the Challenged Claims and the claimed damages amount Mr. Weir has proposed to calculate as a Class-wide claimed price premium (regardless of whether calculated "on a dollar basis" or "on a percentage basis").

C.    **Mr. Weir's Proposed Approaches At Best Would Measure An Average Willingness To Pay, Not An Actual Price Premium Paid**

47.    Mr. Weir failed to acknowledge that his proposed survey approaches (i.e., conjoint analysis or contingent valuation), at best, would measure his survey participants' average "willingness to pay" for the Challenged Claims, not an actual price premium paid.    Mr. Weir conflated two fundamentally different economic concepts: (a) the amount a consumer might hypothetically be *willing to pay* for a product or feature and (b) the

---

[78]    Although Mr. Weir has suggested that a Class-wide claimed price premium could be calculated "on a percentage basis," Mr. Weir failed to acknowledge there is no reason to assume all putative Class members paid the same claimed percentage price premium for the Challenged Claims in light of the wide variations in retail prices paid by putative Class members and the varying market conditions surrounding different putative Class members' purchases as discussed throughout my declaration.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014

_____

actual price charged for the product or feature in the marketplace.[79]  Basic economic theory dictates that price is determined by the interaction between supply and demand factors.  A consumer's "willingness to pay" for a product or feature does not, alone and without other input, determine observed prices or price premiums.  The difference between a consumer's willingness to pay and the actual price paid is called "consumer surplus" – a universally accepted economic distinction.[80]  Generally, the market price of a product is lower than all but the marginal purchaser's willingness to pay – providing incentives to purchase the product for those consumers with a *higher* willingness to pay (because the actual price they pay is less than the value they place upon the product).[81]  Mr. Weir provided no methodology that would allow him to convert a "willingness to pay" figure (potentially derived from either of his proposed survey approaches) into a claimed price premium (if any) that actually occurred in the marketplace.[82]

48.  Willingness to pay may have little or no systematic relationship with the prices actually charged by retailers and paid by consumers.  The prices actually charged by retailers and

---

[79]  For example, Mr. Weir stated that "[c]ontingent valuation asks people to directly report their <u>willingness to pay</u> to obtain a specified good or product attribute," yet Mr. Weir stated that the "result of the contingent valuation survey … would be a measurement of the <u>price premium</u> attributable to the [Challenged Claims]."  With respect to conjoint analysis, Mr. Weir asserted that "the conjoint results would … be analyzed to determine the <u>price premium</u> attributable to the Product Claims," yet he specified that "[t]he conversion of dollar values will be done using the standard 'dollars per util' method" and cited an article which used that method to estimate consumers' <u>willingness to pay</u> rather than an actual price premium paid.  (Weir Declaration, pp. 12 – 14.  (Emphasis added.  Bracketed text added for clarification.)  *See also* "Note on Conjoint Analysis," Hauser, John R., pp. 3 – 4.  (Weir Declaration, Exhibit I.))

[80]  *See, e.g.*, Jeffrey M. Perloff, <u>Microeconomics</u> (5th Edition), p. 272.

[81]  Market conditions ultimately determine the price of a product.

[82]  The "dollars per util" method mentioned in Mr. Weir's description of his proposed conjoint analysis represents one approach to converting certain regression results into measures of consumers' *willingness to pay*, not an actual price premium.  *See, e.g.*, "Note on Conjoint Analysis," Hauser, John R., pp. 3 – 4.  (Weir Declaration, Exhibit I.)  According to the article cited by Mr. Weir and reference herein, "[t]he goal of conjoint analysis is to determine how much each feature contributes to overall preference.  This contribution is called the 'partworth' of the feature."  Partworth values can be denoted in "utils" and can be estimated using regression analysis.  The article discusses using certain regression results to "compute the consumer's willingness to pay (WTP) for each feature."

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

paid by consumers depend upon a combination of demand and supply factors (in addition

to consumer preferences and hypothetical perceptions of value for a particular feature).

Other economic factors that might influence prices (and therefore price premiums)

include:

   a.  the value of other features or attributes provided in the same product (including
       features or attributes not tested in the proposed survey);

   b.  features and prices of other products that consumers might choose as alternatives;

   c.  costs of production and distribution;[83]

   d.  practical pricing considerations, including interactions with other products that may
       be offered by the same manufacturer; and/or

   e.  other strategic considerations that can affect the pricing decisions of manufacturers
       and retailers (including the pricing associated with competing products).

49.    Mr. Weir's proposed survey approaches would measure only a hypothetical willingness

to pay even if performed in a manner that avoids the many potential biases and

uncertainties involved in designing and implementing consumer surveys of this type.

Mr. Weir's proposed analysis fails to take into account supply considerations and/or other

market forces that may be present.  Various forms of margarine and spreads are sold

with a variety of attributes (e.g., taste, form, and nutrition claims) and by a variety of

competitors.   In this context, there may be no nexus between (a) some consumers'

hypothetical willingness to pay for a given attribute of a multi-featured product and (b) a

manufacturer's or retailer's ability to charge an actual price premium or the market's

actual placement of a price premium on that specific product attribute.   Hence, any

_____

[83]  I understand that wholesale prices for Parkay Spray and Parkay Squeeze (which is not labeled or marketed with
the Challenged Claims) are higher on a per-ounce basis than wholesale prices of other Parkay spread products.   Mr.
Sears (Vice President and General Manager, ConAgra Foods, Inc.) testified that the higher prices per ounce that
ConAgra charges for Parkay Spray and Parkay Squeeze are due to those products being relatively low volume
products for ConAgra and are necessary for ConAgra to "cover cost[s]."   (Sears Deposition, pp. 23 – 24.)

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014

_____

claimed "willingness to pay" derived by Mr. Weir from a conjoint analysis or contingent

valuation is likely to have little or no correlation with any <u>actual</u> premium observed in the

market associated with the Challenged Claims.

### D. Mr. Weir Failed To Explain How He Would Overcome Common Flaws In His Proposed Conjoint Analysis And Contingent Valuation Approaches

50. Mr. Weir's descriptions of his proposed survey approaches overlook many known

challenges in performing conjoint analysis and/or contingent valuation, including at least

the following potential drawbacks that Mr. Weir failed to acknowledge or explain how he

would overcome.

   a. Mr. Weir's proposed survey approaches are likely to overstate consumers' willingness to pay for the Challenged Claims, let alone an actual price premium paid.

   b. Mr. Weir's proposed survey approaches draw attention to features that may not be considered by consumers when making actual purchase decisions.

   c. Mr. Weir's proposed survey approaches cannot provide a value for the Challenged Claims tied to the putative Class period (which extends over many years).

   d. Mr. Weir's proposed contingent valuation approach requires reliable reference surveys or preapproval of a proposed survey design, which Mr. Weir has not provided or addressed.

51. From an economic and claimed damages perspective, in light of these drawbacks

associated with Mr. Weir's proposed conjoint analysis and contingent valuation

approaches and because Mr. Weir has not offered pilot surveys, conducted any pretesting

related to his proposed surveys, or provided any fully developed economic models for

evaluation, there can be no assurances that Mr. Weir's proposed survey approaches could

reliably isolate a claimed "willingness to pay" for the Challenged Claims, let alone an

actual price premium paid.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

1.  **Proposed Survey Approaches Are Likely To Overstate Consumers' Willingness To Pay For The Challenged Claims, Let Alone An Actual Price Premium Paid**

52.    Each of Mr. Weir's proposed survey approaches are likely to overstate consumers' willingness to pay for the Challenged Claims (let alone an actual price premium paid), as explained below.

i.  **Conjoint Analysis**

53.    Deriving an average "willingness to pay" for a given product attribute from the results of conjoint analysis involves comparing that attribute's effect on survey respondents' product choices with the effect of price on product choices.   However, various methods of conjoint analysis can underestimate how sensitive consumers are to price differences.   As a result, Mr. Weir's proposed conjoint analysis approach is likely to yield overstated and unreliable estimates of consumers' average willingness to pay for various product attributes, including the Challenged Claims.[84]    Mr. Weir has not addressed how he would overcome this common drawback to his proposed conjoint analysis approach.   Moreover, as discussed previously, even if Mr. Weir were able to accurately measure price sensitivity and willingness to pay for the Challenged Claims (which he has not

_____

[84]  "Chapter 9: Interpreting the Results of Conjoint Analysis," Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Orme, B. Second Edition, pp. 85 – 86.   This chapter is available as a Sawtooth Software technical paper.   (http://www.sawtoothsoftware.com/download/techpap/interpca.pdf, viewed on September 11, 2014.)   In his declaration, Mr. Weir cited Sawtooth Software technical papers generally and this book in particular.   (Weir Declaration, p. 8.)   The chapter referenced herein states, "[s]ome conjoint methods … tend to understate people's price sensitivity.   This can result in inflated willingness to pay values."   The chapter further describes certain methods of assigning monetary values to the results of conjoint analysis as "potentially misleading" and discourages the use of such methods.   The chapter states, "some approaches to converting utilities to dollar equivalents are flawed" and "[e]ven when computed reasonably, the results often seem to defy commonly held beliefs about prices."

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

demonstrated), Mr. Weir failed to provide a methodology for deriving an <u>actual price premium paid</u> (if any) from his estimates of average "willingness to pay."[85]

### ii. Contingent Valuation

54.     Regarding his proposed contingent valuation approach, Mr. Weir stated that in the 1990s, "a panel of Nobel prize winning economists was convened to review the use of contingent valuation and to provide a set of guidelines for use in conducting contingent valuation studies" in a report issued "under the auspices of NOAA" (i.e., the National Oceanic and Atmospheric Administration).[86]   Mr. Weir failed to acknowledge in his declaration that based upon the NOAA panel's review of academic studies relating to contingent valuation, the panel determined that "[t]hese studies suggest that the CV [contingent valuation] technique is likely to overstate 'real' willingness to pay."[87]   Mr. Weir failed to explain how he would ensure that his proposed contingent valuation approach would avoid this drawback (especially in light of the concerns raised by the NOAA panel).    Hence, Mr. Weir has not provided assurances that his proposed contingent valuation approach can accurately measure consumers' willingness to pay for the Challenged Claims, let alone an actual price premium paid (if any).

---

[85]   According to the same book cited by Mr. Weir as noted above, "[e]ven when accurate price sensitivity has been estimated for each individual, an examination of average values will often reveal that respondents are willing to pay much more for one feature over another than is suggested by market prices."   ("Chapter 9: Interpreting the Results of Conjoint Analysis," Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Orme, B. Second Edition, p. 86.)

[86]   Weir Declaration, p. 13.   *See also* "Report of the NOAA Panel on Contingent Valuation," Arrow, K. et al., dated January 11, 1993 ("NOAA Panel Report").   (http://www.darrp noaa.gov/economics/pdf/cvblue.pdf, viewed on September 15, 2014.)

[87]   NOAA Panel Report, pp. 7 – 8.   (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

**2.   Proposed Survey Approaches Draw Attention To Features That May Not
Be Considered By Customers When Making Actual Purchase Decisions**

55.    Mr. Weir's proposed survey techniques (i.e., conjoint analysis and contingent valuation)
would draw attention to the features used in the survey exercise (e.g., the Challenged
Claims) at the expense of features not included in the survey.   A survey necessarily
places emphasis on product attributes that consumers may or may not place emphasis on
while shopping.   By drawing additional attention to the Challenged Claims, Mr. Weir's
proposed survey approaches run the risk of assigning a larger value to the feature(s) than
that which would be actually observed in the marketplace.   Presented with a description
of the Challenged Claims in a survey, respondents may ascribe more value to the
Challenged Claims than they would when making actual purchase decisions.[88]   Mr. Weir
did not address how he will overcome this drawback.

**3.   Proposed Survey Approaches Cannot Provide A Value Tied To The
Putative Class Period**

56.    Survey techniques such as conjoint analysis and contingent valuation generally measure
the value of product attributes at the point in time of the survey and cannot easily
determine the value of attributes in the past.   Hence, any average willingness to pay that
Mr. Weir might calculate through his proposed survey approaches would be based upon
tastes and preferences that exist at the time his proposed survey is performed (i.e., at
some time in the future).   However, the putative Class Period began nearly six years ago
in March 2009.   There are no assurances that the average willingness to pay Mr. Weir
proposes to calculate at some point in the future would be representative of (or correlated

_____

[88]   In a store environment (when an actual purchase is being considered), the consumer chooses the product
attributes upon which to focus; in a survey environment, the consumer is told the product attributes upon which to
focus.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

with) putative Class Members' willingness to pay associated with the Challenged Claims (let alone an actual price premium paid, if any existed) nearly seven years prior to Mr. Weir's proposed survey.[89]

### 4. Lack Of Reliable Reference Surveys Or Agreement On Survey Design

57.    The NOAA panel concluded regarding contingent valuation approaches that "[u]ntil such time as there is a set of reliable reference surveys, the burden of proof must rest on the survey designers.  They must show through pretesting or other experiments that their survey does not suffer from the problems that these [NOAA panel] guidelines are intended to avoid."[90]   Mr. Weir has not indicated that he is drawing from a set of reliable reference surveys relevant to his proposed analysis.   Nor has Mr. Weir presented results from pretesting or other experiments.   Additionally, the NOAA panel recommended that "[s]ince the design of the CV survey can have a substantial effect on the responses, it is desirable that -- if possible -- critical features be preapproved by both sides in a legal action, with arbitration and/or experiments used when disagreements cannot be resolved by the parties themselves."[91]   To my knowledge, Mr. Weir has not sought preapproval from both parties for any features of his proposed survey.

### E. Allocation Of Claimed Damages Measures To Individual Putative Class Members Would Require Individualized Inquiry And Receipts

58.    In order to allocate claimed damages to individual putative Class members, Mr. Weir's proposed approaches not only require individualized inquiry to determine the amount of

---

[89]  In addition, Mr. Weir has not addressed whether and/or how he would ensure that the sample of respondents for his proposed surveys would be appropriately representative of the putative multi-state Class, which comprises members who reside in 31 different states, who are likely to shop in a variety of different sales channels and at a variety of retailers, and who are likely to have a variety of reasons for purchasing Parkay Spray.

[90]  NOAA Panel Report, p. 37.    (Bracketed text added for clarification.)

[91]  NOAA Panel Report, pp. 36 – 37.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

claimed damages associated with each putative Class member's purchases, but also are

complicated by a lack of receipts.

a. Awarding a claimed price premium "on a dollar basis" would require information on
at least the <u>quantity</u> of Parkay Spray each putative Class member purchased. This
information is not likely to be available.

b. Awarding a claimed price premium "on a percentage basis" would require an even
greater amount of information from each putative Class member (i.e., both the
<u>purchase price(s)</u> and <u>quantities</u> of Parkay Spray each putative Class member
purchased).

c. To the extent that Mr. Weir may attempt to determine different claimed price
premiums across the various factors affecting retail prices (and consequently any
claimed price premiums) discussed throughout my declaration, information also
would be required on sales channel, geography, retailer, time of purchase, and
promotional discounts applicable to each purchase of Parkay Spray. None of this
information is likely available.

## IX. THE DISGORGEMENT MEASURES SPECIFIED BY MR. WEIR DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS

59.   In the alternative to a claimed price premium approach, Mr. Weir opined that he would

be able to calculate certain disgorgement measures on a Class-wide basis using common

evidence should the Court prescribe such a measure, including disgorgement of "full

retail price paid," "wholesale revenues," or ConAgra's "profits from the sale" of Parkay

Spray.[92]   However, the disgorgement measures specified by Mr. Weir do not provide a

reliable or relevant measure of economic injury (if any) suffered by putative Class

members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

_____

[92] Weir Declaration, p. 3.   Mr. Weir opined that "the calculation of 'price premium' damages … is an
economically sound method of providing restitution to Class members," but he did not offer a similar opinion
regarding the disgorgement measures he discussed in his declaration.   Rather, Mr. Weir stated that he understood
"legal considerations may affect the chosen method for determining damages in this case."   Hence, it appears that
Mr. Weir does not endorse the use of these disgorgement measures as a basis for calculating claimed damages in this
matter (unless so instructed by the Court).

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

60.   <u>No Adjustment For Value Received By Consumers</u>.   The disgorgement measures

discussed by Mr. Weir do not appropriately take into account the value received by each

putative Class member from the purchase and use of Parkay Spray.   With respect to a

full refund of purchase price paid, accurately assessing economic injury suffered by a

consumer purchasing the Challenged Product requires that Mr. Weir deduct from the

purchase price the value actually received by the consumer.   A similar deduction would

be required from wholesale revenues or ConAgra's profits from the sale of Parkay Spray.

The disgorgement measures specified by Mr. Weir cannot yield a reliable or relevant

estimate of the harm (if any) suffered by a putative Class member as those measures

aggregate the total revenues or profits associated with Parkay Spray without apportioning

(i.e., isolating) the amount attributable to the Challenged Claims or without apportioning

(i.e., separating out) the benefits a putative Class member actually received.[93]

61.   <u>Total Sales And/Or Profits Were Not Caused By The Challenged Claims</u>.   Measuring the

claimed damages suffered by putative Class members requires identifying the economic

losses that are attributable to the alleged wrongful conduct.   Simply aggregating total

retail sales, wholesale revenues, or ConAgra's profits represents a mathematical

---

[93]  Additional considerations also are present with an evaluation of a claimed disgorgement of profits remedy.   Mr. Weir stated in his declaration:

> ConAgra has already provided data relating to its wholesale revenues and profits from the sale of Products, information necessary to determine total units of the Product sold, and market research data that provides detailed information about the retail sales of Products.   Information of this sort would be sufficient to calculate damages under such alternative methodologies.   (Weir Declaration, pp. 3 – 4.)

Mr. Weir provided no description of how he would analyze the profitability data provided by ConAgra and whether it would be appropriate to make adjustments to such data.   While certain ConAgra documents provide Product Contribution Margin data (e.g., PTF000061 – 62), Mr. Weir provided no discussion of this data.   These documents provide a profitability calculation by subtracting Product Cost, Transportation & Warehousing, and Advertising & Promotion expenses from Net Sales.   (*See* footnote D to Parkay Spray P&L Summary, PTF000061.)   Mr. Weir did not discuss this document and whether it would be appropriate to deduct additional "infrastructure" or "common" costs that are indirectly related to Parkay Spray but none-the-less provide corporate support for the provision of the product to the marketplace.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

calculation, but not an approach for measuring claimed economic injury (or a claimed damages calculation). If putative Class members chose to purchase Parkay Spray based upon considerations unrelated to the Challenged Claims, they did not suffer harm because of the Challenged Claims. There would be no correlation between the disgorgement calculations discussed by Mr. Weir and any claimed economic injury attributable to the Challenged Claims (or suffered by putative Class members).

62.  <u>Allocation Of Disgorgement Measures Would Require Individual Inquiry And Receipts</u>. Mr. Weir discussed calculating each disgorgement measure based upon aggregated data regarding either total retail sales, wholesale revenues, or ConAgra's profits associated with Parkay Spray. However, Mr. Weir has not provided a mechanism for allocating to individual putative Class members the portion of those measures associated with each individual Class member's purchase(s).[94]  Any such allocation of the disgorgement measures specified by Mr. Weir would require individual inquiry for at least the following reasons.

a.  <u>Putative Class Members Purchased The Challenged Product At Different Prices</u>.  As discussed throughout my declaration, there are significant variations in the prices paid by individual putative Class members based upon a number of factors including geographic location, sales channel, time period, and whether the product was purchased on promotion or at an everyday price.  Hence, there is no single "purchase price paid" that Mr. Weir could use to evaluate claimed damages for all putative Class members on a Class-wide basis or to allocate aggregated disgorgement measures to individual putative Class members.  Mr. Weir failed to acknowledge in his declaration that *any* type of allocation methodology divorced from actual individual purchase patterns will over-compensate some Class members and under-compensate other Class members.

_____

[94] For example, the Weir Declaration does not state whether two putative Class members who purchased Parkay Spray at different purchase prices (a) have suffered identical claimed damages under the specified disgorgement approaches and (b) would warrant some as-yet-unspecified proportional distribution of the aggregate retail sales, wholesale revenue, or profit disgorgement measures.

Declaration of Keith R. Ugone, Ph.D.
October 10, 2014
_____

   b. <u>Putative Class Members Likely Do Not Have Proof Of Purchases</u>. To the extent that the disgorgement measures discussed by Mr. Weir would require each consumer to provide proof of purchase, individual inquiry would be necessary to obtain information relating to the purchase price paid and the quantity of Parkay Spray purchased by each putative Class member. Further complicating any attempt to use such measures is the fact that many putative Class members likely did not retain receipts relating to their purchases of Parkay Spray. Hence, any approach to allocating total retail sales, wholesale revenues, or profits among putative Class members is unlikely to be correlated with actual prices paid or quantity purchased.

63. Based upon the above considerations, the disgorgement approaches discussed in the Weir Declaration are not reliable or relevant to calculating claimed damages in this matter on a Class-wide basis. As discussed throughout my declaration, evaluating the claimed economic loss suffered by each putative Class member requires individualized inquiry into the circumstances of each putative Class member's purchase.

* * * * * *

64. My analyses, observations, and opinions contained in this declaration are based upon information available to date. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

   I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

   Executed in Dallas, Texas on October 10, 2014.

_____
Keith R. Ugone, Ph.D.

**Exhibit 1**



Main 1 214 523 1400    Fax 1 214 523 1401    www.analysisgroup.com

2911 Turtle Creek Boulevard    Suite 600    Dallas, TX    75219

## KEITH R. UGONE, PH.D.
**Managing Principal**
Phone: (214) 523-1405
keith.ugone@analysisgroup.com

Dr. Keith R. Ugone has provided economic and damages consulting services in antitrust cases, breach of contract cases, business interruption cases, employment / loss of earnings cases, intellectual property cases, lender liability cases, professional negligence cases, and securities-related cases, among others. He specializes in the application of economic principles to complex business disputes and is generally retained in cases requiring economic analyses and/or damages-related analyses. Damage models constructed or evaluated by Dr. Ugone have had as components revenue analyses, lost sales analyses, cost analyses, assessments of the capacity to produce additional units, assessments of profitability, the competitive business environment in which the damages claim was being made, claimed lost profits, claimed lost business value, and claimed reasonable royalties. During the course of Dr. Ugone's career, he has frequently evaluated lost profits and valuation-related damages using large databases of information and complex computer models. Dr. Ugone also has performed economic liability analyses in antitrust matters including defining relevant markets, assessing market power, and evaluating alleged anticompetitive behavior. Dr. Ugone has testified at trial and in deposition over 300 times.

Dr. Ugone has a PhD in Economics from Arizona State University, an MA in Economics from the University of Southern California, and a BA in Economics from the University of Notre Dame. Subject areas of expertise include microeconomics, macroeconomics, industrial organization, antitrust/regulation, and econometrics. He is a member of the American Economic Association, the American Statistical Association, the National Association of Forensic Economists, and the Western Economics Association.

## EDUCATION

| | |
|---|---|
| 1983 | Ph.D., Economics, Arizona State University. |
| 1979 | M.A., Economics, University of Southern California. |
| 1977 | B.A., Economics, University of Notre Dame. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 - Present | Analysis Group, Dallas, Texas – Managing Principal. |
| 1985 – 2003 | PricewaterhouseCoopers LLP (and legacy firms) – Partner (Principal) 1992 – 2003; Senior Manager 1989 – 1992; Manager 1987 – 1989; Senior Consultant 1985 – 1987. Member of United States Admissions Committee (2003). Chairman of PricewaterhouseCoopers Intellectual Property Leadership Forum (2000 – 2003). |
| 1983 – 1985 | California State University, Northridge - Assistant Professor/Lecturer in Department of Economics, Full-time: 1983 – 1985, Part-time: 1986 – 1992. |
| 1979 – 1983 | Arizona State University - Faculty Associate/Teaching Assistant in Department of Economics. |
| 1977 – 1979 | Jet Propulsion Laboratory - Economic/Energy Analyst. |

**PROFESSIONAL AND BUSINESS AFFILIATIONS**

American Economic Association
American Statistical Association
National Association of Forensic Economists
Western Economics Association

**SELECTED LITIGATION CONSULTING EXPERIENCE (by Nature of Suit)**

<u>Securities:  10b-5 / Section 11 Cases</u>

- Evaluated the economic damages being asserted by shareholders and debt holders of a bankrupt energy trading company against a brokerage firm.  Plaintiffs alleged the brokerage firm recommended the stock and debt securities associated with the company even though it knew or should have known the deteriorating pre-bankruptcy financial condition of the company.  Analyzed the trading patterns of the brokerage account customers and the stock price movements of the company upon issuance of analyst reports, and researched confounding events contributing to investors' trading of the securities-in-question.  Demonstrated an economic causal link did not exist between the alleged wrongful conduct and the claimed trading patterns.  Also evaluated the event study conducted by Plaintiffs' damages expert and the claimed inflation component embedded in the company's stock price.  Demonstrated Plaintiffs' damages expert failed to remove the economic impact of confounding events.  Performed an alternative damages evaluation.

- Evaluated shareholder and debt holder claimed damages against a major accounting firm relating to the issuance of allegedly false and misleading financial statements that did not identify certain assets of a communications company as impaired.  Researched industry reports and analyst reports regarding the company's common stock and debt securities, evaluated an event study conducted by Plaintiff's damages expert, analyzed loss causation in accordance with *Dura*, studied the company's stock price movements before and during the claimed class period, and analyzed the company's stock price movement on the day of the alleged corrective disclosure.  Demonstrated Plaintiffs' event study did not appropriately isolate the stock price movement associated solely with the alleged corrective disclosure as confounding events were not removed from the analysis.  Performed an alternative damages calculation.

- Evaluated Plaintiffs' damages claim in a shareholder suit relating to the manufacturer of decoding equipment used in the wireless cable industry.  Analysis demonstrated Plaintiffs' financial expert did not consider market speculation related to the wireless cable industry or Defendant's higher-than-expected earnings when calculating claimed damages.  Additional errors included aggregating into claimed damages stock price increases unrelated to Plaintiffs' allegations and on "no announcement days".

- Evaluated damages claim against a major investment banking/underwriting firm relating to an aborted initial public offering in the temporary staffing industry.  Analysis demonstrated methodological and conceptual errors in Plaintiff's econometrically-based claim that the projected post-IPO stock price of the company justified proceeding with the IPO.  Also evaluated various components of Plaintiff's damages claim, including the profitability of Plaintiff's business, projected use of funds raised, ownership percentages in the company, and the funds that would have inured to the original owners of the company.

- Evaluated Plaintiffs' damages claim in a shareholder suit involving an international airline carrier.  At issue were alleged misrepresentations concerning the airline's ability to reduce its maintenance costs.  Demonstrated that the fifty percent decline in the company's stock price over a one-month period was for reasons unrelated to corrective disclosures concerning maintenance costs.  Also reconstructed Plaintiffs' trading history, comparing the trading pattern to public announcements concerning the airline, and demonstrating a trading pattern inconsistent with Plaintiffs' theory of reliance on the alleged misrepresentations.

- General Overview.  Performed an "event study" and/or evaluated claimed damages in various securities litigation cases involving firms in industries such as:  airlines, biotechnology, computer software, commodities, banking, real estate development, life insurance, entertainment, communications, energy trading, investment banking, computer printers, health care, medical equipment, hotels, non-traditional automotive insurance, information technology services, workmen's compensation insurance, computer hardware, camera and photo finishing, intelligent disk drives, market research, trucking, temporary staffing, real estate investment trusts, computer networking, specialty stores, skilled nursing facilities, wireless cable encoding devices, the provision of software computer services to insurance companies, and the provision of professional services to power plants and large scale industrial facilities.  Analyses included development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price.  Company-specific events often included unfavorable news announcements unrelated to the alleged misrepresentations and the ending of potential takeover bids.  Also involved was a comparison of the firm's actual stock price to its "true value" line, the construction of a matrix to track ins-and-outs traders and retention shareholders, and an evaluation of damages under Section 10b-5 and Section 11 claims.

## Securities:  Merger/Takeover Related Cases

- Evaluated claimed damages against a major accounting firm by a transportation company that acquired another transportation company in alleged reliance upon the audited financial statements of the acquired company and its Mexican subsidiary.  Plaintiff wrote down its investment in the Mexican subsidiary after the acquisition and based its damages claim on a subsequent decline in its stock price.  Analyses included researching competing transportation companies, considerations associated with consummating the merger, analyst reports regarding the merger announcement and the investment write-down announcement, and earnings announcements from comparable companies.  Demonstrated Plaintiff's damages expert did not establish an economic causal link between the alleged wrongful conduct of the Defendant and the claimed economic damages suffered by the Plaintiff and that confounding events were not taken into account appropriately.

- Evaluated Plaintiffs' damages claim relating to a merger in the banking industry.  At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed.  Analyzed whether the complained of events were related to conditions and circumstances in the banking industry.  Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities.  Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance relative to projections.  Also at issue was whether a material adverse change had occurred in the target company's operations and business.  Lost profit damages, interest-related damages, lost contract fees, and diminution-in-value damages were evaluated.

- Evaluated Plaintiffs' damages claim in a merger/acquisition-for-stock litigation in the information technology services industry.  At issue was whether material adverse changes had occurred in the business condition of the acquiring company prior to the closing of the merger.  Damages issues included investigating the nature of the agreed upon warranties and representations contained in the merger agreement, the stock price performance of similarly-situated firms, the length of the alleged damages period, the appropriate length of certain event windows, industry downturns, and the failure to account for the proper mitigation of damages.

- Analyzed a major entertainment company's stock price movement to determine the takeover premium paid by an acquiring company.  Involved was quantifying the impact of takeover rumors prior to the takeover announcement to isolate that portion of the company's pre-acquisition increase in stock price due to takeover speculation as opposed to general industry trends.

- Served as financial advisor to a Special Litigation Committee ("SLC") investigating a shareholder approved merger vote in the telecommunications industry. The merger was not consummated, but the vote triggered the acceleration of vesting of options owned by the officers and directors of the target company. Assisted the SLC in analyzing the acceleration of options and various alternative settlement strategies.

## Securities/Commodities: Other Cases

- Evaluated Plaintiff's claimed lost enterprise value damages relating to Defendants' allegedly fraudulent conduct resulting in an artificial acceleration of income, restatement of income, and ultimate bankruptcy of a food distribution company. Analyses included isolating the dollar magnitude of the alleged artificial acceleration of income allegedly created by Defendant's actions compared to other artificial accelerations of income, an assessment of alternative reasons for Plaintiff's business decline and ultimate bankruptcy, and evaluation of Plaintiff's valuation approaches.

- Evaluated the spot price of a base metal in a major commodities-related market manipulation matter. Developed an econometric model to explain the spot price movements of the base metal in an un-impacted period. Used the econometric model to evaluate what the spot price of the base metal would have been in the absence of the alleged manipulation.

- Calculated short-swing trading profits under Section 16(b) of the Securities Exchange Act of 1934 relating to the stock trading activities of an officer of a long distance telecommunications company. Issues analyzed included allocating stock purchases to stock sales of differing numbers of shares and accounting for a 3-for-1 reverse stock split during the period under consideration.

- Evaluated damages in an alleged lack of suitability, lack of supervision, and failure to execute matter in the securities industry. At issue was an investment strategy of selling short the same stock in which a restricted long position was also held. Demonstrated errors in Plaintiff's damages claim, including the failure to recognize that the financial objectives stated at the time of the development of the investment strategy were in fact met.

- Evaluated the stock price performance of a major distiller over a forty-year period. At issue was whether a portion of the increase in the stock price could be attributed to the efforts of one senior official in the corporation. Company-specific, industry-specific, and economy-wide factors were investigated to determine the reasons for the stock price performance of the distilling company.

## Antitrust: Monopolization/Attempted Monopolization Cases

- Evaluated claimed antitrust damages asserted by a major airline company against a global distribution system ("GDS") operator for alleged anticompetitive behavior relating to the provision of booking services to travel agencies. Evaluated Plaintiff's claimed damages relating to claimed lost profits resulting from the Defendant's alleged actions to impede the rollout of a competing technology for booking services, contractual restrictions allegedly preventing the airline from offering targeted discounts to price-sensitive customers, allegedly imposing retaliatory booking fee increases, and allegedly biasing fare search results displayed to travel agencies.

- Analyzed Plaintiff's allegations that Defendant monopolized or attempted to monopolize the market for magnetic brakes for amusement park rides. Evaluated Plaintiff's assessment of the relevant product market, allegations of market power, and the impact of Defendant's alleged anti-competitive conduct. Also evaluated claimed damages, including assumptions underlying Plaintiff's claimed damages model and economic causal connection between the alleged wrongful conduct and claimed losses. Determined that Plaintiff's expert failed to account for alternative explanations for Plaintiff's claimed losses. Also demonstrated that Plaintiff's expert made inappropriate assumptions regarding growth in the claimed relevant product market and whether Plaintiff was damaged in perpetuity.

- Evaluated Plaintiff's economic liability arguments in an antitrust matter relating to a restriction on the registration of cloned American Quarter Horses with the American Quarter Horse Association. Evaluated Plaintiff's expert's theoretical economic model. Demonstrated that there was no economic harm to the market as a result of the at-issue registration restriction. Also identified numerous flaws in Plaintiff's expert's assumptions regarding the supply and demand of high quality American Quarter horses (including excess breeding capacity). Evaluated Plaintiff's damages claim relating to lost sales of cloned American Quarter horses and lost breeding opportunities.

- Evaluated the claimed anticompetitive impact of an alleged conspiracy by a major oil and gas exploration company to monopolize the market for Helicopter Underwater Egress Training ("HUET"). Evaluated the relevant product and geographic markets and the alleged market power of the Defendant. Demonstrated that the Defendant lacked the market power necessary to monopolize the relevant market. Also demonstrated the flaws in Plaintiffs' damages claim, including but not limited to, loss of Plaintiffs' market share for reasons other than the alleged anticompetitive acts (e.g., self-imposed price increases and the loss of a large customer unrelated to the alleged wrongful conduct), failure to take into account the general economic downturn in the U.S. economy during the relevant period, the use of an inappropriate discount rate for quantifying claimed future damages, and the use of an inappropriate assumption relating to future claimed market shares in the absence of the alleged wrongful conduct.

- Evaluated the competitive impact of certain covenants not to compete associated with restricted stock unit awards issued to operations management employees by a major dairy processor. Evaluated the relevant product and geographic markets. Concluded that the covenants not to compete were overly broad and restrictive, outweighing any precompetitive benefits associated with the covenants. Concluded that the covenants did not contain reasonable limitations as to time frame and scope of activity. The covenants effectively restricted competition and raised rivals' costs in the relevant market.

- Evaluated Plaintiff's damages claim associated with the assertion that certain freight forwarders engaged in bid rigging, price fixing, group boycott, and illegal tying arrangements in a traffic channel for transporting military household goods. Demonstrated the flaws in Plaintiff's damages claim, including but not limited to, declines in revenues and profits prior to the alleged conspiracy period, alternative reasons for the Plaintiff's poor performance during the claimed damages period (e.g., the closing of military bases and increased competition in one leg of the channel), and the use of an inappropriate benchmark period for quantifying claimed damages.

- Evaluated the anticompetitive impact of an alleged conspiracy between a distributor and manufacturer whereby the manufacturer refused to ship certain aftermarket automotive exhaust systems and catalytic converters to a competing distributor in Washington and Oregon. Analyses included evaluating the relevant product and geographic markets for aftermarket automotive exhaust products and the damages suffered by the competing distributor. Also evaluated the competing distributor's direct and indirect price discrimination claims (including differential discounts in areas where shipments did occur) and associated claimed damages.

- Analyzed various monopolization allegations in an antitrust counterclaim to a patent infringement matter in the home lighting control systems industry. Analyzed the trade practices of the home lighting control system manufacturers (e.g., sales channels, advertising and promotion, etc.), product and geographical markets, and the potential substitutes to the products at issue. Analyses demonstrated counterclaim Defendant did not possess the ability to monopolize the relevant market for home lighting control products given the channels through which manufacturers made sales and the availability of close substitute products.

- Evaluated Plaintiff's economic liability arguments in an antitrust counterclaim relating to a supply agreement for an ingredient (i.e., larch arabinogalactan) contained in certain patented dietary and nutritional supplements for the promotion and maintenance of good health. Concluded that (a) the sales agreement in question did not constitute an unreasonable restraint on trade, (b) the Defendant did not possess monopoly power, and (c) the Defendant did not engaged in anticompetitive behavior in any properly defined relevant market. Observed that the prices of dietary supplements containing arabinogalactan did not increase since the signing of the sales agreement, the output of dietary supplements containing arabinogalactan did not decline since the signing of the sales agreement, (c) the capacity to produce additional arabinogalactan had been increasing, and (d) Plaintiff did not face a dangerous probability of being harmed by the supply agreement.

- Evaluated claimed antitrust damages asserted by the holder of certain common packet channel ("CPCH") technology patents against a group of handheld mobile device hardware and infrastructure manufacturers for an alleged conspiracy to deprive the patent holder of the value of its patented technology in the third generation partnership project ("3GPP"). The patent holder's technology had been removed as an optional standard. Damages-related analyses included conducting a *Georgia-Pacific* analysis and analyzing the licenses identified by Plaintiff's expert as comparable to the patents at issue. Also determined that Plaintiff's expert had not established an economic causal link between the alleged wrongful conduct and the damages being claimed.

- Evaluated the claimed anticompetitive activities of Defendant hospital's alleged exclusionary arrangements and practices relating to managed care contracts. Evaluated the relevant antitrust markets (product and geographic) for primary care services provided by physicians to managed care-covered patients in Smith County, Texas. Also evaluated the volume of commerce impacted by the claimed exclusionary practices and the impact of these claimed exclusionary practices on competition in the relevant markets. In addition, evaluated the economic damages suffered by the Plaintiff hospital as a result of Defendant's alleged anticompetitive activities.

- Evaluated Plaintiff's claim of antitrust injury in the markets for orthodontic brackets and orthodontic services allegedly due to the advertising guidelines promulgated by a national orthodontic trade association. Analysis demonstrated the advertising guidelines were efficiency enhancing (by lowering consumer search costs), promoted competition, and did not stifle innovation in the relevant markets. Also empirically demonstrated that legitimate advertising through a variety of media was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise values in a carbonated soft drink antitrust litigation. Defendants allegedly entered into a series of anti-competitive marketing agreements with retailers relative to the promotion and sale of national brand carbonated beverages. Analysis demonstrated Plaintiffs' expert did not take into account the brand composition of Plaintiffs' case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from the distributors' parent company.

- Analyzed the impact of a proposed merger of two insurance companies on the long term care and medicare supplement insurance markets in the state of Oklahoma. Evaluated whether the merger would substantially lessen competition or have a tendency to create a monopoly. Evaluated the number of competitors, the reasonable interchangeability of the insurance products offered, insurance company sizes, ease of entry, the impact of regulation, and the ability of consumers to acquire price information in a low-cost manner.

- Analyzed the alleged anticompetitive impact of an exclusive provider arrangement between a hospital and a group of anesthesiologists on the market for anesthesia services. Analyses included determining inpatient services market shares, anesthesia procedures market shares, and recent entry into the hospital service area. Also evaluated the damages claims being alleged by a group of Certified Registered Nurse Anesthetists.

- Conducted an economic analysis in a vertical non-price (advertising) restraint antitrust case dealing with tennis ball throwing machines. Analysis demonstrated the pro-competitive nature of the advertising restraint and that the termination of a non-complying dealer did not substantially reduce competition in the relevant market.

- <u>General Overview</u>. Provided economic analyses and developed damages models and/or critiqued the opposition's damages models in various antitrust cases involving the following industries and/or markets: anesthesia services, printed circuit boards, nutritional supplements, carbonated soft drinks, aftermarket automotive exhaust systems, telecommunications switching equipment, dairy processing, radio control model airplanes, local area networks, entertainment lighting, integrated casino bonusing software, home lighting control systems, medicare supplement/long term care insurance, commercial air conditioning units, disposable dust/mist respirators, immunodiagnostic tests, in-patient hospital services and managed care contracts, PBX systems, military freight forwarding, underground storage tanks, long distance telephone lines, tennis ball throwing machines, check processing readers/sorters, local television advertising, personal watercraft, automobile refinishing paint, Christian music, subsea horizontal extraction wells, orthodontic braces, DRAM microcomputer chips, women's designer clothes, single point of contact telecommunication services, non-prescription reading glasses, and the provision of temporary electrical services to convention centers. Damages models were constructed or critiqued that involved lost sales analyses, incremental cost analyses, and assessments of capacity increases. Also investigated were economic forces external to the company that may have impacted the company's performance. Economic analyses included defining the relevant market, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of competition in a particular market.

## Antitrust: Price Fixing Cases

- Evaluated Plaintiffs' claimed damages relating to allegations of an industry-wide price fixing conspiracy among the defendant manufacturers of polyether polyol products. At issue were the alleged overcharges relating to sales of TDI, MDI, and polyether polyols during the alleged conspiracy period. Analyses included evaluating Direct Action Plaintiffs' and Class Plaintiffs' econometric pricing models which purported to show alleged overcharges (and the unreasonableness of the claimed overcharges in light of existing profitability levels). Also assessed indicators of competition in the relevant market, including evidence of supplier switching by Plaintiffs, changes in defendants' market shares, and pricing patterns of the at-issue products.

- Evaluated allegations of price-fixing among freight companies relating to bids to ship the household goods of U.S. Armed Forces' members and civilian employees of the U.S. Department of Defense between Germany and the U.S. Analyses included an investigation of the efficiency-enhancing economic benefits provided by the at-issue "landed rate" pricing system. Also evaluated Plaintiff's claimed damages allegedly associated with elevated rates and alternative factors contributing to claimed elevated rates unrelated to claimed conspiracy. Evaluated Plaintiff's econometric model used to purportedly identify claimed overcharges.

## Antitrust: Predatory Pricing/Price Discrimination Cases

- Evaluated differences in prices paid by a plaintiff distributor relative to those paid by a competitor in a price discrimination case involving the distribution of aftermarket exhaust systems. Analyses included an evaluation of the relevant product and geographic market for the at-issue products as well as damages caused by the alleged anticompetitive behavior.

- Evaluated the relevant product and geographic markets and impact on competition in a price discrimination case involving a manufacturer of lighting products and the prices charged to various distributors. Analyses included an investigation of the primary-line market (i.e., competition among manufacturers of lighting products) and the secondary-line market (i.e., competition among distributors). The impact on competition among the distributors of lighting products was investigated (and whether a substantial lessening of competition occurred) given the pricing policies of the manufacturer.

- Reviewed the newly proposed pricing structure of a major magazine distributor to identify the efficiency enhancing attributes of the proposed pricing structure as well as potential discriminatory effects. The proposed pricing structure was a major change from industry practices and included per copy distribution fees and excess return fees.

- Evaluated the economic and damages-related claims made in a major price discrimination case in the pharmaceutical industry. At issue were the additional sales and profits that would have been made by grocery drug stores and retail drug chains in the absence of the alleged price discrimination.

- Conducted various industry and firm-specific analyses in a major wholesale bread predatory pricing case. Bread industry studies included analyses of industry profitability rates, the changing size distribution of firms in the industry, and general trends in wholesale bread prices. Firm-specific studies included analyses of advertising rates, "cripple" (i.e., reject) rates, and "stale" (i.e., return) rates. Also involved was a critique of Plaintiff's calculation of Defendant's average variable cost of producing and distributing a loaf of bread.

- Calculated the average cost of servicing a three-yard bin of trash in a solid waste disposal predatory pricing case. Also included was an analysis of number of routes and bin pickups per route.

## Antitrust: Tying Cases

- Evaluated certain economic and damages claims made by a local television station against a television program syndicator. At issue was an alleged unlawful tying arrangement relating to the claimed requirement to license *Becker* in order to license *Judge Judy* and *Judge Joe Brown*. Demonstrated the syndicator did not possess market power in a properly defined market since substitution existed between different genre of television programs, between different syndicators, between different demographic groups, and between different types of syndicated programming (i.e., first-run, off-network, and evergreen programming). Also demonstrated that the pricing patterns of the syndicator were inconsistent with the antitrust claims being made.

- Evaluated an unlawful tying claim brought by a pizza franchisee against its franchisor. Franchisees were required to purchase equipment and supplies from an approved supplier owned by the pizza franchisor. Plaintiff alleged the claimed unlawful tying arrangement was enforced through threats of termination of the franchise agreement. Demonstrated that the pizza franchisor did not possess market power in the consumer market for pizza, in the provision of equipment and supplies to franchisees, or in the market for pizza franchises. Also demonstrated the economic justifications for the requirement (i.e., maintaining quality standards, uniformity of operations, and protection of brand name).

- Critiqued Plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software (the "tying" good) and mainframe timesharing (the "tied" good). At issue was the total size of the market, the likelihood of entry, and the market share of the Plaintiff in the absence of the alleged tie. Also investigated was the likelihood that design vendors would place the software on their own mainframes rather than timeshare.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged tying case. Demonstrated that a particular POS product was not a relevant market based on the reasonable interchangeability of various brands of fast food POS equipment from the perspective of the consumer (fast food restaurants). Also analyzed the degree of price competition, non-price competition, ease of entry, and relative market shares of fast food POS equipment manufacturers.

## Business Interruption/Interference Cases

- Evaluated Plaintiffs' claimed damages in a tortious interference, business disparagement, and breach of contract matter dealing with the licensing of testing equipment in the petrochemical piping inspection industry. Demonstrated Plaintiff's expert committed errors relating to the duration of the contracts in dispute, system license fees, cost of replacement systems, pricing of services, utilization of the test systems, and mitigation of future damages.

- Evaluated Plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan. Analyzed Plaintiff's allegations that Defendants made untrue statements to the bid evaluation team concerning Plaintiff's net worth, working capital, and profitability trends. Evaluated Plaintiff's claimed damages using as a benchmark prior engineering projects completed by Plaintiff.

- Calculated damages suffered by the owner of numerous mobile home parks due to the actions of a Defendant in a case involving alleged intentional interference with contractual relations. Involved was an analysis of occupancy rates, a projection of park revenues in the absence of the alleged interference, and an analysis of mobile home park incremental profitability rates.

- Evaluated the damages sustained by a cosmetic company as a result of defective decorated glass containers being furnished for its new therapy products. Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill replacement gift costs, waste disposal costs, and lost profits on the therapy products. The lost profits analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated damages relating to the introduction of a new popcorn product line in a business interruption dispute. The introduction of the new popcorn product line was aborted due to defective containers. Analyses undertaken included determining the cost of popcorn, the cost of popcorn bags, freight costs, as well as the projected revenues associated with popcorn sales. An assessment was also made of the supermarket outlets and territories in which the popcorn would have been sold.

- Evaluated Plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership. Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim. Analysis demonstrated Plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- <u>Other Matters</u>. Provided deposition questions, economic analyses, and a critique of opposing economists' damage models in various business interruption cases resulting from (e.g.) fires, "lockouts", electrical outages, defective products, and/or injuries to key personnel. Businesses evaluated included a workout facility (gym), a pediatric practice, a balloon manufacturing plant, a radiology practice, and a packaging machine manufacturer.

## Intellectual Property: Patent Infringement and Patent-Related Cases

- Evaluated the claimed royalty damages the owners of a patent related to the processing of documents with arbitrary XML elements were asserting against a major software manufacturer for allegedly incorporating the patented technology into its software applications. Based upon an evaluation of the historical financial performance of the Plaintiffs before and after the time of the hypothetical negotiation, market demand for and supply of products similar to the allegedly embodying products, the respective economic contributions of the Parties to the successful commercialization of the accused products, and the *Georgia-Pacific* factors, opined to an alternative royalty damages estimate. Also evaluated the four factors outlined in *eBay Inc. v. Mercexchange L.L.C.* and opined that based upon economic considerations an injunction against the accused products was not warranted.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to scanning, counting, and counterfeit detection technologies in currency discriminators. In both matters, analyzed the *Panduit* and *Georgia-Pacific* factors, constructed a hypothetical negotiation framework, conducted market and industry research, and compiled an accused product sales database. With respect to Plaintiff's lost profits-related damages, performed incremental profit analyses on lost unit sales and ancillary sales. Evaluated Plaintiff's reasonable royalty-related damages taking into account the economics associated with currency discriminator sales. Evaluated damages under a variety of scenarios based upon potential findings of infringement on patents and claims contained in these patents.

- Evaluated the claimed damages of a foam ear sleeve manufacturer who brought suit against a high-performance professional and personal audio earphone manufacturer alleging patent infringement relating to ear pieces having disposable compressible polymeric foam sleeves. Evaluated Plaintiff claimed royalty damages using market and industry data, a *Georgia-Pacific* factor analysis, and the changing licensing policies of the patent holder over time. Provided an alternative royalty damages analysis. Also analyzed from an economic perspective Defendant's countersuit of alleged patent misuse. Reviewed the patent holder's licensing strategy and certain provisions contained in the licenses into which the patent holder entered. Analyses demonstrated the patent holder's licensing strategy and the provisions contained in its licenses were consistent with the allegation of patent misuse.

- Evaluated Plaintiffs' claimed royalty damages in two separate patent infringement matters relating to video game controllers. The first matter related to six degrees of freedom video controller technology; the second matter related to controller-to-processor voltage technology. In both matters, conducted market and industry research, performed a *Georgia-Pacific* analysis, and evaluated company-specific and controller-related licenses. Also evaluated the key drivers of Defendant's sales including its brand name, innovative products and games, and installed base of gaming console owners. Provided an alternative royalty damages figure.

- Evaluated Plaintiff's lost profits and price erosion damages in a patent infringement matter relating to a method for delivering internet content from a network of content delivery network ("CDN") servers. The suit was brought by a CDN services provider. Evaluated Plaintiff's lost profits-related damages using market share data, adjusting for customer and market segment differences and the likelihood of supplemental sales. Evaluated Plaintiff's price erosion-related damages for selected customers for whom Plaintiff was required to lower rates and/or renegotiate contracts based upon the alleged unlawful competition of the Defendant.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to status feedback in home lighting control systems. Performed analyses on a large database of invoices relating to sales of the accused products, analyzed end-user surveys, and identified ancillary sales based upon consumer purchasing patterns. Conducted *Panduit* and *Georgia-Pacific* analyses. Calculated Plaintiff's lost sales based upon market share data reflected in industry surveys. Calculated Plaintiff's royalty damages based upon comparable license analyses.

- In a patent infringement matter relating to the air interface protocol of UMTS/WCDMA cellular phone technology, evaluated whether the Plaintiff had offered Defendant a license to the patents-in-suit on fair, reasonable, and non-discriminatory ("FRAND") terms (as required by the European Telecommunications Standards Institute's intellectual property rights policy). Analyzed the economic benefits associated with patents, the economic benefits associated with standard setting organizations, and the economic evidence related to the FRAND principles. Concluded that none of Plaintiff's licensing offers comported with FRAND principles.

- Evaluated Plaintiff's claimed lost profits in a patent infringement suit against a medical device manufacturer producing trocars with floating septum seals. Analyzed market data relating to trocar products, competitors, and market share information. Also analyzed hospital data with respect to product use and conversion between different manufacturers. Demonstrated that Plaintiff had not demonstrated Defendant would have lost sales and Plaintiff would have gained sales in the absence of the alleged infringement. Concluded a claim for lost profits was not warranted.

- Evaluated Plaintiff's claimed royalty damages asserted against a major software manufacturer in a patent infringement matter relating to a pre-fetch concept allowing for the faster loading of operating systems and software applications. Analyzed the financial performance of the patent holder at the time of the hypothetical negotiation, the drivers of demand for the products allegedly embodying the patent-in-suit, the Parties' respective contributions to the successful commercialization of the accused products, the Parties patent licensing approaches, and the relevant *Georgia-Pacific* factors. Opined to an alternative royalty damages estimate.

- Evaluated the joint venture lost profits and reasonable royalty damages in a patent infringement suit brought by a natural gas producer against an energy producer relating to a system for producing natural gas from unconventional reservoirs. Constructed an economic model incorporating complex technical and economic relationships to determine the value of the natural gas likely to be captured from the reservoirs in question. Conducted a *Panduit* factor and a *Georgia-Pacific* factor analysis.

- Evaluated claimed royalty damages in a patent infringement suit against a nutritional supplement manufacturer and distributor for the alleged infringement of two patents relating to hydrosoluble organic salts and certain compositions and methods for enhancing muscle performance and recovery from fatigue in humans. Concluded Plaintiff's expert inappropriately constructed the hypothetical negotiation framework, failed to consider non-infringing alternative compositions, and overstated the claimed reasonable royalty rate in light of licensing evidence.

- Evaluated claimed damages in a patent infringement matter relating to course management system ("CSM") products and services using the Internet to facilitate the interaction of students and instructors. Conducted a *Panduit* and a *Georgia-Pacific* factor analysis. Calculated lost profits and reasonable royalty damages. Also analyzed Plaintiff's business model and revenue types, Defendant's infringing sales based upon customer licensing agreements and contracts, Plaintiff's prior relationship with Defendant's customers, and Plaintiff's incremental profitability.

- Evaluated Plaintiff's royalty damages claim in a suit brought by a patent holding company against a major software manufacturer relating to certain pivot table functionalities in software. Opined to an alternative royalty damages figure based upon an analysis of the *Georgia-Pacific* factors, the demand for the products allegedly embodying the patent-in-suit, the failed licensing attempts by the former owners of the patent-in-suit, and the relative contributions of the Parties to the commercialization of the accused products.

- Evaluated the royalty damages allegedly suffered by a patent holder against a major internet services provider relating to a method for streaming media over the internet (which facilitated the transmission of real-time, high-quality audio information over a communications network to multiple users simultaneously). Demonstrated that the patent holder's economic expert overstated the claimed reasonable royalty rate, overstated the claimed royalty base, and reached conclusions that failed numerous reliability tests. Also demonstrated that the patent holder's economic expert failed to properly recognize the economics associated with internet radio, leading to an incorrect conclusion as to the proper royalty base that would have been agreed upon at the hypothetical negotiation.

- Evaluated claimed damages in a patent infringement matter filed by an operator of a web-based market place against a competing company relating to the submission of automobile purchase requests over the internet. Analyzed market and industry data relating to Plaintiff's line of business, Plaintiff's and Defendant's financial performance, and Plaintiff's and Defendant's respective market shares. Estimated Plaintiff's lost profits damages.

- Evaluated claimed reasonable royalty damages in a patent infringement matter involving 5 defendants relating to congestion management in ATM networks. Analysis included an assessment of sales of ATM network products allegedly containing the patented feature, an analysis of the price of the integrated circuits embodying the accused functionality relative to the price of the entire ATM product, and a review of industry license agreements. Provided alternative reasonable royalty damages based upon the *Georgia-Pacific* factors in addition to a determining the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated claimed reasonable royalty damages in a patent infringement matter relating to implantable rate responsive pacemakers and implantable cardioverter devices ("ICDs"). Analysis included an assessment of alleged infringing sales of pacemakers and ICDs, a review of license agreements, and an analysis of the defendant's cost savings associated with the allegedly infringing technology as compared to its next best alternative. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors, and the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated Plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to DVR technology.  Analysis included an assessment of Plaintiff's sales of DVR products and monthly subscriptions in the absence of the alleged infringement and an incremental revenue and cost analysis. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated lost profit damages in a patent infringement matter involving blasting hole drilling rigs.  At issue were the lost profits stemming from lost rig sales and lost replacement part sales.  With respect to lost rig sales, evaluated the model types, geographic sales coverage, and model prices of the entities involved.  Also evaluated the capacity of the Plaintiff to make the additional claimed sales.  With respect to lost replacement part damages, evaluated the likely stream of replacement part sales over the life of the drilling rig.  Royalty calculations were performed on sales not subject to lost profit calculations.

## Intellectual Property:  Theft of Trade Secrets Cases

- Evaluated Plaintiff's claimed damages in a trade secret theft case in the golf equipment industry.  Plaintiff claimed disgorgement of global profits and other unjust enrichment due to the alleged misappropriation of certain golf club design trade secrets through the Defendant's sale of the company and assets to a large sporting goods company.  Analysis included calculating net profits from the sale of the accused golf clubs and evaluating claimed reasonable royalty damages.

- Evaluated Defendant's assessment of the incremental costs associated with a contract to provide integrated bonusing software to a casino.  The contract allegedly was won through the use of misappropriated trade secrets from the Plaintiff.  At issue was the allocation of development and common costs to the contract in dispute.  Also evaluated Plaintiff's antitrust counterclaim to Defendant's patent infringement suit relating to the technology used as a foundation for the integrated bonusing software.

- Evaluated damages in a theft of trade secrets matter dealing with next generation switching equipment in the telecommunications industry.  At issue was the alleged theft of trade secrets when the Defendant firm hired nine employees of the Plaintiff firm.  Analyzed Plaintiff's claimed inability to maintain its projected market share, the alleged accelerated entry of the Defendant firm into the next generation switching equipment market, disgorgement measures of damages, and reasonable royalty measures of damages.

- Evaluated damages suffered by a Plaintiff in the business of installing systems delivering ultra-high purity air, water, gas and chemicals to companies manufacturing integrated circuits.  Plaintiff alleged a former managerial employee breached his fiduciary duty by engaging in wrongful use of trade secrets, wrongful solicitation of employees and customers, and unfair competition with the original employer. Analysis involved estimating the lost sales and lost profits to the original employer by estimating the number of bid opportunities missed because of the alleged actions of the former employee, adjusting for changing industry conditions.

- Critiqued Plaintiff's damage model in a trade secrets case in the printed circuit board industry.  Plaintiff was claiming lost profits due to the misappropriation of trade secrets through Defendant's hiring of four key management personnel from the Plaintiff's company.  Issues evaluated included the appropriateness of the "proxy/yardstick" approach undertaken to estimate lost revenues, and the incremental profit rates used to translate lost revenues into lost profits.

## Intellectual Property:  Copyright/Trademark/Trade Dress Infringement/False Advertising Cases

- Evaluated Plaintiff's claimed damages relating to the alleged failure of a TV station to deliver contracted gross rating points over a 6-year period.  Plaintiff was claiming lost sales and lost profits based upon a regression analysis used to isolate a relationship between sales revenues and advertising.  Demonstrated Plaintiff's regression omitted important explanatory variables (e.g., consumer income, promotions, discounts, competitors' prices, and other print and TV advertising conducted by the Plaintiff).  Also demonstrated a failure to account for diminishing returns to advertising.  Each of these errors served to increase the magnitude of the claimed relationship between sales revenues and advertising.

- Evaluated Plaintiff's unjust enrichment damages claims in a copyright infringement matter brought against a hospital and a construction company relating to a medical building design. Compared budgeted construction costs to actual construction costs and analyzed the revenues received by the construction company associated with the copyrighted attributes of the building design as opposed to unrelated construction costs. Also analyzed the likely demand-related reasons for revenues that would accrue to the hospital unrelated to the design of the hospital.

- Evaluated claimed damages in a false advertising matter involving tooth-whitening products between two large consumer product companies. At issue were allegedly false, misleading, and disparaging statements about Plaintiff's tooth-whitening products in comparative advertisements shown on television. Plaintiff sought to recover lost profits damages associated with reduced sales resulting from the alleged false advertising. Analyses included an evaluation and critique of Plaintiff's expert's claimed damages model including analysis of A.C. Nielsen scanner data and CMR media data. Analysis demonstrated that Plaintiff's expert did not measure properly the impact of the alleged misleading content, failed to account for alternative reasons for Plaintiff's sales declines, and implemented an incorrectly specified econometric model.

- Provided economic analysis relating to claims of unfair competition and misleading advertising in the pizza industry. Using economic indicia such as dollar sales revenue, trends in market share, growth in number of stores opened, same-store sales data, and store closure rates, evaluated whether the commercial success of a particular pizza company was due to customer acceptance of its pizza product or allegedly deceptive advertising. Also investigated the buying patterns of pizza consumers with respect to cross-chain patronage.

- Critiqued Plaintiff's damage claim in a matter involving alleged tortious interference with business relations and allegations of trade dress infringement. At issue was the projected sales and profitability of Plaintiff's tape dispensing machines during a period of alleged tortious interference by the Defendant and Plaintiff's simultaneous alleged trade dress infringement.

- Analyzed the lost profits of a Plaintiff in a trademark infringement case involving a law enforcement product sold through a mail-order catalog. Also analyzed the profits of the alleged infringer and the cost of remedial advertising.

- Assessed damages resulting from the alleged infringement of copyrighted training manuals. Analysis included identifying the corporate clients of the Plaintiff and Defendant firms and the reasons for customer switching unrelated to the use of the proprietary training manuals.

## Intellectual Property: Commercial Success Cases

- Evaluated indicators of commercial success relating to a surgical hernia mesh fixation device employing a patented helical tacker design. Demonstrated that the patented device had achieved significant and sustained sales and sales growth. Also demonstrated that the sales of the patented device had grown faster than the sales of other hernia mesh fixation devices and achieved a majority share of sales when compared to staplers and other hernia mesh fixation products.

- Submitted a rebuttal declaration to the U.S. Patent and Trademark Office relating to the claimed commercial success of intrusion prevention system ("IPS") products asserted to practice a patent undergoing an *Inter Partes* reexamination. Opined that an economic nexus had not been established between the claimed teachings of the patent and the commercial success of stand-alone IPS products. The patent holder had not demonstrated that the claimed teachings of the patent were commercially successful separate and apart from (a) features not claimed by the patent, (b) economic factors extraneous to the claimed invention, or (c) features covered by other patents present in the IPS products.

- Evaluated Plaintiff's analysis regarding the claimed nexus between a patented technology and the commercial success of the accused devices in this patent infringement matter relating to text messaging using a limited keypad such as those found on cell phones. Analyses demonstrated Plaintiff's failed to consider many factors that lead to the commercial success of the accused devices unrelated to the patent in dispute.

**Breach of Contract / Breach of Fiduciary Duty Cases**

- Evaluated Counter-Plaintiff's claimed damages arising from Counter-Defendant's failure to honor a most-favored licensee provision in a licensing agreement relating to a semiconductor patent portfolio. Opined as to the economic interpretation of certain licensing terms and the differences and similarities between lump sum, per unit, and percentage of revenue royalty payments. Compared the licensing terms between the Counter-Defendant and another party with the licensing terms between Counter-Defendant and Counter-Plaintiff.

- Evaluated Plaintiffs' claimed damages arising from an alleged breach of contract related to the sale of a community club house and other recreational facilities in an age-restricted residential neighborhood. Plaintiffs' claimed that since they were not given the opportunity to exercise their right-of-first refusal to purchase the contested real estate assets, they lost the value of the equity associated with the real estate assets and they were required to make excessive operating expense payments. Determined that Plaintiffs' expert failed to properly consider the economic factors driving the value of the real estate assets in question.

- Evaluated Plaintiff's breach of contract damages claim relating to the use of a national brand name and other support for the development of a time share resort. Concluded Plaintiff had not demonstrated an economic causal link between Plaintiff's allegations and the quantum of damages being claimed. Adjusted Plaintiff's claimed damages for various conceptual and computational errors, including alternative actions that might have been undertaken by the Plaintiff in the absence of the alleged wrongful conduct.

- Evaluated claimed damages in an alleged breach of fiduciary duty matter between a franchisee and a major fast food franchisor relating to the development and managing of fast-food franchises. Plaintiff claimed economic harm due to franchisor's refusal to grant certain additional franchisees to Plaintiff that Plaintiff claimed would otherwise be in competition with the Plaintiff's existing franchises. Concluded Plaintiff's impact analysis failed to take into account many factors affecting the performance of the Plaintiff's existing franchises that were unrelated to the alleged wrongful conduct.

- Evaluated claimed breach of contract and misrepresentation damages in a suit brought by a global information technology company against a global professional services company relating to a joint venture agreement under which a human resources outsourcing company was formed. Analysis included conducting a client-by-client analysis regarding the specific wrongful conduct associated with each client of the joint venture and estimated the associated economic damages. Based upon certain parameters contained in the contract, also calculated the purchase price overpayment had certain performance issues come to light prior to the closing of the joint venture agreement.

- Evaluated a developer's/franchisee's damages claim against a major sandwich franchisor for the alleged breach of a five-state area development agreement. Reviewed the area development agreement, analyzed the revenues, costs, and profitability associated with franchised outlets, and estimated the Plaintiff's lost franchise fees and lost royalty income based upon various alternative scenarios discussed by the Parties.

- Evaluated the claimed damages of a calling card distribution company due to Defendant's alleged breach of a contract relating to the servicing of the calling cards. Conducted market research on the calling card industry, analyzed alternative reasons for the alleged decline in calling card sales, and evaluated Plaintiff's damages expert's report.

- Evaluated Plaintiff's damages claim concerning the alleged failure of a call center to properly process inquiries relating to the newspaper and television marketing of a collectible doll in the likeness of a recently deceased public figure. Analyzed advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by Plaintiff's actions. Estimated damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated Plaintiffs' damages claim relating to the underwriting and loan servicing of subprime automobile loans. Plaintiffs' contended the servicing company did not properly administer the portfolio of subprime automobile loans thereby causing excessive loan losses. Analysis demonstrated that Plaintiffs' financial experts failed to take into account alternative reasons for Plaintiffs' performance. Analysis of Plaintiffs' loan volume, interest income, loan loss rate, and deteriorating industry conditions also demonstrated that Plaintiffs' business plan did not provide a reasonable basis from which to calculate claimed damages.

- Evaluated Plaintiff's claim of lost profits relating to the collection of ballots for a Mexican telecommunication company in Mexico's Equal Access program. Analyzed a database of telephone customers, including statistics such as the length of service, average monthly consumption patterns, current billing status, and differences between residential and commercial customers. Developed an alternative claimed damages model taking into account consumption patterns and the turnover rate of customers, among other factors.

- Evaluated Plaintiffs' claim of lost success fees, lost closing fees, and underpayment of value relating to Defendant's acquisition of an oncology laboratory and the alleged failure to consummate additional acquisitions. Analysis demonstrated Plaintiffs' projections regarding the profitability of the proposed acquisitions were not reasonable given the historical financial performance of the targets. Also demonstrated Plaintiffs were not underpaid for the assets of the acquired laboratory since no investor or buyer was willing to provide funds to Plaintiffs pre-acquisition and since Plaintiffs in their valuation approach inappropriately assigned all post-acquisition synergies and gains to the Plaintiffs.

- Evaluated Plaintiff's damage claim arising from an alleged misappropriated opportunity to develop a computer superstore franchise in Mexico based on the equivalent U. S. concept. Demonstrated Plaintiffs overstated per store revenue, understated store-level costs, and used inappropriate financial and strategic assumptions regarding the number of stores opened, the amount of capital required, outside investor contribution, equity shares, and strategic acquisitions. Plaintiffs also conducted a valuation based on companies bearing little or no resemblance to a computer superstore.

- Evaluated Plaintiff's claim of lost profits arising from an alleged breach of contract involving two tubular inspection equipment manufacturing companies. Analyses demonstrated that Plaintiff's expert overstated the projected utilization rate of the company's equipment and associated revenue and understated the projected incremental costs that would have been incurred by Plaintiff. Analyses demonstrated market demand would not support the equipment utilization rate projected by Plaintiff's expert.

- Evaluated Plaintiff's claim of damages in a breach of contract matter in the magazine publishing and distribution industry. Plaintiff claimed Defendants breached a distribution agreement by suspending distribution pending the resolution of a trademark infringement dispute. Plaintiff abandoned the magazine, claiming lost profits and the estimated lost value of the magazine had it been sold after its fourth year of publication. Analysis demonstrated Plaintiff's expert overstated subscription-based revenues, distorted the cost/revenue structure that would have existed for the magazine, and overstated the likelihood of success by ignoring the failure of similar genre magazines.

- Evaluated the damages sustained by the public safety division of an information technology services firm due to the early termination a ten-year services agreement to provide enhanced 9-1-1 services to a governmental agency. One-time up-front implementation costs in setting up the 9-1-1 system and ongoing operational costs were compiled in constructing a cost reimbursement damage claim. Also evaluated the reasonableness of an early termination charge schedule designed to represent the one-time buyout total if the governmental entity opted to terminate the contract before the ten-year term expired.

- Evaluated the damage claim of a bank arising from an allegedly defective conversion of the bank's data processing system. Areas investigated included the softening macroeconomic environment surrounding the bank during the relevant time period, the changing financial services market, internal bank ratios, and technical flaws contained in Plaintiff's damage calculations.

- Estimated lost sales and lost royalty payments to a "thick" potato chip producer due to a breach of contract. Involved was the construction of a damage model, analyses of the market for potato chips and per capita potato chip consumption, and projecting the rate of introduction of a new potato chip into regional markets.

- Calculated damages and provided other economic analyses in a "lack of best efforts" breach of contract case in the carbonated soft drink industry. At issue was the impact on sales due to the "lack of best efforts" vs. the impact on sales from contemporaneous new entrants into the market.

- Calculated damages in a breach of contract matter involving an association of nephrologists and a management company operating 12 kidney dialysis clinics. Areas of investigation included the "profitability available for distribution" from the clinics, the projected rate of growth in patients, the rate of introduction of new clinics, and the costs associated with running the clinics. A damage model was developed which projected the profits that would have been distributed to the management company over the life of the contract in the absence of the breach.

- Evaluated claimed damages against a hospital for allegedly breaching a contract allowing hyperbaric oxygen services on hospital premises. Investigations included assessing the local market for hyperbaric services, evaluating Plaintiff's business growth potential given the physical space constraints at the hospital, and demonstrating Plaintiff had fully mitigated claimed future damages through the establishment of an alter ego firm at a nearby local hospital.

## Class Certification Engagements

- Evaluated Plaintiff's position that the claimed economic injury suffered by putative Class members could be quantified on a Class-wide basis in a class action matter relating to anti-aging skin care products marketed as preventing and repairing signs of aging "in just one week." Demonstrated that the approaches proposed by the opposing expert to calculate Class-wide damages would not yield reliable or relevant estimates of the alleged harm suffered by individual Class members. Arguments presented included that the large number of repeat buyers, the wide variations in the retail prices associated with the accused products, and the wide variations in the retail price differences relative to other anti-aging products would prevent a reliable calculation of putative Class members' damages on a Class-wide basis.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter brought by an institutional investor against a bank associated with the bank's securities lending program. Demonstrated that a class-wide approach would obfuscate important differences among putative Class members' individual investment expectations and tolerances. Differences requiring individualized inquiry included the variability in maturity guidelines, credit-quality guidelines, prohibited investments, and diversification requirements.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter where a beverages company marketed certain beverages as containing beneficial vitamins and allegedly failed to disclose the sugar content of the beverages. Evaluated the wide variations in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. A comparison of the average retail prices of the at-issue beverages relative to identified benchmark products did not support the allegation that the at-issue beverages possessed a systematic price premium as a result of the company's allegedly misleading marketing campaign.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter where an automobile company allegedly did not inform purchasers that actual vehicle miles per gallon performance could vary from the 40 miles per gallon EPA estimated fuel efficiency. Demonstrated that individualized inquiry would be required to ascertain consumers' valuation of vehicle characteristics (including their expected fuel economy) when purchasing an accused vehicle, actual prices paid, driving patterns, driving conditions, and whether putative Class members' expectations were influenced by the company's alleged wrongful conduct. Evaluated Plaintiffs' class certification expert's opinion that alleged damages could be evaluated on a class-wide basis using a hedonic regression methodology.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter relating to the issuance of a special assessment fee by a timeshare vacation club. Demonstrated that potential damages-related conflicts were likely to arise among putative Class members (including among the Named Plaintiffs) – making Class-wide proof an unreliable measure of economic injury for each putative Class member. Also demonstrated that evaluating claimed damages on a Class-wide basis would result in potentially awarding damages to putative Class members who suffered no injury.

- Evaluated Plaintiffs' position that the economic injury allegedly suffered by putative class members could be quantified on a class-wide basis in a matter where a beverages company marketed certain beverages as "All Natural" when they contained high fructose corn syrup ("HFCS"). Demonstrated that wide variations existed in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. Also demonstrated that wide variations existed in the beverages' retail prices because of promotional discounts and coupons and because the company did not sell directly to consumers. Consequently, whether consumers paid a price premium because of the "All Natural" labeling (and how much, if any) could not be determined by proof common to the proposed class. A comparison of the average retail prices of the "All Natural" beverages in dispute to identified benchmark products did not support the allegation that the "All Natural" beverages possessed a systematic price premium as a result of the "All Natural" labeling.

- Evaluated the commonality of purchasing circumstances of proposed Class members in a class action matter against a national quick service restaurant ("QSR") chain. Plaintiffs alleged the QSR misrepresented the trans fat levels contained in the QSR's french fries. Plaintiffs also alleged the proposed Class paid a price premium for certain food products based upon the alleged misrepresentations. After reviewing survey data, marketing materials, and pricing data, concluded that individual inquiries were required to establish different customer's awareness of the alleged misrepresentations, different customer's reliance upon the alleged misrepresentations in their purchasing decisions, and other important economic factors impacting each customer's purchase decision.

- Evaluated Plaintiffs' claim that Class members' alleged damages could be "mechanically calculated" in a class action matter against a payphone company's auditor. The payphone company had filed bankruptcy and the Class members alleged the auditor misrepresented the company's financial statements, upon which the Class members allegedly relied. Conducted economic and market research and identified factors that caused a general decline in the payphone industry which contributed to the bankruptcy of the company. Analyzed the claimholders' database and identified issues relating to the database that precluded Plaintiffs' expert from mechanically calculating the damages allegedly suffered by class members.

## Lender Liability Cases

- Evaluated Plaintiff's allegations that it was capital constrained and consequently economically damaged as a result of its loans being placed into the special assets department of its lender. Analyzed the Plaintiff's unused cash, credit, and other available funds. Also analyzed Plaintiff's successful access to the capital markets, acquisition spending, R & D spending, sales performance, and profitability relative to peer companies.

- Analyzed Plaintiffs' damage claim in a lender liability suit relating to Defendant's alleged failure to fund certain residential housing development and construction loans. Evaluated Plaintiffs' changing five-year business plan projections, including revenue growth, geographic expansion, market share, salesmen coverage, cost structure, and profitability assumptions. Also evaluated Plaintiffs' strategy for "exiting" the business and the alleged value of their ownership at that time.

- Evaluated damages in a lender liability case involving the bankruptcy of a gear manufacturing company. The bankruptcy was allegedly due to the failure of a bank to fully fund a previously committed loan. Investigations included researching alternative market-related reasons for the decline in the gear manufacturer's business as well as evidence of internal mismanagement on the part of the company's owners.

- Other Matters. Evaluated damages, causation issues, and liability issues in various lender liability cases involving the calling in of loans, the failure to fund previously committed loans, the failure to release collateral, and the misappropriation of loan payments. Cases involved firms in the wire and cable, drywall/construction, PVC piping, and auto dealership industries, among others.

## Professional Negligence (Non-Securities / Non-Merger) Cases

- In an alleged professional negligence matter, a lender to distressed companies sought $40 million in damages from an auditor in connection with a $130 million credit facility extended to an HDTV company. The lender failed to collect when the borrower filed for bankruptcy. The auditor was alleged to have made negligent misrepresentations associated with the borrower's financial statements; the lender asserted it had relied upon the borrower's financial statements when entering into the credit facility. Performed economic causation and damages-related analyses. Identified the known or knowable risks associated with providing a credit facility to the borrower, including certain accounts receivable collection risks and market softness risks. Opined that it was the materialization of these known and knowable risks that caused the lender's claimed losses.

- Evaluated claimed damages against a major law firm for alleged professional negligence when filing a patent for the treatment of septic shock. Researched (among other things) the FDA approval process, associated statistics regarding the product category allegedly covered by Plaintiff's patent, and various industry projections regarding the category growth. Performed a discounted cash flow analysis, an incremental profitability analysis, a licensing analysis, and provided an alternative calculation of claimed damages.

- Evaluated Plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed Plaintiffs' causation linkages to claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Evaluated claims by a Department of Insurance appointed liquidator that alleged the auditor of a bankrupt insurance company breached its fiduciary duty, resulting in a $100 million deficit on the insurance company's books. Conducted various analyses of a claims register database, including a comparison of indemnity payments and reserves per claim before and after the appointed liquidator took control of the liquidation process. Analyses demonstrated both the indemnity payments and reserves per claim were higher after the appointed liquidator took over the liquidation process, implying the liquidator over-paid and over-reserved claims.

## Entertainment/Sports-Related Engagements

- Evaluated the claimed damages of a movie production company against a major home video rental company. At issue was the claim that the refusal of the home video rental company to commit to carry a particular movie in its stores caused the movie production company to suffer lost profits when its distributor then refused to release the movie theatrically. Demonstrated that Plaintiff's methodology for estimating lost box office revenues was inappropriate and failed to account for important determinants of movie attendance.

- Analyzed Plaintiffs' lost profits and reasonable royalty damages in a patent infringement matter relating to offset head lacrosse sticks. Analysis included an assessment of Plaintiffs' sales in the absence of the infringement, the distribution of the lost sales to the models that would have been sold in the absence of the infringement, and an incremental revenue and cost analysis. Also analyzed Plaintiffs' competitors, pricing patterns, productive capacity, and geographic coverage in support of the lost profits claim. Reasonable royalty damages were assessed using the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Estimated the diminished box office revenues suffered by a theatrical release due to the breach of a quick service restaurant promotional tie-in arrangement with a major pizza chain. Developed a database of recently released films and related film characteristics such as genre, rating, critics review, box office revenues, media spending, production budget, season of release, and talent. A regression model was then developed to quantify the relationship between media spending and box office revenue. An industry review of quick service restaurant promotional tie-in arrangements was also conducted.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the sale of certain minority interests in a National Basketball Association team. At issue were Plaintiffs' tag-along rights whereby limited partnership interests could be included in any sale by the general partner on the same terms and conditions. Damages were calculated as the difference between the formulaic value of the minority interests versus the market value of the minority interests when sold separately. Discounts for lack of control and reduced marketability were analyzed.

- Evaluated Plaintiff's damages claim relating to a NASCAR racing team sponsorship agreement. Plaintiff contended the Internet service provider sponsor interfered with the racing team's ability to sell advertising banners that were part of the sponsorship agreement. Analyses included assessing the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Also analyzed the financial performance of the race team, the economic terms of the sponsorship agreement, and the risks associated with a barter arrangement.

- Estimated damages arising from a breach of contract claim between an electronic retailer and a local television station. At issue was the lost profits to the electronic retailer when the local television station discontinued broadcasting the electronic retailer's programming.

- Analyzed the market and evaluated damages on behalf of a television station denied access to a cable system. At issue was whether the cable operator was attempting to monopolize the market for local television advertising. Analysis included an estimation of the advertising revenues that would have been received by the local television station had it been allocated a channel on the cable system.

- Estimated damages arising from a breach of contract claim between a video-cassette manufacture/distributor and a theatrical motion picture producer/distributor. At issue was whether the motion picture distributor manipulated the theatrical release of certain titles distorting the films the video-cassette producer could distribute under the terms of the agreement.

## Tax-Related Engagements

- Participated in an analysis of the impact on tax revenues to the State of Texas from a change in tax laws relating to pension fund managers. Helped demonstrate that changing the apportionment rule from "location in which the investment services were performed" to "residence of the investment beneficiaries" would not result in a negative fiscal impact.

- Served as consulting partner on an engagement estimating qualifying research and expenditure costs in response to certain expenses disallowed by the IRS. Analysis included developing a methodology to estimate qualifying hours and qualifying costs for groupings of employees with missing data.

- Analyzed whether the salaries paid to the owners/managers of a heavy and highway construction company were reasonable in a matter before the IRS. Areas investigated included the cyclical nature of the construction industry, the resulting cyclical nature of compensation paid to construction industry executives, and the 50th and 75th percentile salaries paid to various types of executives in the construction industry.

- Participated in an analysis of the tax benefit versus detriment to a Plaintiff as a result of ownership in certain partnership interests over the 1982-1998 time period. Also involved was an analysis of cumulative suspended tax losses, partnership income available for distribution, and changing tax rates over time.

- Quantified the net out-of-pocket cash position of investors who purchased limited partnership interests in nine real estate partnerships in an alleged non-disclosure matter. Also quantified the impact caused by changes in the Federal income tax laws. Supporting analyses included comparing the actual and projected performance of the partnerships taking into account restructurings, refinancings, and dissolutions.

## Personal Injury and Wrongful Death Cases

- <u>General Overview (Personal Injury)</u>. Assessed damages and lost earnings in various personal injury cases involving movie production workers, management consultants, financial consultants, nurses, medical doctors, chiropractors, secretaries, truck drivers, airline stewardesses, mechanics, engineers, maintenance personnel, carpenters, masonry workers, crane operators, machine operators, actresses, military aircraft production workers, tankermen, teachers, film editors, portfolio managers, hair stylists, automobile assemblers, landscape architects, sole proprietors, and real estate agents (among others). In each case, issues investigated included an assessment of the projected undamaged income, damaged income, expected work life of the individual, and appropriate discount rate to use. Assistance to the attorney included the preparation of deposition questions, economic analyses, and a critique of the opposing economist's damage model.

- <u>General Overview (Wrongful Death)</u>. Developed numerous damage models in wrongful death cases. Issues investigated included the projection of lost earnings, the projected personal consumption expenditures of the decedent, and projected lost pension benefits. Professions of the decedents included various types of entrepreneurs (e.g., boat store owners, etc.), white-collar workers (e.g. attorneys, architects, etc.), and blue-collar workers (e.g., demolition contractors, grocery store clerks, etc.). Ages of the decedents ranged from adults to teenagers to children.

- Evaluated claims of damages submitted by the family members of 88 decedents from an airplane crash. Family members were seeking damages in state and federal courts against the airline and certain parts manufacturers. Most of the decedents resided and worked in Asian countries. Researched various data sources for information regarding social security benefits, interest rates, and the relevant economic statistics for workers in these countries. Evaluated four Plaintiff damages experts' reports and testimonies, summarized our evaluation of these damage models, and calculated alternative damages figures. Analysis included evaluating lost earnings, lost business value, lost non-salary benefits, lost retirement funds, and lost savings.

## Wrongful Termination Cases

- Evaluated Plaintiff's alleged lost earnings and lost future earnings capacity in a matter against a major shipping company in which the Plaintiff claimed to have resigned his legal counsel position due to the Defendant's alleged criminal conduct and its refusal to conduct an independent investigation. Analyzed various employee benefits offered by the Defendant including but not limited to the salaries of similarly-situated employees, long term incentive plans, 401(k) plan, paid vacation, stock options, and retirement benefits. Also analyzed promotion criteria, similar benefits received by the Plaintiff at alternative employment, and the lower cost of living associated with the geographical location of the alternative employment.

- Evaluated Plaintiff's claimed economic harm in a wrongful termination / negligent misrepresentation matter. Plaintiff claimed that pre-termination certain representations by the company dissuaded him from resigning and selling his stock holdings, thereby causing economic harm from the subsequent decline in the company's stock price. Analysis included quantifying the salary, bonuses, pension benefits, and severance pay the Plaintiff received during the additional time spent with the company as compared to the stock price declines that formed the basis of Plaintiff's damages claim.

- Evaluated Plaintiff's loss of earnings claim in an alleged wrongful termination matter in the long distance telecommunications industry. Plaintiff was an independent representative with a "downline" working for a company using a multilevel marketing sales approach. Analyzed the Plaintiff's historical earnings, business expenses, and the earnings of Plaintiff's peers to evaluate Plaintiff's net earnings in the absence of the alleged wrongful termination.

- Evaluated Plaintiff's damage claim in a wrongful termination matter involving an insurance broker/branch manager. Evaluated Plaintiff's alleged damage period, earnings in the absence of the termination, fringe benefits, business expenses, and offsetting earnings. The sales patterns of the relevant insurance products at the state and national level were incorporated into the analysis. Also analyzed trends within the company with respect to branch manager positions.

- Evaluated the damages suffered by the manager of an over-the-counter trading department in an alleged wrongful termination action. Since the compensation of the manager was based on the profitability of the department, one issue investigated was the reason for the decline in the post-termination performance of the department.

- Other Matters. Assessed damages and lost earnings in other wrongful termination cases involving internal medicine specialists, neurosurgeons, anesthesiologists, entertainment company executives, brokers/traders, secretaries, accountants, attorneys, quality assurance managers, company presidents, real estate brokers, property managers, insurance brokers/managers, and military aircraft production workers. Areas investigated include many of the same items as described in personal injury cases.

**Other Economic Engagements**

- Conducted an economic analysis of historical and projected lost revenues due to SEC-related independence constraints for an information technology consulting entity. The analysis demonstrated that SEC rules requiring SEC registrants to disclose the amount of non-audit fees paid to its auditor, as well as constraints on the consulting entity's ability to perform outsourcing or managed application services for audit clients significantly impacted business growth relative to the market and its closest competitors. The analysis also demonstrated that certain revenue projections assuming independence relief were appropriate in light of market conditions and the independence constraints.

- Conducted an economic cost/benefit analysis of the SEC's proposed rule changes relating to non-audit services performed by auditing firms for audit clients. Analyses demonstrated that public accounting firms have an incentive to protect their brand name capital and that purchasers of non-audit services have an incentive to maintain investor confidence in the reliability of the audited financial statements.

- Performed an economic impact analysis on behalf of a major pipeline corporation seeking to gain regulatory approval for the construction of an oil pipeline in the Pacific Northwest. Evaluated the net economic impact of the project on employment, income, and consumer expenditures in the region. New employment opportunities resulting from construction and maintenance of the pipeline were compared to the potential lost jobs associated with the alternative means of transporting the petroleum.

- Participated in a major antitrust risk assessment exercise for a large industrial corporation. Work performed included evaluating the major litigation risks in the areas of monopolization, price discrimination, price fixing, illegal tying, and exclusive dealing. A detailed questionnaire designed to collect relevant economic data and identify potential risks was constructed and sent to the corporation's division managers.

- Evaluated revenue projections relating to an electronic toll collection system. The system was designed to recover lost toll revenue and other administrative fees from toll violators traveling along a consortium of tollways in New York, New Jersey, and Delaware. Analyzed four critical revenue drivers in the projections (number of transactions, violation rates, citation rates, and collections rates) and the potential variability of certain components of the projections by compiling comparative data through interviews with industry participants. Analysis was used in assisting lenders evaluating the economic viability of the project.

- In a bankruptcy matter, analyzed the expected rate of return that could be earned on a portfolio of assets. Included in the analysis was determining the investment portfolio of a prudent pension fund manager and the historical risk premiums earned on each category of assets in the portfolio. The assets were being held to meet future pension plan liabilities.

- Conducted an analysis of low-cost housing in Los Angeles County (CA) to determine whether sufficient housing was available to house the County's general relief recipient population. In separate engagements, conducted similar studies for San Bernardino County (CA) and Alameda County (CA). The Alameda County study also analyzed earned income incentives and food stamp allotments as a source of income in addition to the County's monthly general relief assistance. An affordable housing analysis was also conducted for the State of New Jersey's Department of Health relating to the state's child exclusion policy and AFDC recipients.

- Conducted an economic analysis on behalf of the California Public Utilities Commission. Tasks included incorporating elasticities into alternative rate design and pricing models, analyzing subsidies accruing to various residential consumer groups under alternative rate designs, and estimating the relative welfare loss associated with each alternative rate design.

## Fraud/Criminal-Related Engagements

- Evaluated claimed damages in a suit brought by Plaintiff relators against a major information technology company for allegedly submitting false and fraudulent claims to the U.S. government under a Medicaid program providing health-cost reimbursements to school districts. Conducted various benchmarking analyses including analyzing a "claimed amount" versus "paid" pattern analysis and a reimbursement rate analysis across Defendant-administered school districts and non-Defendant-administered school districts. Also conducted a reimbursement rate benchmarking analysis associated with school districts before and after administration by the Defendant. Concluded there was no economic evidence of a systematic effort to defraud the U.S. government.

- Evaluated Plaintiff's claim of damages stemming from the alleged embezzlement of funds and falsification of income statements by a bank official relating to a mortgage lending division of a bank. Analysis identified errors made by the bank in specifying the length of the damage period and not properly accounting for accounts receivable collections made post-discovery of the alleged illegal acts.

- Analyzed skilled nursing facility nursing ratios in a criminal health care fraud matter relating to Medicare reimbursements. At issue was Defendant's ratio of skilled nursing costs to unskilled nursing costs alleged to be outside of governmental guidelines. Analyzed facility-level ratios by establishing peer groups of facilities based upon size of facility, number of participating beds, skilled utilization percentage, state location, average length of stay, and facilities with similar levels of acuteness.

- Estimated freight overcharge damages on behalf of a major multinational information technology services firm. Analysis required the utilization of a database of all freight shipments made over a five-year period, including incorporating subsequent credit memos, discounts, and dimensional weight charges. Analysis compared actual freight charges to rates charged by alternative carriers for shipments of identical ship method (e.g., ground, next day, two day), weight, and destination.

- Performed economic analysis relating to a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for the referral of Medicare-eligible patients. Analyze included evaluating the savings from reduced admissions rates and from reduced average length of stays. Also analyzed the profitability of certain laboratory-related work.

## TEACHING EXPERIENCE

### Macroeconomic Principles and Intermediate Macroeconomics

Topics covered included unemployment/full employment, inflation/price stability, economic growth/gross domestic product, determination of national income, and monetary and fiscal policies.

### Microeconomic Principles and Intermediate Price Theory

Topics covered included functioning of markets (demand and supply analysis), elasticities, theory of the firm (profit maximization), industry performance, allocation of resources, and government regulation.

### Companies In Crisis

Topics covered included companies, markets, and industries in contemporary crisis situations from external or internal changes in the operating environment or significant conflict. Topics included case studies focusing on solutions for companies facing competitive issues, management issues, or litigation-related issues.

## PUBLICATIONS

"An Economic Framework for Analyzing Covenants Not to Compete" (with Elaine Fleming and Steven Herscovici), Expert Witnesses, ABA Section of Litigation, Spring/Summer 2011, Vol. 7 No. 1.

"Financial Expert Witness Challenges and Exclusions: Results and Trends in Federal and State Cases Since Kumho Tire" (with Lawrence F. Ranallo), Accountants' Handbook, Tenth Edition 2004 Supplement, *forthcoming*, edited by D.R. Carmichael, New York: John Wiley & Jones, Inc., 2004.

"Accounting for Damages in Intellectual Property Litigation" (with Tony Samuel and John Davis), Building and Enforcing Intellectual Property Value – an International Guide for the Boardroom 2003.

"Challenges to the Admissibility of Financial Expert Witness Testimony" (with Lawrence F. Ranallo), Litigation Services Handbook, 2002 Supplement, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 2A.1 – 2A.17, New York: John Wiley & Sons, Inc., 2001.

"Calculation of Lost Earnings" (with Carlyn R. Taylor and Randi L. Firus), Litigation Services Handbook, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 11.1 – 11.16, New York: John Wiley & Sons, Inc., 2001.

"Preparing the Financial Expert or Economist" (with George G. Strong, Jr.), Witness Preparation, V. Hale Starr, 13.4 – 13.4.1, New York: Aspen Law & Business, A Division of Aspen Publishers, Inc., 1998.

"The Effect of Institutional Setting on Behavior in Public Enterprises: Irrigation Districts in the Western States" (with John M. McDowell), Arizona State Law Journal, Vol. 1982, No. 2, 453 – 496.

## SELECTED CLIENTS OVER THE PAST FIVE YEARS

Selected clients over approximately the past five years include but are not limited to: Abbott Laboratories; Akamai Technologies, Inc.; America Online, Inc.; Apple Inc; Autobytel Inc.; Blackboard Inc.; Blackstone Group; Blockbuster Inc.; Bioengineered Supplements & Nutrition, Inc.; CDX Gas; Chrysler; Cigna; Coca Cola Company; Covidien; Crane Co.; Cummins-Allison Corp.; DirecTV, Inc.; Dow Chemical Company; Electronic Data Systems; Ernst & Young LLP; GoDaddy.com, Inc.; Google; Gorlick Distribution Centers; Haggar; Halliburton; Hyundai Motor America; Idearc; Ingenico Inc.; Juniper; LG Electronics, Inc.; Lutron Electronics Co., Inc.; McDonald's Corporation; Medtronic, Inc.; Merial Limited; Microsoft Corporation; National Dairy Holdings, L.P.; New York Times, Company; Nike, Inc.; Nintendo; Nortel Networks Inc.; Research in Motion; Rohm Co. Ltd.; Sabre Inc.; Samsung; Shure, Inc.; Shell Exploration & Production Company; SIGA Technologies; Snapple Beverage Corporation; St. Jude Medical, Inc.; Stolt Nielson; TiVo Inc; T-Mobile USA, Inc.; Tyco Heathcare; UBS; United States Surgical Corporation; VeriFone Systems, Corp.; Verizon; Versata (f/n/a Trilogy); Volkswagen Group of America, Inc.; Waste Management; Wachovia Corporation; Wells Fargo & Company; Wendy's; Wyndham International, Inc.; Yahoo!

**Exhibit 2**

# KEITH R. UGONE, PH.D.
## TRIAL, HEARING, AND ARBITRATION TESTIMONY[1]

Personal Audio, LLC vs. **CBS Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP) (2014)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2014: preliminary injunction hearing)

NXP B.V. vs. **Research In Motion, Ltd. and Research In Motion, Corp.** (United States District Court For The Middle District Of Florida, Orlando Division, Case 6:12-cv-498-ORL-22GJK) (2014)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2014)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (two testimonies: trial (2014) and evidentiary hearing on on-going royalties (2014))

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (two trials; 2014)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013)

---

[1] Trial, hearing, and arbitration testimony over the 1990-2014 time period. Case citations and dates subject to verification. **Clients bolded.** Deposition testimony begins on page 10.

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.,** Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd, TPV Electronics (Fujian) Co. Ltd, TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

*e*Plus Inc., vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2013)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-CV-362-RSP) (2013)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. **The Dow Chemical Company** (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2013)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District Of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012) (two trial testimonies: affirmative case and counterclaim)

I/P Engine, Inc. vs. **AOL, Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation** (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

DDR Holdings, LLC vs. **Hotels.com, L.P.**; **Expedia, Inc.**; **Travelocity.com, L.P.**; Site59.com, LLC; Internetwork Publishing Corporation d/b/a Lodging.com; Neat Group Corporation; Orbitz Worldwide, LLC; **International Cruise & Excursion Gallery, Inc.; OurVacationStore.com, Inc.**; **National Leisure Group, Inc. / World Travel Holdings, Inc.**; and **Digital River, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:06-CV-42-JRG) (2012)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2012)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Merial Limited and Merial SAS** vs. Cipla Limited, Velcera, Inc., and FidoPharm, Inc. (In The United States District Court For The Middle District Of Georgia, Athens Division, Case No. 3:07-CV-125 (CDL)) (2012; injunction hearing)

Geoffrey L. Berman, Trustee of the SB Liquidation Trust vs. **Ernst & Young LLP** (International Institute For Conflict Prevention & Resolution, New York, NY) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2012)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Bedrock Computer Technologies LLC vs. **Yahoo! Inc**. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Bedrock Computer Technologies LLC vs. **Google Inc**. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-420-TJW) (2011)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2011)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc. (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple, Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

VirnetX Inc. and Science Applications International Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 607CV80 (LED)) (2010)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. **Electronic Data Systems, LLC** (JAMS Arbitration, Washington, D.C., No. 1410005118) (2010)

**Cummins-Allison Corp.** vs. Shinwoo Information & Telecommunications Co., Ltd., n/k/a SBM Co., Ltd., and Amro-Asian Trade, Inc. (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:07cv196 and Civil Action No. 9:07cv228, Consolidated) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2009)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**Abbott Laboratories and TheraSense, Inc.** vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 WHA) (2008)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008; trial and injunction hearing)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2008)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:06-CV-140-RHC) (2007)

YC Partners, LTD. d/b/a Yantis Company vs. Zach Hall; **Rodman Excavation, Inc. d/b/a Rodman Companies, San Antonio Division; Rodman Utilities, L.P.; Rodman Power & Communications, LLC; Rodman Natural Resources, Inc.; Rodman Paving, Inc.** (In The District Court, Bexar County, Texas, 285th Judicial District, No. 2007-CI-03027). (2007; hearing regarding Motion to Compel Plaintiff's Documents)

QPSX Developments 5 Pty Ltd vs. **Nortel Networks Inc.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:05CV-268) (2007)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2006)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

William Ziegler and DenLou, Inc. vs. **Synergistic International, LLC** (American Arbitration Association, Dallas, Case No.: 71 114 E 00733 04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

**Aviall Services, Inc.** vs. Honeywell International, Inc. and Kelly Aerospace, Inc.  (American Arbitration Association, Los Angeles, Arbitration No. 71 Y 181 00717 03) (2005)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2005)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2005)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2004)

**PK Ventures, Inc. and Subsidiaries, PK Ventures Limited Partnership, and Robert M. Rose and Alice N. Rose** vs. Commissioner of Internal Revenue (United States Tax Court, Jacksonville, Florida, Docket Nos. 005836-99, 006395-99, and 10154-99) (2004)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2003)

Teleplus, Inc., vs. **Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2003)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., TPC Acquisition Corp., Carlos Slim Helu and James Halpin** (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2001)

United States of America vs. **Dan Anderson** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (2000)

Scott K. Ginsburg vs. **Goldman, Sachs & Co.** (Before the National Association of Securities Dealers, Inc., Dallas) (2000)

**TCP Holdings, LLC, Robert Neely, and David Thomas** vs. Tim Kirk (Before the American Arbitration Association, Dallas, Case No. 71 18000564 98) (2000)

United States of America vs. **Dan Anderson and Baptist Medical Center** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (1999; Sentencing Hearing)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998; Daubert/Robinson Hearing Testimony and Trial Testimony)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1998)

7

Sledge W. Killion vs. **Metropolitan Life Insurance Company**, et al. (Before the National Association of Securities Dealers, Inc., Dallas, NASD Arbitration No. 95-05997) (1997)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1997)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Exar Corporation vs. **SGS-Thomson Microelectronics Srl** (Court of International Arbitration of the International Chamber of Commerce, New York) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

**Rauscher, Pierce, Refsnes, Inc.** vs. Alfred W. Anderson, Jr. (Before the National Association of Securities Dealers, Inc., Dallas) (1995)

**Ivy Goth** vs. City of Los Angeles and Department of Water and Power (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1995)

**Bio-Medical Applications Management Company, Inc.** vs. Dallas Nephrology Associates (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:94CV37) (1995)

Cybor Corporation vs. **FAS Technologies, Inc.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1995)

Phillips Petroleum Company vs. **Rexene Corporation** (U.S. District Court for the District of Delaware, Civil Action No. 1:90CV208) (1994)

**Donald J. Dougher**, et al. vs. Gerard J. Dougher, Sr., et al. (Superior Court of the State of California for the County of Orange, Case No. 677451) (1994)

Texas State Bank, et al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994)

**Union Oil Company of California** vs. International Insurance Company, et al. (Superior Court of the State of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993)

**Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.**

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Villarreal** vs. East Union High School District (Superior Court of the State of California) (1993)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc. vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

**Southwest Tank Liners** vs. Joor Manufacturing, Inc. (U.S. District Court for the Central District of California) (1990)

Deposition Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## DEPOSITION TESTIMONY[2]

Smartflash LLC and Smartflash Technologies Limited vs. Apple Inc., Robot Entertainment, Inc., KingsIsle Entertainment, Inc., HTC Corporation, and **Game Circus LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-CV-447); Smartflash LLC and Smartflash Technologies Limited vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, HTC Corporation, HTC America, Inc., Exedea, Inc., and **Game Circus LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-CV-448) (2014)

Adaptix, Inc. vs, Alcatel-Lucent USA, Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:12-cv-00122) (2014)

Adaptix, Inc. vs, Apple Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Northern District Of California, San Jose Division, Civil Action No. 5:13-cv-01776-PSG); Adaptix, Inc. vs, HTC Corporation, HTC America, Inc., and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Northern District Of California, San Jose Division, Civil Action No. 5:13-cv-01844-(PSG)); Adaptix, Inc. vs, LG Electronics, Inc., LG Electronics USA, Inc., and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00120); Adaptix, Inc. vs, Pantech Wireless, Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00020) (2014)

Transcenic, Inc. vs. **Google Inc.**, Microsoft Corporation, America Online, Inc., MapQuest, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 11-582-LPS) (2014)

**Georgetown Rail Equipment Company** vs. Holland L.P. (United States District Court, Eastern District Of Texas, Tyler Division, Case No. 6:13-cv-366-MHS-JDL) (2014)

Uniloc USA, Inc. and Uniloc Luxembourg S.A. vs. **Activision Blizzard, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00256) (2014)

Ultratec, Inc. and CapTel, Inc. vs. **Sorenson Communications, Inc. and CaptionCall, LLC** (United States District Court, Western District Of Wisconsin, Case No.:3:13-cv-00346) (2014)

---

[2] Deposition testimony over the 1990-2014 time period.  Case citations and dates are subject to verification.  **Clients bolded.**

Deposition Testimony of Keith R. Ugone, Ph.D.

Personal Audio, LLC vs. **CBS Corporation, NBCUniversal Media, LLC, FOX Broadcasting Company, FOX Networks Group, Inc., Lotzi Digital, Inc. et al.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP, 2:13-cv-00271-JRG-RSP, 2:13-cv-577-JRG-RSP, 2:13-cv-00014-JRG-RSP) (2014)

In Re **ConAgra Foods, Inc.** (Wesson Oil) (United States District Court, Central District Of California, Western District, Case No. CV 11-05379-MMM, MDL No. 2291) (2014)

Optimize Technology Solutions, LLC vs. Staples, Inc., Dillard's, Inc., HSN, Inc., J.C.Penney Corporation, Inc., and **Recreational Equipment, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-CV-00419-JRG) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

Connecticut Ironworkers Employers Association, Inc., et al. vs. **New England Regional Council of Carpenters** (United States District Court, District Of Connecticut, Docket No. 3:10-CV-165-SRU) (2014)

**United Services Automobile Association** vs. Mitek Systems, Inc. (In The United States District Court For The Western District Of Texas, San Antonio Division, Case No. 5:12-cv-00282-FB) (2014)

Florida Atlantic University Research Corporation and Domaine Associates, LLC vs. **Acer Inc, ASUS Computer International, and TPV Technology Limited**, et al. (United States District Court, Southern District Of Florida, Case No.: 9:12-cv-80694-PAS, Case No.: 9:12-cv-80697, and Case No.: 9:12-cv-80701-PAS, respectively) (2014)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company**, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2014)

Brightstar Corp. and Brightstar, US, Inc. vs. **e-Recycling, LLC** (In The Circuit Of The 11th Judicial Circuit In And For Miami-Date County, Florida, Case No. 12-08985 CA 40) (2014)

US Airways, Inc. vs. **Sabre Holdings Corporation, Sabre Inc., and Sabre Travel International Limited** (United States District Court, Southern District Of New York, Civil Action No. 1:11-cv-02725-MGC) (2014)

**ASUS Computer International** vs. Round Rock Research, LLC (United States District Court, Northern District Of California, Civil Action No. 3:12-CV-02099-JST) (2014)

Yanira Algarin and Patsy Murdock, on behalf of themselves and all others similarly situated vs. **Maybelline, LLC d/b/a Maybelline New York** (United States District Court, Southern District of California, Case No. 12CV3000 AJB DHB) (2014)

11

Deposition Testimony of Keith R. Ugone, Ph.D.

Jean Melchior vs. **Hilite International, Inc.** (United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No.: 3:11-CV-03094-M) (2014)

Becton, Dickinson and Company vs. **Insulet Corporation** (In The United States District Court For The District Of New Jersey, Case No. 2:10-cv-04371-PGS-ES) (2014)

NuVasive, Inc. vs. **Globus Medical, Inc.** (In The District Court Of Travis County, Texas, Cause No. D-1-GN-11-002134) (2013)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (2013)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien, Inc. and Covidien, LP** (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2013)

Applied Medical Resources Corporation vs. **Tyco Healthcare Group LP d/b/a Covidien** (In The United States District Court For The Central District of California, Southern Division, Civil Action No.: SACV11-01406JVS (ANx)) (2013)

**Microsoft Corporation** vs. LBS Innovations LLC and LBS Innovations LLC, a Texas LLC (In the United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:12-cv-759-JRG) (2013)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (two depositions: 2013 (damages) and 2014 (preliminary injunction))

NeuStar, Inc. and Quova, Inc. vs. **F5 Networks, Inc.** (In The United States District Court For The Northern District Of California, San Jose Division, Case No. CV12-02574) (2013)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (2013)

**Swivelpole Group Pty Ltd. and Swivelpole Patent Pty Ltd** vs. Swivelpole USA, Ltd., Swivelpole Holdings, LLC, Swivelpole Canada Holdings, Inc., ILS Products, LLC, ILS Products Holdings, LLC, ILS Manufacturing, LLC, and Andrew Grant (In The District Court Of Harris County, Texas, 164th Judicial District, Cause No. 2012-42402) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2013)

Lodsys, LLC, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No.: 2:11-CV-90) (2013)

**One Technologies, L.P.** vs. Profinity, LLC and Chad D. Ertel (In The District Court Dallas County, Texas, 14th Judicial District, Cause No. 12-03980-A) (2013)

Eidos Display, LLC and Eidos III, LLC vs. AuOptronics Corporation, AU Optronics Corporation America, **Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc.**, Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013; three depositions)

SFA Systems, LLC vs. **Amazon.com, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-00052) (2013)

Palomar Medical Technologies, Inc. and The General Hospital Corporation vs. **TRIA Beauty, Inc.** (In The United States District Court, District Of Massachusetts, Civil Action No. 09-CV-11081-RWZ) (2013)

Maureen Stewart, Kelly Lamicella, and Nicole Bello vs. **Beam Global Spirits & Wine, Inc., Jim Beam Brands Co., SGC Global, L.L.C., Skinny Girl Cocktails, L.L.C., and Bethenny Frankel** (United States District Court For The District Of New Jersey, Civil Action No. 1:11-cv-05149 (NLH) (KMW) (2013)

Securities and Exchange Commission vs. **Life Partners Holdings, Inc.**, Brian Pardo, R. Scott Peden, and David M. Martin (The United States District Court For The Western District of Texas, Austin Division, Civil Action No.: 1-12-cv-00033-JRN) (2013)

**St. Jude Medical, Cardiology Division, Inc., St. Jude Medical Systems AB, and St. Jude Medical S.C., Inc.** vs. Volcano Corporation (In The United States District Court For The District Of Delaware, C.A. No. 10-631-RGA) (2013)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (2013)

**Sound Design Technologies, Ltd.** vs. Oticon, Inc., SeboTech Hearing Systems, LLC, and Gennum Corp. (The United States District Court For The District Of Arizona, No. CV11-1375-PHX-SRB) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

SmartPhone Technologies, LLC vs. Research In Motion, Corp., **Apple, Inc.**, et al. (The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-CV-74-LED) (2013)

**Lutron Electronics Co., Inc.** vs. Crestron Electronics, Inc., Face Group, Inc. d/b/a Lifestyle Electronics, Lava Corp., Audio Vision Systems, LLC (In The United States District Court, District Of Utah, Central Division, Case: 2:09-cv-707) (2012)

Oasis Research, LLC vs. AT&T Corp., **Carbonite, Inc., EMC Corp., Decho Corp., IOMEGA Corp., GoDaddy.com, Inc., Iron Mountain Incorporated, Iron Mountain Information Management, Inc., Pro Softnet Corp.**, et al. (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:10-cv-00435-MHS-ALM) (2012)

Secure Axcess, LLC vs. Bank of America Corp., **Arvest Bank, Bank of the Ozarks, Inc., Compass Bancshares, Inc., First National Bank Texas, First National Bank of Omaha, Zions Bancorporation**, et al. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-00670) (2012)

Kehlie R. Espinosa, Lillian E. Levoff, Thomas Ganin, and Daniel Baldeschi vs. **Hyundai Motor America** (United States District Court, Central District Of California, Case No. 2:12-cv-00800 GW (FFMx)) (2012)

Axcess International, Inc. vs. **Savi Technology, Inc.** (In The United States District Court For The Northern District Of Texas, Dallas Division, Case No. 3:10-cv-01033-F) (2012)

American Airlines, Inc. vs. **Sabre Inc.**, et al. (In The Judicial District Of Tarrant County, Texas, 67th Judicial District, No. 067-249214-10) (2012)

I/P Engine, Inc. vs. AOL, Inc.; **Google Inc.**; IAC Search & Media, Inc.; Gannett Company, Inc.; and Target Corporation (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

Deposition Testimony of Keith R. Ugone, Ph.D.

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; **Cellco Partnership d/b/a Verizon Wireless International, Inc.**; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and T-Mobile USA, Inc. (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; Cellco Partnership d/b/a Verizon Wireless International, Inc.; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and **T-Mobile USA, Inc.** (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (two depositions: 2012 and 2013)

Technical Resource Services, Inc., et al. vs. **Shell Exploration & Production, Company** (In The United States District Court For The Eastern District Of Louisiana, Civil Action No. 09-7339) (2012)

U.S. Bank National Association, Litigation Trustee of the Idearc Inc. et al. Litigation Trust vs. **Verizon Communications Inc., Verizon Financial Services, LLC, GTE Corporation**, and John W. Diercksen (In The United States District Court For The Northern District Of Texas, No. 3:10-CV-1842-G) (2012)

Eon Corp. IP Holdings, LLC vs. T-Mobile USA, Inc., Research In Motion Corporation, **Cellco Partnership d/b/a Verizon Wireless**, et al. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-cv-00379-LED) (2012)

My485, Inc. vs. **Riverside Partners, LLC, d/b/a The Riverside Company and HealthcareFirst, Inc.** (In The District Court, 67th Judicial District, Tarrant County, Texas, Cause No. 067 251767 11) (2012)

In Re Glaceau Vitamin Water Marketing and Sales Practice Litigation (No. II): **The Coca Cola Company and Energy Brands, Inc.** (In The United States District Court, Eastern District Of New York, Case No. 1:11-md-02215-DLI-RML) (2012)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012; two depositions)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2012)

Deposition Testimony of Keith R. Ugone, Ph.D.

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2012)

LSQ Funding Group, L.C. vs. **EDS Field Services n/k/a HP Enterprise Services, LLC** (United States District Court, Middle District Of Florida, Orlando Division, Case No.: 6:10-CV-1246-ORL-ACC-DAB) (2012)

*e***Plus Inc.**, vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Mitsubishi Heavy Industries, Ltd.** vs. General Electric Co. (In The United States District Court, Middle District Of Florida, Orlando Division, Civil Action No. 6:10-cv-812) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

W.L. Gore & Associates, Inc. vs. **GI Dynamics, Inc.** (United States District Court, District Of Arizona, No. CV 10-8088 PCT GMS) (2011)

LML Patent Corp. vs. JPMorgan Chase & Co.; **Wells Fargo Bank, N.A.; Wachovia Bank, N.A.**; Citigroup, Inc.; HSBC Bank USA, N.A.; Capital One National Association; Northern Trust Company; Deutsche Bank Trust Company; PayPal, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:08-cv-448 DF) (2011)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2011; two depositions)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2011 and 2012; two depositions)

Curtis Berrien; Rose Huerta; Tina Musharbash; Fern Prosnitz; Michael Andler; Marcus Boness; Timothy Bonnell; Richard Buford; Elaine Cefola; Kenneth Davis; Jerome Garoutte vs. **New Raintree Resorts International, LLC; RVC Members, LLC; Douglas Y. Bech** (In The United States District Court For The Northern District Of California, Oakland Division, Case No. CV10-3125 CW) (2011)

Deposition Testimony of Keith R. Ugone, Ph.D.

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Eon Corp. IP Holdings, LLC vs. **Sensus USA Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-00116) (2011)

Bedrock Computer Technologies LLC vs. **SoftLayer Technologies, Inc.; CitiWare Technology Solutions, LLC; Google Inc.; Yahoo! Inc.; MySpace Inc.; Amazon.com Inc.; PayPal Inc.; Match.com, LLC; and AOL Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Beneficial Innovations, Inc. vs. Blockdot, Inc.; CareerBuilder, LLC; CNET Networks, Inc.; Digg, Inc.; Ebaums's World, Inc.; Jabez Network, Inc.; **The New York Times Company**; The Washington Post Company; and The Weather Channel Interactive, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-263-TJW-CE) (2010)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc. (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Eon Corp. IP Holdings, LLC vs. **Verizon Clinton Center Drive Corp.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-cv-00385) (2010)

**Tyco Healthcare Group LP** vs. C.R. Bard, Inc. and Davol, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 09-264 (SLR)(MPT)) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; and **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

SP Syntax LLC and SP3 Syntax LLC vs. James Ching Hua Li, Man Kit (Thomas) Chow, Michael K. Chan, Vincent F. Sollitto, Jr, Wayne A. Pratt, John S. Hodgson, David P. Chavoustie, Christopher C. L. Liu, Alice Phang, **Ernst & Young LLP**, and Grobstein, Horwath & Company LLP (Superior Court Of The State Of California, County Of Los Angeles, Case No. BC402910) (2010)

**Gorlick Distribution Centers, LLC** vs. Car Sound Exhaust System, Inc. and Allied Exhaust Systems, Inc. (United States District Court, Western District of Washington at Seattle, Case No. C07-1076 RAJ) (2010)

Stacy Holk, on behalf of Herself and all others similarly situated vs. **Snapple Beverage Corporation** (United States District Court, District of New Jersey, Civil Action No. 3:07-cv-03018-MJC-JJH) and Evan Weiner and Timothy McCausland on behalf of themselves and all others similarly situated vs. Snapple Beverage Corporation (United States District Court For The Southern District Of New York, Civil Action No. 07-cv-08742) (2010)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2010; two depositions)

Good Sportsman Marketing, LLC and IP Holdings, Inc. vs. **Non Typical, Inc., Mark Cuddeback, and Richard Scales Advertising Associates, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 06:07-cv-00177-LED) (2010)

DataTreasury Corporation vs. **Wachovia Corporation, Wachovia Bank National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

DataTreasury Corporation vs. **Wells Fargo & Company, Wells Fargo Bank, National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. Brookshire Enterprises, LLC, Custom Computer Cable, Inc., Jackson Browne, LLC, Courtney Matthews, and **Electronic Data Systems, LLC** (Virginia: In The Circuit Court For Loudoun County, Civil Case No. CL 46964) (2009)

Deposition Testimony of Keith R. Ugone, Ph.D.

MHL Tek, LLC vs. Nissan Motor Co., Nissan North America, Inc., Nissan Technical Center North America, Inc., Hyundai Motor Co., Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, Kia Motors Corporation, Kia Motors America, Inc., Dr. Ing. H.C.F. Porsche AG, Porsche Cars North America, Inc., Bayerische Motoren Werke AG, BMW of North America LLC, BMW Manufacturing Co., LLC, Isuzu Motors Ltd., Isuzu Motors America, Inc., Subaru of America, Inc., Subaru of Indiana Automotive, Inc., **Audi AG, Volkswagen AG, and Volkswagen Group of America, Inc.**  (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-289-TJW) (2009)

**Crane Co. and Dixie-Narco Inc.** vs. SandenVendo America, Inc. and Royal Vendors, Inc.  (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-42) (2009)

**LG Electronics Inc.** vs. Hitachi, Ltd., Hitachi Automotive Products (USA), Inc., Clarion Co. Ltd., Clarion Corporation of America and Xanavi Informatics Corporation.  (In The United States District Court, Eastern District Of Texas, Texarkana Division, Civil Action No. 5:07-CV-90) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**The Compliance Source, Inc. and Digital Docs, Inc.** vs. GreenPoint Mortgage Funding, Inc. (In The United States District Court, Northern District Of Texas, Dallas Division, Civil Action No. 3-06-cv1057-L (ECF)) (2008)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2008)

**Lutron Electronics Co. Inc.** vs. Control4 Corporation (In The United States District Court For The District Of Utah, Central Division, Civil Action No. 2-03-CV-00401 DAK) (2008)

ELB Enterprises of Dallas, L.P. and Bai-Mac, Inc. vs. **McDonald's Corporation, McDonald's USA, LLC, and Golden Arch of Texas, Inc., and Ricardo Colon** (In The Court At Law, Court No. 4, Dallas County, Texas, Cause No. CC-06-17226-D) (2008)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2008)

Iovate Health Sciences, Inc., University of Florida Research Foundation, Inc. and Flamma SpA vs. **Bio-Engineered Supplements & Nutrition, Inc., d/b/a BSN, Inc.** and Medical Research Institute (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Case No. 9:07-cv-46) (2008)

Ronald A. Katz Technology Licensing, L.P. vs. **The DIRECTV Group, Inc., DIRECTV, Inc., DIRECTV Holdings, LLC, DIRECTV Enterprises, LLC, and DIRECTV Customer Services, Inc.** (In The United States District Court, Central District of California, Case No. 2:07-CV2322 RGK (FFMx) and Case No. 2:07-ML-1816-B RGK (FFMx), originally filed in the Eastern District of Texas as Case No. 9:06-CV-00193-RHC) (2008)

Quantum Unlimited, LLC, Quantum of Troon North, LLC, and Redsky Resorts of Troon North, LLC n/k/a Redsky Resorts, LLC vs. **Wyndham International, Inc.**, Tempus Resorts International, Ltd, **The Blackstone Group L.P.**, et al. (In The District Court Of Dallas County, Texas, 298th Judicial District) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008; two depositions)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

$O_2$Micro International Limited vs. **Rohm Co. Ltd.**, Sony Corporation, Sony EMCS Corporation, Sony Corporation of America, and Sony Electronics Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2-05-CV-00211-TJW) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008)

**Abbott Laboratories and Abbott Diabetes Care Inc.** vs. Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc., and Bayer Healthcare LLC; Abbott Laboratories and TheraSense, Inc. vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 MJJ, Civil Action No. C04-3327 MJJ, Civil Action No. C04-3732 MJJ, and Civil Action No. C05-3117 MJJ) (2008; two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

United States of America, ex rel Toni R. Barron and Vicky J. Scheel vs. Deloitte & Touche, LLP, Deloitte Touche Consulting Group, LLC, Deloitte & Touche Consulting Group Holding, LLC, Medicaid Solutions of Texas, and **National Heritage Insurance Company** (In The United States District Court, Western District of Texas, Civil Action No. SA-99-CV-1093FB) (2007)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2007)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:06CV140-RHC) (2007)

**Tinkers & Chance** vs. LeapFrog Enterprises, Inc. (In The United States District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-349-TJW) (2007)

**DEJ Productions, Inc., Blockbuster Inc., and First Look Studios, Inc.** vs. Media 8 Entertainment and MDP Distribution, Inc. (In The District Court of Dallas County, Texas, M-298[th] Judicial District, Cause No. 06-01887) (2007)

Art International Forwarding, Inc. vs. **The Pasha Group and Gosselin Worldwide Moving, N.V.** (In The United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:05-CV-01410-RWS) (2007)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2007)

**Nike, Inc.** vs. adidas Salomon North America, Inc., adidas America Inc. d/b/a adidas International, and adidas Promotional Retail Operations Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-43-RHC) (2007)

**BIAX Corporation** vs. Intel Corporation and Analog Devices, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-184-TJW) (2007)

Two-Way Media, LLC vs. **America Online, Inc.** (In The United States District Court For The Southern District of Texas, Corpus Christi Division, Civil Action No. C-04-089) (2007)

In re Enron Corporation Securities Litigation; Kevin Lamkin, Janice Schuette, Robert Ferrell and Stephen Miller vs. **UBS Financial Services, Inc. and UBS Securities LLC** (Civil Action No. H:02-CV-0851; Consolidated MDL) and Samuel Giancarlo vs. **UBS Financial Services, Inc., UBS Securities LLC., and UBS AG** (Civil Action No. H-03-4359; Consolidated MDL) (In The United States District Court For The Southern District of Texas, Houston Division) (2007)

Deposition Testimony of Keith R. Ugone, Ph.D.

$O_2$Micro International Limited vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-323 (Ward)) (2007)

CNX Gas Corporation and CNX Gas Company LLC vs. **CDX Gas Company LLC** vs. CONSOL Energy, Inc. (In The United States District Court For The Western District of Pennsylvania, Civil Action No. 05-CV-1574) (2007)

**Parkade Center, Inc.** vs. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc. (In The District Court 398th Judicial District of Hildalgo County, Texas, Cause No. C-2584-06-1) (2007)

The Post Confirmation Trust (The Fleming Companies) vs. **Digital Exchange Systems, Inc.** (In The United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:05-CV-165(TJW)) (2007)

Golden Bridge Technology, Inc. vs. **Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Qualcomm Incorporated, and Lucent Technologies, Inc.** (In The United States District Court for the Eastern District of Texas, Tyler Division, Civil Action No: 6:06-cv-00163-LED) (2006)

John P. Rochon, Nick G. Bouras, Nu-Kote International, Inc., J.R. Investment Corporation, Richmont Corporation and Nu-Kote Acquisition Corporation vs. **Akin Gump Strauss Hauer & Feld, LLP and Alan Feld** (In The District Court of Dallas County, Texas, 192nd Judicial District, Cause No. 04-03311-K) (2006)

**Autobytel Inc.** vs. Dealix Corporation (United States District Court Eastern District of Texas, Marshall Division, Case No. 2:04-cv-338-LED) (2006)

**Electronic Data Systems Corporation and EDS Information Systems, L.L.C.** vs. MCI Communications Services, Inc. (Before the American Arbitration Association, Arbitration No. 13 181 00976 06) (2006)

Jeffrey A. Kozak vs. **Medtronic Sofamor Danek** (In The United States District Court for the Southern District of Texas, Houston Division, Civil Action Number H-03-4400) (2006)

Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc. v. **Advanced Medical Optics, Inc.** (In The United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4-05CV-496-A) (2006)

Eckhard U. Alt, MD vs. **Medtronic, Inc.** (In The United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:04CV370) (2006)

Deposition Testimony of Keith R. Ugone, Ph.D.

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

In re: **Williams** Securities Litigation (WCG Subclass) (In The United States District Court for the Northern District of Oklahoma, Case No. 02-CV-72H(M)) (2006)

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson vs. **Fulbright & Jaworski, LLP** (United States District Court Western District of Texas, Austin Division, Cause No. A 05 CA 334 SS) (2006)

Children's Medical Center of Dallas vs. **Columbia Hospital at Medical Center Dallas Subsidiary L.P.** (In The United States District Court Northern District Of Texas, Dallas Division, Civil Action No. 3:04-CV-2436-BD) (2006)

Vantage Controls, Inc. vs. **Lutron Electronics Co., Inc.** (In The United States District Court for the District of Utah, Central Division, Case No. 2:03-CV-00488TC) (2006)

Blueberry Sales, L.P., f/k/a Blueberry Confections, Inc. vs. **ED&F Man Sugar, Inc.** (United States District Court for the Western District of Texas, El Paso Division, EP-04-CA0193) (2005)

**Cummins-Allison Corp.** vs. Glory LTD., Glory Shoji Co., LTD., and Glory (U.S.A.), Inc. (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2-03-CV-358 (TJW)) (2005)

Gilbert R. Sada and Victor L. Hernandez vs. **Jack In The Box Inc.** (United States District Court for the Western District of Texas, San Antonio Division. Civil Action No. SA04CA0541 (OG)) (2005)

Trinity Mother Frances Health System and Mother Frances Hospital vs. **East Texas Medical Center Regional Healthcare System and East Texas Medical Center** (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:03CV464) (2005)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2005; two depositions)

William Rutledge Scott, Individually and as Independent Executor of the Estate of Mozelle Rutledge Scott, Deceased vs. **Hughes & Luce, L.L.P., Kathryn G. Henkel, and Laurel Stephenson** (In the County Court of Tom Green County, Texas, Cause No. 02P211-L) (2005)

Junitha Bee, et al. vs. Kavilico Corporation, ITT Neodyne, **Parker Hannifin**, and the Boeing Company (Superior Court of the State of California, County of Los Angeles, Case No. C99-589C) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

MOSAID Technologies Incorporated vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (In the United States District Court for the District of New Jersey, Civil Action No. 01-4340 (WJM)) (2004)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2004)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Airbel Wireless, Inc. and JAVS Telecom, Inc. vs. **AT&T Wireless Services, Inc.** (American Arbitration Association, New York, Case No. 13 Y 199 00709 03) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2003 and 2004; two depositions)

Anthony Stella and Mary S. Stella, Individually and on Behalf of all Persons Similarly Situated in the State of Texas vs. **Grant Thorton, L.L.P.** (In the District Court of Galveston County, 212th Judicial District) (2003)

Administaff, Inc. and Administaff of Texas, Inc. vs. **Aetna Life Insurance Company** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:01CV3802) (2003)

GATT Trading, Inc. vs. **Sears, Roebuck and Co.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:01CV260) (2003)

**IEX Corporation** vs. Blue Pumpkin Software, Inc. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:01CV16) (2003 and 2005; two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

Teleplus, Inc., vs. **MCI Telecommunications Corporation, MCI International Telecommunications Corporation, MCI International Inc., MCI Communications Corporation, MCI Worldcom, Inc., MCI Global Support Corporation, MCI Global Access Corporation, and Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2002)

Customedia Technologies, LLC and William H. Lewis vs. Joby Hughes, Felsman, Bradley, Gunter & Dillon, Stephen Perkins, **Sidley & Austin**, Litigation Risk Management, Inc., and Granite Ventures, Inc. (In the District Court of Harris County, Texas, 125th Judicial District, Case No. 2000-26667) (2002 and 2003; two depositions)

Edward Ahearn vs. **Ernst & Young, L.L.P.** (Before the American Arbitration Association, Case No. 13-107-00136-01) (2002)

John H. Houser and Frederick A. Raffa vs. **Wachovia Corporation** (In the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV1041-T-17MSS) (2002)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2002 and 2003; two depositions)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

Tyler Jet, L.L.C., TeamXtreme Racing, L.L.C., and Burl Outlaw vs. **Lycos, Inc.** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV-179) (2001)

EPI Environmental Products, Inc. vs. **In-Line Plastics, L.C.** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:98CV4209) (2001)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Health Laboratories of North America, Inc., et al. vs. **Neodata Services, Inc.** (In the Superior Court of the State of Arizona In and For the County of Maricopa, Civil Action No. CV1998-008143) (2001)

Acres Gaming Inc. vs. Mikohn Gaming Corporation and **Casino Data Systems** (In the United States District Court District of Nevada, Civil Action No. CV-S-01462-PMP (RJJ)) (2000)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V.**, et. al. (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2000)

Healthtech Diagnostics, Corporation and Oncogenetics, Inc. vs. **Impath, Inc. and Impath-HDC, Inc.** (In the District Court of Dallas County, Texas, L-193rd Judicial District, Case No. 97-08552) (2000)

Pacific Southwest Bank and NAFCO Holding Company, LLC vs. **Electronic Data Systems Corporation** (In the District Court of Dallas County, Texas, 191st Judicial District, Cause No. 98-5954) (2000)

Anthony D. Viazis, et. al. vs. **American Association of Orthodontists**, et. al. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:98-CV-245) (2000)

**Kvaerner Oilfield Products, Inc.** vs. Cooper Cameron Corp. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-98-3369) (2000)

J.V. Smith, et al. vs. Randyl Louis Harrell, **Enterprise Products Company**, et. al. (In the District Court of Liberty County, Texas, 75th Judicial District) (2000)

Norman Yourish, et. al. vs. **California Amplifier**, et. al. (Superior Court of the State of California for the County of Ventura, Civil Action No. CIV173569) (2000)

David Kimberly Hackett, individually and Samuel G. Swope, individually and as Assignees of Courtesy Auto Group, Inc. vs. **Electronic Data Systems, Inc.** (In the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 98-1065-CIV-19-A) (2000)

County Council of Northampton County vs. **SHL Systemhouse Corp.** vs. Northampton County (In the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 98-CV-0088) (1999)

**Natural Reserves Group, Inc.** vs. Baker Hughes, Inc., et. al. (In the United States District Court for the Southern District of Texas, Harris County Division, Civil Action No. 96-31380) (1999)

**BeautiControl, Inc.** vs. Ryco Packaging Corp. vs. Arrowpak, Inc. and Custom Decorative Systems, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-98CV1775-H) (1999)

Peoples National Bank, Peoples National Mortgage Corp., and Texas Peoples National Bancshares, Inc. vs. Russell A. McClendon, **St. Paul Mercury Insurance Company**, Smith-Reagan Life and Health Insurance Agency, Inc. and Gary Robertson (In the District Court Lamar County, Texas, 62nd Judicial District) (1999)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Petrofac, Inc. and Petrofac International, Ltd. vs. **Howe-Baker Engineers, Inc. and Omar J. Ghalayini** (In the County Court at Law; Smith County, Texas, Cause No. 39,839) (1998)

L & S Concrete Company, Inc., Gilliam Brothers, Inc., Webco, Inc., Charles T. Weaver, Gus Blass, III, Bob Townsell, Alex Lieblong, and Dr. Thomas Robinson vs. **Trans World Airlines, Inc.** (In the United States District Court for the Eastern District of Arkansas Western Division, Case No. Civ-97-378) (1998)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1997)

**Excel Telecommunications, Inc., Excel Communications, Inc., Steve Smith, and Kenny Troutt** vs. Linden Wood, Brad Campbell, Candy Campbell, Jerry Szeszulski, and Team Excel of Independent Representatives (American Arbitration Association, Dallas, Texas Region) (1997)

**Gourmet Award Foods** vs. Continental Extrusion, Genpak Corporation, and Heartland Packaging Corporation (Judicial District Court of Dallas County, Texas, D-95th Judicial District) (1997)

L. Anne H. Frazier vs. **Owsley Brown Frazier** (Jefferson Family Court, Division Eight; Louisville, Kentucky, Case No. 94-FD-01957) (1997)

Dodee Frost Crockett vs. **Randy Miller and Gina Kaiser** (In the District Court of Dallas County, Texas; 192nd Judicial District) (1996)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1996)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Deposition Testimony of Keith R. Ugone, Ph.D.

James Hylsky and Terri Hylsky vs. **Fruehauf Trailer Corporation**, et. al. (In the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois) (1996)

In Re: **CSC Industries, Inc.** and In Re: **Copperweld Steel Company** (In the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, Civil Case No. 4:93bk41898) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Lacerta Enterprises, Inc. dba Frontline Systems, Inc. vs. **Geac Computers, Inc. and Fasfax Corporation** (U.S. District Court for the District of Arizona, Case No. CIV 95-0649 PHX (ROS)) (1995)

Bluebonnet Savings Bank, et. al. vs. **Federal Deposit Insurance Corporation**, et. al. (U.S. District Court for the Northern District of Texas, Dallas, Civil Action No. 3:91CV1066) (1995)

Circo Craft Company, Inc. vs. **AMP-AKZO Corporation**, et. al. (Superior Court of the State of California for the County of San Diego, North County District) (1995)

BancTec USA, Inc. vs. **Advanced Financial Solutions**, et. al. (U.S. District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:93CV1277) (1994)

**Ivy Goth** vs. Datsun-Nissan Motor Company, Ltd., et. al. (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1994)

Cybor Corporation vs. **FAS Technologies and FAStar Ltd.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1994)

Texas State Bank, et. al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994; two depositions)

Auto Color Specialists, Inc. and Polly Chen vs. **BASF** (Superior Court of the State of California for the County of Orange, Case No. 677861) (1994)

**Tactical Edge, Inc.** vs. Gall's, Inc. (District Court of the Fourth Judicial District of the State of Idaho in and for the County of Ada) (1994)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

Dominquez vs. **Holy Cross Hospital** (Superior Court of the State of California for the County of Los Angeles) (1993)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Union Oil Company of California** vs. International Insurance Company, et. al. (Superior Court of the State of California) (1993)

Maranatha Music! vs. **Capital Cities, Inc./ABC, Inc., and Word, Inc.** (U.S. District Court for the Western District of Texas, Waco Division) (1993)

**Villarreal** vs. East Side Union High School District (Superior Court of the State of California) (1993)

Official Committee of Creditors Holding Unsecured Claims on behalf of First Capital Holdings Corporation vs. **Shearson Lehman Brothers Holdings Inc.**, et. al. (U.S. District Court for the Central District of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993; three depositions)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

Holabird Sports Discounters vs. **Tennis Tutor, Inc.** (U.S. District Court for the District of Maryland, Civil Action No. 1:91CV2208) (1992)

Expo-Tech Electrical & Plumbing Services vs. **Greyhound Exposition Services** (1992)

**De Laurentiis Entertainment Group, Inc.** Securities Litigation; **De Laurentiis Film Partners** Securities Litigation (U.S. District Court for the Central District of California) (1991; two depositions)

James T. Ryan vs. **Crowley Towing and Transportation and Shell Oil Company** (Superior Court of the State of California for the County of Los Angeles) (1991)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc., vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

Frank V. and Gloria Lumbert vs. **Robert C. Skinner and Lillian R. Skinner**, et. al. (Superior Court of the State of California for the County of Los Angeles) (1990)

Plaintiff vs. **Valley Hunt Club**, Tournament of Roses, et. al. (Superior Court of the State of California) (1990)

Kippy Thomas vs. **Mary Lendo and Circle K**, (Superior Court of the State of California for the County of Riverside) (1990)

**Exhibit 3**

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|

### Legal Documents

Class Action Complaint

Declaration of Colin B. Weir dated August 11, 2014

Declaration of Plaintiff Erin Allen in Support of Motion for Class Certification dated August 10, 2014

Declaration of Ureka Idstrom in Support of Plaintiff's Motion for Class Certification

First Amended Class Action Complaint

Plaintiff's Notice of Motion and Motion for Class Certification; Memorandum or Points and Authorities in Support

Unredacted Declaration of Lee M. Gordon in Support of Plaintiff's Motion for Class Certification dated August 11, 2014

### Deposition Transcripts and Associated Exhibits

30(b)(6) Deposition of ConAgra by Chris Chatzidakis taken June 24, 2014

30(b)(6) Deposition of ConAgra by Chris Chatzidakis, Volume II,  taken June 25, 2014

30(b)(6) Deposition of ConAgra by Karrie Weis taken June 25, 2014

30(b)(6) Deposition of ConAgra by Patrick Fitzgerald, Volume II, taken June 24, 2014

30(b)(6) Deposition of ConAgra by Robert Ewart taken June 24, 2014

30(b)(6) Deposition of ConAgra Foods by Catherine Bartholomew, taken June 26, 2014

30(b)(6) Deposition of ConAgra Foods by Catherine Bartholomew, Volume II, taken June 27, 2014

30(b)(6) Deposition of ConAgra Foods by Jeremy Attal taken June 26, 2014 and Associated Exhibits

30(b)(6) Deposition of ConAgra Foods by Karl Sears taken June 26, 2014 and Associated Exhibits

Deposition of Alison Watkins taken June 25, 2014

Deposition of Colin B. Wier taken September 30, 2014

Deposition of Erin Allen taken August 28, 2014

Deposition of Patrick Fitzgerald taken June 23, 2014 and Associated Exhibits

Deposition of Steven Asnes taken June 26, 2014 and Associated Exhibits

### Documents Produced by Plaintiff

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Various Color Photographs | PTF | 000001 | 000010 |
| Margarine: Consumption by How Used and Meal Occasion Table, Four Years Ending May 2008 Table | PTF | 000011 | 000011 |
| Margarine: Age/Demographic Profile, Four Years Ending May 2008 Table | PTF | 000012 | 000020 |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
| --- | --- | --- | --- |
| Top Host Foods to Margarine When Used as an Additive or Ingredient, Four Years Ending May 2008 Table | PTF | 000021 | 000034 |
| Top Host Foods to Margarine When Used as an Additive, Four Years Ending May 2008 Table | PTF | 000035 | 000045 |
| Top Host Foods to Margarine When Used as an Additive Indexed to Total Margarine, Four Years Ending May 2008 Table | PTF | 000046 | 000048 |
| Top Host Foods to Margarine When Used as an Ingredient, Four Years Ending May 2008 Table | PTF | 000049 | 000056 |
| Top Host Foods to Margarine When Used as an Ingredient Indexed to Total, Four Years Ending May 2008 Table | PTF | 000057 | 000058 |
| When Liquid/Bottle Margarine is Used as an Additive to Bread: When Is It Consumed, Ten Years Ending May 2008 | PTF | 000059 | 000060 |
| Parkay Spray P&L Summary, FY08 - FY14 | PTF | 000061 | 000061 |
| Parkay Spray Detailed P&L, FY08 - FY14 | PTF | 000062 | 000062 |
| Parkay Spray Retail Only Net Sales and Profits Summary, FY08 - FY12 | PTF | 000063 | 000064 |
| Parkay Sprd, 16/8oz Spray Sum of Total Sold to State Name Table, FY08 - FY12 | PTF | 000065 | 000069 |
| Per "Sold To" Detailed Pull, FY08 - FY12 | PTF | 000070 | 000070 |
| Excluding Puerto Rico Sum of Total, FY08- FY12 | PTF | 000071 | 000071 |
| Parkay Squeeze/Spray SHP P&L Summary, FY08 - FY14 | PTF | 000072 | 000072 |
| Parkay Spray Retail Only Net Sales and Profit Summary, FY08 - FY12 | PTF | 000073 | 000073 |
| Parkay Spray Retail Only Net Sales and Profit Summary, FY08 - FY12 | PTF | 000074 | 000074 |
| Per Dave Denakas Sum of Total Type Sales and Sum of Total Sales Excluding Puerto Rico, FY08 - FY12 | PTF | 000075 | 000075 |
| Parkay Sum of Total Sold to State Name, PRK Sprd 16/8z Spray, FY08 - FY12 | PTF | 000076 | 000080 |
| Total Sold by Brand to Company and State, FY 09 | PTF | 000081 | 000089 |
| Table Spreads Stick Pricing Tracker Table | PTF | 000090 | 000092 |
| Various Parkay Images | PTF | 000093 | 000098 |
| Deposition of Colin B. Weir taken May 23, 2014 in the ConAgra Foods, Inc. Matter (U.S. District Court in the Central District of California, Western Division, 11-05379-mmm) | PTF | 000099 | 000218 |
| September 2, 2014 Invoice from Economics and Technology, Inc. to Hagens, Berman, Sobol, Shapiro LLP regarding Professional Services in the Allen v. ConAgra Foods, Inc. Matter | PTF | 000219 | 000220 |
| 30(b)(6) Deposition of ConAgra Foods by Catherine Bartholomew taken June 26, 2014, Volume 1, in the Erin Allen v. ConAgra Foods, Inc. Matter (U.S. District Court in the Northern District of California, San Francisco Division, 3:13cv01279) | PTF | 000221 | 000236 |
| 30(b)(6) Deposition of ConAgra Foods by Catherine Bartholomew taken June 27, 2014, Volume 2, in the Erin Allen v. ConAgra Foods, Inc., Matter (U.S. District Court in the Northern District of California, San Francisco Division, 3:13cv01279) | PTF | 000237 | 000332 |
| Decision in the  Brazil v. Dole Packaged Foods, LLC Matter dated May 30, 2014 (US District Court, Northern District of California, San Jose Division, 12-cv01831) | PTF | 000333 | 000349 |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| 30(b)(6) Deposition of ConAgra Foods by Chris Chatzidakis taken June 24, 2014, Volume 1, in the Erin Allen v. ConAgra Foods, Inc. Matter (U.S. District Court in the Northern District of California, San Francisco Division, 3:13-cv-01279-jst) | PTF | 000350 | 000383 |
| 30(b)(6) Deposition of ConAgra Foods by Chris Chatzidakis taken June 25, 2014, Volume 2, in the Erin Allen v. ConAgra Foods, Inc. Matter (U.S. District Court in the Northern District of California, San Francisco Division, 3:13-cv-01279-jst) | PTF | 000384 | 000439 |
| Class Action Complaint in the Erin Allen v. ConAgra Foods Inc. Matter (U.S. District Court for the Northern District of California, 13-1279) | PTF | 000440 | 000473 |
| Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis International Journal of Innovation, Management and Technology, Vol. 4 No. 6, December 2013 | PTF | 000474 | 000479 |
| Deposition of Patrick Fitzgerald taken June 23, 2014 in the Erin Allen v. ConAgra Foods, Inc. Matter (U.S. District Court, for the Northern Division of California, San Francisco Division, 13-cv-1279-vc) | PTF | 000480 | 000574 |
| 30(b)(6) Deposition of ConAgra by Patrick Fitzgerald taken June 24, 2014 in the Erin Allen v. ConAgra Foods, Inc. Matter (U.S. District Court for the Northern District of California, San Francisco Division, 3:13-cv-01279-jst) | PTF | 000575 | 000623 |
| July 31, 2014 Invoice from Economics and Technology, Inc. to Hagens, Berman, Sobol, Shapiro LLP regarding Professional Services in the Allen v. ConAgra Foods, Inc. Matter | PTF | 000624 | 000624 |
| June 30, 2014 Invoice from Economics and Technology, Inc. to Hagens, Berman, Sobol, Shapiro LLP regarding Professional Services in the Allen v. ConAgra Foods, Inc. Matter | PTF | 000625 | 000625 |
| Decision in the Khoday v. Symantec Corp. Matter, Slip Copy dated March 13, 2014 (US District Court, D. Minnesota, 11-180) | PTF | 000626 | 000653 |
| Note on Conjoint Analysis by John R. Hauser, MIT Sloan Management Courseware | PTF | 000654 | 000672 |
| Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis Abstract (http://www.nobi.nlm.nih.gov/pubmed/20074390) | PTF | 000673 | 000674 |
| Statement of Qualifications by Colin B. Weir | PTF | 000675 | 000680 |
| When "All Natural" May Not Be By Laura Stamm (http://www.Analysisgroup.com/assessing_false_advertising_claims.aspx?print=1) | PTF | 000681 | 000682 |

### Documents Produced by ConAgra

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| July 24, 2012 Email from Patrick Fitzgerald to Various regarding Table Spreads info for Gold Store | CAGAL | 000404 | 000406 |
| April 2, 2012 Email from Joey Matos to David Dobronski regarding Spreads Pricing - Request Approval for 1lb. Tub | CAGAL | 000464 | 000465 |
| Parkay FY13 Strategy | CAGAL | 000717 | 000749 |
| ConAgra Table Spreads Price and Promotion Study dated January 6, 2010 | CAGAL | 000956 | 000992 |
| ConAgra Table Spreads Price and Promotion Study dated January 26, 2009 | CAGAL | 001455 | 001589 |
| Tablespreads Portfolio Analysis Butter Spray and Squeeze Strategic Plan Presentation by ConAgra Foods | CAGAL | 001847 | 001857 |
| ConAgra Foods List | CAGAL | 001909 | 001924 |
| February 2, 2009 Email from Jim Donzelli to Various regarding January Pricing Report | CAGAL | 002061 | 002071 |
| ConAgra Grocery Foods Retail Pricing Report | CAGAL | 002073 | 002082 |
| Price Increases: Unilver vs. ConAgra, 2007, 2008 | CAGAL | 002090 | 002093 |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Tablespreads Overview and Plan: Indianapolis Plant Presentation by ConAgra dated April 4, 2008 | CAGAL | 002097 | 002158 |
| Table Spreads IRI Scorecard FY08 CAG Period 10 (4 Weeks Ending March 23, 2008) | CAGAL | 002160 | 002165 |
| 067 Butter/Margarine - Period 9, 2012 Presentation by ConAgra | CAGAL | 002312 | 002357 |
| ConAgra Table Spreads List | CAGAL | 002565 | 002640 |
| Table Spreads IRI Scorecard 5 Weeks Ending February 24, 2008 | CAGAL | 003222 | 003291 |
| Various Retail Sales and Pricing Data | CAGAL | 003293 | 003492 |
| Product Fact Sheet dated July 13, 2011 | CAGAL | 004250 | 004269 |
| Retail Interaction Data (CAGAL_004346.xls) | CAGAL | 004346 | 004346 |
| Table Spreads Assortment Drivers Model - Preference Indices IRI Panel Data, TUS Food, 52 Weeks Ending July 16, 2006 (CAGAL_004347.xls) | CAGAL | 004347 | 004347 |
| IRI Consumer Network Panel Data, Total US All Outlets, 52 weeks ending May 7, 2006 (CAGAL_004348.xls) | CAGAL | 004348 | 004348 |
| Table Spreads Cross Purchase Sales, Share, % HH Buying, Purchase Occasions Per Buyer, Sales Per Occasion, 52 Weeks Ending March 19, 2006 (CAGAL_004349.xls) | CAGAL | 004349 | 004349 |
| October 14, 2009 Email from Judith Breish to Various regarding Tablespreads Pricing Work by IRI | CAGAL | 005137 | 005137 |
| Table Spreads IRI Scorecard 4 Weeks Ending December 23, 2007 (CAGAL_006016.xls) | CAGAL | 006016 | 006016 |
| Table Spreads IRI Scorecard 4 Weeks Ending September 23, 2007 (CAGAL_006018.xls) | CAGAL | 006018 | 006018 |
| Table Spreads IRI Scorecard 4 Weeks Ending October 21, 2007 (CAGAL_006020.xls) | CAGAL | 006020 | 006020 |
| Table Spreads IRI Scorecard 4 Weeks Ending August 19, 2007 (CAGAL_006022.xls) | CAGAL | 006022 | 006022 |
| Edible Fats and Oils - U.S., February 2008 Report | CAGAL | 006339 | 006429 |
| Various Retail Sales and Pricing Data (CAGAL_006437.xlsx) | CAGAL | 006437 | 006437 |
| Various Retail Sales and Pricing Data  (CAGAL_006438.xlsx) | CAGAL | 006438 | 006438 |
| Various Retail Sales and Pricing Data (CAGAL_006439.xlsx) | CAGAL | 006439 | 006439 |
| Table Spreads IRI Scorecard 4 Weeks Ending February 24, 2008 (CAGAL_006633.xls) | CAGAL | 006633 | 006633 |
| Table Spreads IRI Scorecard 4 Weeks Ending January 20, 2008 (CAGAL_006634.xls) | CAGAL | 006634 | 006634 |
| ConAgra Brand Tablespreads Portfolio | CAGAL | 007793 | 007824 |
| Various Retail Sales and Pricing Data (CAGAL_008259.xlsx) | CAGAL | 008259 | 008259 |
| October 6, 2009 Email from Brenda Jennings to Jeremy Attal regarding Spreads FSI History with Attached Tablespreads Values and Events.xlsx | CAGAL | 008261 | 008261 |
| Various Retail Sales and Pricing Data (CAGAL_008896.xlsx) | CAGAL | 008896 | 008896 |
| Various Retail Sales and Pricing Data (CAGAL_008913.xls) | CAGAL | 008913 | 008913 |
| Various Retail Sales and Pricing Data (CAGAL_008914.xls) | CAGAL | 008914 | 008914 |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Various Retail Sales and Pricing Data (CAGAL_008941.xlsx) | CAGAL | 008941 | 008941 |
| August 18, 2010 Email from Jeremy Attal to Steven Asnes regarding Spreads Elasticities | CAGAL | 008987 | 008987 |
| BPEs for Parkay Items Range from Inelastic to Elastic, While FSLM Items are Inelastic and BB Items Continue to be Elastic Presentation by Information Resources | CAGAL | 008988 | 008988 |
| Butter, Margarine and Spreads - U.S., August 2011 Report by Mintel Group Ltd. | CAGAL | 009235 | 009344 |
| Butter, Margarine and Spreads, August 2011 Presentation by Mintel International Group Ltd. | CAGAL | 009345 | 009356 |
| Various Retail Sales and Pricing Data (CAGAL_010979.xlsx) | CAGAL | 010979 | 010979 |
| Various Retail Sales and Pricing Data (CAGAL_010980.xlsx) | CAGAL | 010980 | 010980 |
| Various Retail Sales and Pricing Data (CAGAL_010981.xlsx) | CAGAL | 010981 | 010981 |
| Various Retail Sales and Pricing Data (CAGAL_010982.xlsx) | CAGAL | 010982 | 010982 |
| Various Retail Sales and Pricing Data (CAGAL_010983.xlsx) | CAGAL | 010983 | 010983 |
| Various Retail Sales and Pricing Data (CAGAL_010984.xlsx) | CAGAL | 010984 | 010984 |
| Various Retail Sales and Pricing Data (CAGAL_010985.xlsx) | CAGAL | 010985 | 010985 |
| Various Retail Sales and Pricing Data (CAGAL_010986.xlsx) | CAGAL | 010986 | 010986 |
| Various Retail Sales and Pricing Data (CAGAL_010987.xlsx) | CAGAL | 010987 | 010987 |

## Documents Produced by Third Parties

IRI Retail Sales and Pricing Data (IRI_ConAgra2_0001^CONFIDENTIAL-ATTORNEYS' EYES ONLY.xlsx)

## Documents Independently Obtained

"Age and Sex Composition: 2010," 2010 Census Briefs (http://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf, viewed on October 6, 2014)

"Chapter 9: Interpreting the Results of Conjoint Analysis," Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Orme, B. Second Edition (http://www.sawtoothsoftware.com/download/techpap/interpca.pdf, viewed on September 11, 2014)

"Company News; ConAgra Buys Several Margarine Brands from Nabisco," The New York Times, July 22, 1998 (http://www.nytimes.com/1998/07/22/business/company-news-conagra-buys-several-margarine-brands-from-nabisco.html, viewed on September 11, 2014)

"I Can't Believe It's Not Butter! Original Spray" (http://www.icantbelieveitsnotbutter com/product/detail/129811/i-can-t-believe-it-s-not-butter-original-butter-spray, viewed on September 29, 2014)

"Parkay margarine:  A fresh and creamy taste" (http://www.conagrafoods.com/our-food/brands/parkay, viewed on September 11, 2014)

"Parkay: Our Spreads" (http://www.parkay.com/our-spreads.jsp, viewed on September 11, 2014)

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
| --- | --- | --- | --- |
| "Report of the NOAA Panel on Contingent Valuation," Arrow, K. et al., dated January 11, 1993 (http://www.darrp.noaa.gov/economics/pdf/cvblue.pdf, viewed on September 15, 2014) | | | |
| ConAgra Foods, Inc. Form 10-K for the fiscal year ended May 25, 2014 | | | |
| Jeffrey M. Perloff, Microeconomics (5th Edition) | | | |
| SUPERVALU Inc. Form 10-K for the fiscal year ended February 22, 2014 | | | |

**Exhibit 4**

**Individuals Cited In the Rebuttal Expert Report Of Keith R. Ugone**

| Deponent | Date | Party/Title | Context of Reference in Report |
|---|---|---|---|
| Erin Allen | 8/28/2014 | Plaintiff | -Purchase history of Parkay Spray since 2009<br>-Usage of Parkay Spray<br>-Lack of receipts or other records reflecting her purchases of Parkay Spray |
| Colin Weir | 9/30/2014 | Plaintiff's Expert | -Proposed approaches for calculating claimed damages on a Class-wide basis<br>-Assignment of monetary value measure to conjoing survey results<br>-Calculation of claimed price premium on a dollar basis or on a percentage basis<br>-Target sample size for proposed surveys |
| Steven Asnes | 9/4/2014 | Director of Sales, ConAgra Foods, Inc. | -ConAgra does not sell directly to consumers or set retail prices |
| Jeremy Attal | 6/26/2014 | Vice President of Customer Strategy & Planning, ConAgra Foods, Inc. | -Information collected for ConAgra regarding Parkay Spray prices charged by Walmart |
| Catherine Bartholomew | 6/27/2014 | Senior Director of Consumer Insights, ConAgra Foods, Inc. | -Purchase drivers of Parkay Spray (e.g., uniqueness of spray form) |
| Patrick Fitzgerald | 9/4/2014 | Senior Brand Manager, ConAgra Foods, Inc. | -Varieties of Parkay products sold by ConAgra<br>-Purchase drivers of Parkay Spray (e.g., taste, spray form, convenience)<br>-Competition between Parkay Spray and I Can't Believe It's Not Butter |
| Karl Sears | 6/26/2014 | Vice President and General Manager, ConAgra Foods, Inc. | -Retail prices of Parkay Spray set by retailers and differ across retailers<br>-Higher wholesale pricing per ounce for Parkay Spray and Parkay Squeeze due to those products being relatively low volume products |

**Exhibit 5**

# EXHIBIT 5

# FILED UNDER SEAL

**Exhibit 6**

# EXHIBIT 6

# FILED UNDER SEAL

**Exhibit 7**

# EXHIBIT 7

# FILED UNDER SEAL

**Exhibit 8**

# EXHIBIT 8

# FILED UNDER SEAL

**Exhibit 9**

# EXHIBIT 9

# FILED UNDER SEAL

**Exhibit 10**

# EXHIBIT 10

# FILED UNDER SEAL