UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ERIN ALLEN, TYOKA BRUMFIELD, OFELIA FRECHETTE, SHELLEY HARDER, DEANA MARR, TAMMIE SHAWLEY, BRIAN SMITH, and BETTY VAZQUEZ, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CONAGRA FOODS INC., a Delaware corporation,<br><br>    Defendant. | Case No. 3:13-CV-01279-WHO<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

**<u>DECLARATION OF KEITH R. UGONE, PH.D.</u>**

**March 30, 2019**

CONFIDENTIAL

# DECLARATION OF KEITH R. UGONE, PH.D.

## March 30, 2019

I.      BACKGROUND AND OVERVIEW OF ASSIGNMENT ........................................... 1

     A. Allegations ........................................................................................... 1

     B. Prior Declarations And Court Ruling Denying Motion For Class Certification .......... 2

     C. Current Named Plaintiffs' Declarations .................................................. 3

     D. Assignment .......................................................................................... 5

II.     SUMMARY OF OPINIONS ........................................................................... 5

     A. Determination Of Claimed Economic Injury And Damages As A Result Of The Challenged Claims Requires Individual Inquiry .................................. 5

     B. Evaluation Of The Claimed *Price Premium Approach* In The Weir And Dennis Declarations ........................................................................... 9

         1. Dr. Dennis' Produced Simulator Fails to Reproduce Dr. Dennis' Claimed Price Premiums ........................................................ 9

         2. Dr. Dennis' Claimed Percentage Price Premiums Are Inconsistent With Market Evidence And Fail Reasonableness Tests .............. 11

         3. Dr. Dennis' Conjoint Analysis Yields Measures Of Willingness To Pay, Which Are Not A Reliable Estimate Of A Claimed Price Premium (If Any) ...... 12

     C. Evaluation Of Mr. Weir's *Full Refund Approach* ...................................... 15

III.    QUALIFICATIONS AND EXPERIENCE ....................................................... 16

IV.    FACTS, DATA, AND INFORMATION RECEIVED .......................................... 18

V.     OVERVIEW OF PARTIES ........................................................................... 19

     A. Named Plaintiffs .................................................................................. 19

         1. Erin Allen ............................................................................... 20

         2. Ofelia Frechette ...................................................................... 21

         3. Shelley Harder ........................................................................ 22

         4. Deana Marr ............................................................................ 23

         5. Tammie Shawley ..................................................................... 24

         6. Brian Smith ............................................................................ 25

     B. Conagra Brands, Inc. ........................................................................... 26

VI.    DETERMINING WHETHER AND TO WHAT EXTENT A PUTATIVE CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS REQUIRES INDIVIDUALIZED INQUIRY ................................................. 26

     A. Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Products ....................... 28

     B. Individual Inquiry Is Required To Determine Putative Class Members' Use (And Amounts Used) Of The Challenged Products .......................... 32

C. Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perceptions Related To The Challenged Claims.................................................. 35

D. Individual Inquiry Is Required To Determine The Specific Price Paid For Parkay Spray By Each Putative Class Member ...................................................................... 37

   1. Description Of Data ............................................................................................ 38

   2. Analyses Performed Regarding Retail Prices Of Parkay Spray ......................... 40

      i. Parkay Spray Prices Vary Depending Upon Sales Channel ......................... 41

      ii. Parkay Spray Prices Vary Depending Upon Geographic Location ............... 42

      iii. Parkay Spray Prices Vary Depending Upon Retailer ..................................... 44

      iv. Parkay Spray Prices Vary Depending Upon Promotional Activity ............... 46

   3. Summary ............................................................................................................ 48

E. Dr. Dennis' Simulator Supports The Requirement Of Individualized Inquiry........... 49

VII.    **DR. DENNIS' MARKET SIMULATOR FAILS TO REPRODUCE DR. DENNIS' CLAIMED PRICE PREMIUMS** ............................................................... 51

VIII.   **DR. DENNIS' CLAIMED PERCENTAGE PRICE PREMIUMS ARE INCONSISTENT WITH MARKET EVIDENCE AND FAIL REASONABLENESS TESTS**........................................................................................ 56

A. Dr. Dennis' Market Simulator Yields Results Inconsistent With Real-World Prices Of Parkay Spray and Parkay Squeeze........................................................................ 57

   1. Analysis Of Real-World Prices Of Parkay Spray And Parkay Squeeze............... 58

   2. Simulate Prices Of Parkay Spray And Parkay Squeeze Products Using Dr. Dennis' Simulator ............................................................................................. 60

   3. Comparison Of The Results From Dr. Dennis' Market Simulator To Real-World Prices Of Parkay Spray and Parkay Squeeze............................................. 66

B. Dr. Dennis' Claimed Percentage Price Premiums Fail Reasonableness Tests .......... 69

   1. Dr. Dennis And Mr. Weir Fail To Evaluate The Profitability Of The Challenged Products ........................................................................................ 70

   2. Dr. Dennis' Own Market Simulator Demonstrates That The Challenged Claims Are Relatively Less Important Than Numerous Other Product Attributes............................................................................................................ 72

C. Plaintiffs' Experts' Claimed Percentage Price Premium Approach Assesses Claimed Damages On Price Differences Unrelated To The Challenged Claims...................... 73

D. Dr. Dennis' Claimed Price Premiums Are Not Tied To The Putative Class Period .. 77

IX.    **DR. DENNIS' CONJOINT ANALYSIS YIELDS MEASURES OF WILLINGNESS TO PAY, WHICH ARE NOT A RELIABLE ESTIMATE OF A CLAIMED PRICE PREMIUM (IF ANY)** ................................................................... 79

A. Willingness-To-Pay Measures Are Not Price Premiums............................................ 80

B. Sawtooth Software Documentation Describes Its Market Simulators As Yielding Measures Of Willingness To Pay (Rather Than Price Premiums) ............................. 81

C. Dr. Dennis' Conjoint Analysis Did Not Incorporate Supply Factors ....................... 83

1. Dr. Dennis' Conjoint Analysis Obtains And Relies Upon Evidence Of Potential Consumer Behavior But Not Of Potential Producer Or Retailer Behavior ........................................................................................................ 85

2. Using Prices As Used By Dr. Dennis In A Survey Does Not Account Properly For Relevant Supply Considerations .................................................... 86

**X.    MR. WEIR'S FULL REFUND APPROACH DOES NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS ........................................................................................................ 88**

## DECLARATION OF KEITH R. UGONE, PH.D.

### March 30, 2019

I, Keith R. Ugone, make the following declaration under penalty of perjury:

## I.     BACKGROUND AND OVERVIEW OF ASSIGNMENT

1.     I am an economist and have been retained by counsel for Conagra Brands, Inc., formerly known as ConAgra Foods, Inc. ("Conagra" or "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Erin Allen et al. v. ConAgra Foods, Inc.*

### A.     Allegations

2.     I understand Named Plaintiffs allege that Conagra has engaged in "deceptive practices in its labeling and marketing of Parkay Spray" (the "Challenged Product") by its use of the "Fat Free" and "Zero Calories" asserted claims, and later the "0g Fat Per Serving" and "Zero Calories Per Serving" asserted claims (collectively, the "Challenged Claims").[1] Generally, the Named Plaintiffs contend the Challenged Claims are misleading for at least the following reasons.

   a.     "Defendant's claims regarding Parkay Spray are false and misleading because its product is improperly labeled 'fat free,' '0 fat' and '0 calories.'"[2]

   b.     "Parkay Spray is neither 'Fat Free' nor 'Calorie Free.'"[3]

---

[1] Consolidated Second Amended Class Action Complaint filed on September 12, 2018 ("Second Amended Complaint"), p. 1. *See also* Second Renewed Motion for Class Certification dated March 1, 2019 (" Second Renewed Motion for Class Certification"), p. 1. Named Plaintiffs (or Plaintiffs) are Ms. Erin Allen, Ms. Tyoka Brumfield, Ms. Ofelia Frechette, Ms. Shelley Harder, Ms. Deana Marr, Ms. Tammie Shawley, Mr. Brian Smith, and Ms. Betty Vazquez. I understand Ms. Brumfield seeks to be dismissed from this lawsuit.

[2] Second Amended Complaint, p. 1. According to the Second Renewed Motion For Class Certification, the "2007 version of Parkay Spray's front label displayed the words 'Fat Free' and 'Zero Calories' in a prominent logo at the top of the bottle, centered around a large '0.'" (Second Renewed Motion For Class Certification, p. 3.) In 2009, ConAgra "added 'Per Serving' to the logo." In addition, "ConAgra changed the words 'Fat Free' to '0g Fat.'" (Second Renewed Motion For Class Certification, p. 3.)

[3] Plaintiffs allege "Parkay Spray contains 832 calories and 93 grams of fat per bottle." (Second Amended Complaint, p. 1).

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

     c.  The Parkay Spray "product labels include artificially small 'serving sizes' that fail to account for the manner in which these products are customarily consumed."[4]

3.     According to the Second Renewed Motion for Class Certification, Plaintiffs seek certification of the "Class" defined as follows: "All natural persons who purchased Parkay Spray in the United States, at any time from January 1, 2008 to the present and subject to the applicable statues of limitations."[5]  In addition, it is my understanding Plaintiffs seek certification of six Multi-State Subclasses[6] and a California Subclass.[7, 8]  Plaintiffs claim they paid a price premium due to the mislabeling of Parkay Spray.[9]

### B. Prior Declarations And Court Ruling Denying Motion For Class Certification

4.     On August 11, 2014, Mr. Colin B. Weir submitted a declaration in support of class certification in this matter (the "Weir 08/11/14 Declaration").[10]  Mr. Weir opined that he

---

[4] Second Amended Complaint, p. 1.

[5] Second Renewed Motion for Class Certification, p. vi.

[6] The Multi-State Subclasses are defined as follows: (a) Subclass #1: All class members who purchased the product in the following states: Alabama, Alaska, Connecticut, Delaware, Illinois, Minnesota, Mississippi, Nebraska, South Carolina, and Wisconsin, subject to the applicable statutes of limitations; (b) Subclass #2: All class members who purchased the product in the following states: Alabama, Alaska, Delaware, Michigan, Minnesota, Mississippi, Nebraska, and Ohio, subject to the applicable statutes of limitations; (c) Subclass #3: All class members who purchased the product in the following states: District of Columbia, Florida, Iowa, Louisiana, Missouri, Montana, New Hampshire, New Jersey, New York, North Carolina, Oregon, Rhode Island, Tennessee, Vermont, and Washington, subject to the applicable statutes of limitations; (d) Subclass #4: All class members who purchased the product in the following states: California, Georgia, Hawaii, Maryland, Massachusetts, Virginia, and West Virginia, subject to the applicable statutes of limitations; (e) Subclass #5: All class members who purchased the product in the following states: California, Georgia, Hawaii, Maryland, Virginia, and West Virginia, subject to the applicable statues of limitations; (f) Subclass #6: All class members who purchased the product in the following states: Arkansas, Indiana, and Wyoming, subject to the applicable statutes of limitations.  (Second Renewed Motion for Class Certification, pp. vi – vii.)

[7] The California Subclass is defined as follows: All class members who purchased the product in California at any time from March 21, 2009 to the present.  (Second Renewed Motion for Class Certification, p. vii.)

[8] According to the Second Renewed Motion For Class Certification, in addition to the California Subclass, if the Court denies any Multi-State Subclass, Plaintiffs propose additional subclasses for those states in which a named plaintiff has purchased the product (i.e., Florida, Georgia, Illinois, Indiana, Michigan, Ohio, and Wisconsin (collectively, the "State Subclasses")).  (Second Renewed Motion for Class Certification, p. viii.)

[9] Second Amended Complaint, p. 17.

[10] Declaration of Mr. Colin B. Weir dated August 11, 2014 ("Weir 08/11/14 Declaration").

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

could "determine [claimed] damages attributable to the Product Claims on a Class-wide basis using common evidence" by using either (a) conjoint analysis or (b) contingent valuation to determine "whether Class Members paid a 'price premium' for the Product because of the Product Claims."[11]

5.    On October 10, 2014, I submitted a rebuttal declaration (the "Ugone 10/10/14 Declaration").  In the Ugone 10/10/14 Declaration, I evaluated from an economic and claimed damages perspective the claimed Class-wide (or common proof) approaches proposed by Mr. Weir to calculate a Class-wide monetary recovery.  I concluded (i) the claimed injury and/or claimed damages suffered by putative Class members as a result of the Challenged Claims cannot be evaluated reliably using Class-wide or common proof and (ii) Mr. Weir's proposed claimed Class-wide approaches would not provide a reliable or relevant measure of the economic injury (if any) suffered by Class members.[12]

6.    On January 8, 2015, the Court issued a court order denying without prejudice Plaintiff Erin Allen's motion for class certification.[13]

### C.  Current Named Plaintiffs' Declarations

7.    On July 9, 2018, Plaintiff Erin Allen, plus new intervenors, filed a Renewed Motion for Class Certification.[14]  Two damages-related expert declarations were submitted in support of class certification.

---

[11] Weir 08/11/14 Declaration, pp. 2 and 4.  (Bracketed text added for clarification.)  Mr. Weir also opined that he would be able to calculate certain disgorgement measures on a Class-wide basis using common evidence should the Court prescribe such a measure, including disgorgement of "full retail price paid," "wholesale revenues," or Conagra's "profits from the sale" of Parkay Spray.  (Weir 08/11/14 Declaration, p. 3.)

[12] Declaration of Keith Ugone dated October 10, 2014 ("Ugone 10/10/14 Declaration"), p.

[13] Order Denying Without Prejudice Plaintiff's Motion for Class Certification and Denying Defendant's Motion to Strike dated January 8, 2015.

[14] On March 1, 2019, Plaintiffs filed a Second Renewed Motion for Class Certification.

---

a. <u>Declaration And Expert Report Of J. Michael Dennis, Ph.D.</u>  On July 9, 2018, Dr. J. Michael Dennis ("Dr. Dennis") submitted a declaration presenting the results of a conjoint survey (which he referred to as "a price premium survey").[15]  Using conjoint survey data, Dr. Dennis performed simulations in an attempt to measure the claimed "price premium, if any, that is attributable to the challenged claims."[16]  Dr. Dennis alleges that the claimed price premium is (i) 34% for the "Fat Free" / "Zero Calories" Challenged Claims (during 2007 – October 2009) and (ii) 40% for the "0g Fat Per Serving" / "Zero Calories Per Serving" Challenged Claims (during October 2009 – Present).[17]

b. <u>Declaration Of Mr. Colin B. Weir.</u>  On July 9, 2018, Mr. Colin B. Weir ("Mr. Weir") submitted a declaration in which Mr. Weir used the results of Dr. Dennis' conjoint survey to attempt to calculate claimed "Price Premium Damages" for the Class.[18]  Mr. Weir used IRI data from 2012 – 2018 to estimate the total sales of Parkay Spray from March 21, 2009 – Present (using "a statistical forecast to estimate sales from March 21, 2009 – 2011).[19]  Mr. Weir multiplied the claimed price premium percentages calculated by Dr. Dennis by his estimated total dollar sales of Challenged Products.[20]  According to Mr. Weir, claimed Nationwide price premium damages totaled (a) $2,794,487.83 from March 21, 2009 – October 14, 2009 and (b) $37,396,021.93 from October 15, 2009 – Present.[21, 22]

---

[15] Declaration and Expert Report of J. Michael Dennis, Ph.D. dated July 9, 2018 ("Dennis Declaration"), pp. 6 – 7, and 30 – 31.

[16] Dennis Declaration, p. 6.

[17] Dennis Declaration, p. 30.

[18] Declaration of Colin B. Weir dated July 9, 2018 ("Weir Declaration"), pp. 11 and 18 – 21.

[19] In his declaration, Mr. Weir stated that he was provided "retail sales of the Product from Information Resources, Inc. for the period 2012 – 2018" and that he "used a statistical forecast to estimate sales for the remaining time of the Class period."  (Weir Declaration, p. 19.)  In his deposition, Mr. Weir testified that he "backcast sales data" for the time period included in the prior proposed class period for which he does not have IRI data (2009 – 2011).  (Deposition of Colin B. Weir dated March 7, 2019 ("Weir Deposition"), p. 58).

[20] Mr. Weir calculated Nationwide sales from March 2009 – Present to be $101,709,136.68 (i.e., $8,219,081.86 between March 21, 2009 – October 14, 2009 and $93,490,054.82 between October 15, 2009 – Present).  In addition, Mr. Weir calculated California sales from March 21, 2009 – Present to be $832,759.77 (i.e., $58,275.86 between March 21, 2009 – October 14, 2009 and $774,483.91 between October 15, 2009 – Present).  (Weir Declaration, pp. 20 – 21).  Thus, according to Mr. Weir, California sales of the Challenged Products account for less than 1% (0.819%) of Nationwide sales.

[21] Weir Declaration, p. 21.  According to Mr. Weir, claimed price premium damages for California totaled (a) $19,813.79 from March 21, 2009 – October 14, 2009 and (b) $309,793.56 from October 15, 2009 – Present.

[22] In addition, Mr. Weir opined, "[f]ull refund damages are easily calculated for any geography or time period" and referred to Table 1 in his declaration which he stated "summarizes the total sales, and thus full refund amounts, on a nationwide basis, and for California."  (Weir Declaration, p. 22.)  Thus, according to Mr. Weir, claimed Nationwide full refund damages totaled (a) $8,219,081.86 from March 21, 2009 – October 14, 2009 and (b) $93,490,054.82 from October 15, 2009 – Present.  In addition, according to Mr. Weir, claimed full refund damages for California totaled (a) $58,275.86 from March 21, 2009 – October 14, 2009 and (b) $774,483.91 from October 15, 2009 – Present.  (Weir Declaration Table 1, p. 20.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

### D.  Assignment

8.     I have been requested by counsel for Defendants to evaluate from an economic perspective:

    a.     whether standard economic analysis can be used to quantify reliably on a Class-wide basis (using common proof) the economic injury and economic damages being asserted in this matter; and

    b.     whether Dr. Dennis' and Mr. Weir's proposed methodologies of calculating claimed Class-wide damages using common proof yields relevant and reliable results.

## II.     SUMMARY OF OPINIONS[23]

9.     Based upon (a) my economics and damage quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) analysis of retail sales and pricing data associated with the Challenged Products, and (e) my review of the Weir Declaration and the Dennis Declaration, *inter alia*, I have reached the following conclusions.

    a.     Determining whether and to what extent a putative Class member was economically injured as a result of the allegedly deceptive marketing requires individualized inquiry.

    b.     Dr. Dennis' and Mr. Weir's methodologies do not provide a relevant or reliable common proof measure of the claimed economic injury suffered by putative Class members.

### A.  Determination Of Claimed Economic Injury And Damages As A Result Of The Challenged Claims Requires Individual Inquiry

10.     It is my understanding that the Named Plaintiff(s) in a class action matter must present a proposed damages approach that is consistent with the asserted liability theory and subject to common, Class-wide proof.  However, from an economic and damages perspective, the greater the number of differences in underlying characteristics (e.g., reasons for purchase, knowledge and perceptions relating to the allegedly misleading marketing, benefits received, and prices paid), the more difficult it is to evaluate Class-wide damages using

_____

[23] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout my declaration (i.e., narrative, **Appendix A**, and associated exhibits).

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

common proof.  In such situations, individual inquiry (and not common proof) is required to reliably evaluate claimed damages.

11.     In his declaration, Mr. Weir proposes to calculate damages by multiplying the claimed percentage price premiums (identified by Dr. Dennis) by the total dollar sales of Parkay Spray units sold.[24]  However, Mr. Weir's proposed "percentage price premium times retail dollar sales" approach using common proof will not yield a reliable measure of Class-wide claimed damages.  This is because (a) there is no common proof measure of the quantity of the Challenged Products purchased by putative Class members who suffered economic harm (as discussed throughout my declaration[25]) and (b) there is no common proof measure of a percentage price premium (as discussed throughout my declaration[26]).  The circumstances surrounding each putative Class member's purchasing decision (and resulting benefits derived from each purchase) must be considered in order to determine whether and to what extent a putative Class member was injured as a result of the alleged wrongful conduct.

_____

[24] Mr. Weir performs this calculation using the dollar sales of the Challenged Products nationwide and for California. (Weir Declaration, pp. 20 – 21.)

[25] Given (a) putative Class members' variety of reasons for purchasing the Challenged Products and (b) the fact that at least some putative Class members were not deceived by the allegedly deceptive advertising, individual inquiry would be required to isolate the quantity of purchases of the Challenged Products made by putative Class members who suffered economic harm.  A common proof approach would not reliably isolate a base to which a claimed percentage price premium-related figure (if any) could be applied.

[26] There is no common proof measure of "price" or "percentage price premium" to apply in a "percentage price premium times retail dollar sales" approach.  This is because there are significant variations in observed retail prices associated with the Challenged Products, including variations in purchase prices across putative Class members and likely even across purchases made by the same putative Class member.  These price differences are unrelated to the alleged wrongful conduct.  Significant variations in observed retail prices occur depending upon the circumstances surrounding the purchase, including the sales channel, geographic location, retailer, timing, and promotional activity, among other factors.  Hence, a common proof claimed "percentage price premium" approach would not provide a reliable measure of the amount by which putative Class members allegedly overpaid for purchases of the Challenged Products.

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

12.    In addition to the above considerations regarding Mr. Weir's proposed methodology, I

provide below a summary of the individual inquiry considerations that must be evaluated

to determine whether and to what extent putative Class members suffered economic harm

with a nexus to the allegedly misleading Challenged Claims.[27]

a.    Individual Inquiry Is Required To Determine Putative Class Members' Reasons For
Purchasing The Challenged Product.    Documentary evidence and deposition testimony
indicate that consumers purchase Parkay Spray for a variety of reasons other than the
Challenged Claims, including but not limited to Parkay Spray's taste, convenient spray
form, price, and nutrition claims unrelated to the Challenged Claims (e.g., no trans fat,
no cholesterol).    In economic terms, consumers who purchased Parkay Spray solely (or
in large part) for reasons other than the Challenged Claims received the value that was
paid for.    Individual inquiry is required to evaluate each putative Class member's
reasons for purchasing the Challenged Products and whether a corresponding claimed
injury may exist (with a nexus to Named Plaintiffs' theory of liability).    (*See* **Section
VI.A**.)

b.    Individual Inquiry Is Required To Determine Putative Class Members' Use (And
Amounts Used) Of The Challenged Products.    Individual putative Class members' use
(and typical amounts used) of Parkay Spray may affect whether an individual suffered
harm with a nexus to the Challenged Claims.    From an economic and claimed damages
perspective, putative Class members who used Parkay Spray as a cooking spray and/or
for topping purposes (i.e., in relatively small amounts) may not have considered (or
placed value on) the Challenged Claims.    In addition, putative Class members who used
Parkay Spray in a manner consistent with serving size suggestions may have considered
the Challenged Claims and adjusted their consumption patterns accordingly.    Under the
Named Plaintiffs' theory of liability, the aforementioned consumers were not injured
to the same degree (if at all) as consumers who used Parkay Spray in relatively large
volumes (e.g., consumers who unscrew the lid to pour the Parkay Spray product over
their food).    (**Section VI.B**.)

c.    Individual Inquiry Is Required To Determine Putative Class Members' Knowledge
And Perceptions Related To The Challenged Claims.    Individual putative Class
members' knowledge and perceptions relating to the Challenged Claims may affect the

_____

[27] Even on an individual putative Class member basis, there may be a lack of evidence to allow a reliable determination
of the claimed economic injury.    Putative Class members are unlikely (a) to have kept all or any of the receipts from
purchases of the Challenged Product, (b) to remember or otherwise substantiate the prices they paid for the Challenged
Product, and/or (c) to remember or otherwise substantiate the quantities purchased.    In this matter, not only do the
facts and circumstances indicate that the appropriate analyses concerning alleged economic inquiry are not amenable
to Class-wide proof, but this is compounded by a lack of evidence that would be needed to determine the alleged
economic injury on an individual putative Class member basis.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

---

determination of whether an individual purchaser suffered injury with a nexus to the
alleged wrongful conduct.

i.   It is my understanding that according to the FDA's Guide to Nutrition Labeling and
     Education Act (NLEA) Requirements, (1) calories per serving can be reported as
     zero if there are less than 5 calories per serving and (2) total fat per serving can be
     reported as zero if there is less than 0.5g of fat per serving.  Putative Class members
     who had knowledge of the FDA's nutritional labeling requirements would not have
     been misled in the manner alleged by Plaintiffs.

ii.  The Parkay Spray bottle indicates that Parkay Spray contains "44% Vegetable Oil
     Spread" (on the front of the bottle) and soybean oil and buttermilk (on the back of
     the bottle).  Putative Class members who were aware that (1) Parkay Spray contains
     vegetable oil, soybean oil, and buttermilk and (2) these listed ingredients contain
     fat may not have been misled in the manner alleged by Plaintiffs.

iii. Putative Class members who have knowledge of the allegations regarding the
     Challenged Claims through news articles that discuss the Parkay Spray lawsuit
     would not have been misled in the manner alleged by Plaintiffs.

From an economic and damages perspective, putative Class members who were not
misled by the Challenged Claims (i.e., those whose knowledge and perceptions were
in line with the actual product they received) did not suffer economic injury.
(**Section VI.C.**)

d.   <u>Individual Inquiry Is Required To Determine The Specific Price Paid For Parkay Spray
     By Each Putative Class Member</u>.  The prices that consumers paid for the Challenged
     Products varied widely over the putative Class period and across numerous dimensions,
     including (at least) the sales channel, geographic location, retailer, date of purchase,
     and whether they paid a promoted (i.e., "on sale") or non-promoted price.  The
     significant variation in individual actual prices paid by putative Class members (across
     the aforementioned dimensions) negates the ability of a Class-wide (common proof)
     damages approach to yield a reliable and accurate estimate of a claimed percentage
     price premium with a nexus to Named Plaintiffs' theory of liability.  In addition, an
     individual putative Class member who received a discount on the purchase price of
     Parkay Spray greater than a claimed "price premium" associated with the Challenged
     Claims would not have suffered an economic loss.  (**Section VI.D.**)

e.   <u>Dr. Dennis' Simulator Supports The Requirement Of Individualized Inquiry</u>.
     According to the results generated by Dr. Dennis' simulator and based upon Dr.
     Dennis' deposition testimony,[28] a substantial portion of consumers (27.9%) would
     purchase Parkay Spray at the same price regardless of the Challenged Claims.  From
     an economic and damages perspective, these consumers did not suffer economic injury
     and received a value that was commensurate with what was paid.  Thus, Dr. Dennis'

---

[28] *See* Deposition of J. Michael Dennis taken on February 14, 2019 ("Dennis Deposition"), pp. 223 – 224.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

own simulator demonstrates that individualized inquiry and analyses regarding putative Class members' motivations in purchasing the Challenged Products would be required to determine whether individual putative Class members suffered economic injury with a nexus to the Challenged Claims.  (**Section VI.E.**)

### B. <u>Evaluation Of The Claimed *Price Premium Approach* In The Weir And Dennis Declarations</u>

13.    From an economic and claimed damages perspective, (a) the claimed price premiums attributable to the Challenged Claims that were presented by Dr. Dennis based upon his conjoint survey and his market simulations and (b) Mr. Weir's proposed approach of multiplying these claimed price premiums by the Challenged Product dollar sales do not yield a reliable or relevant measure of the claimed harm suffered by putative Class members for at least the following reasons.

#### 1. <u>Dr. Dennis' Produced Simulator Fails to Reproduce Dr. Dennis' Claimed Price Premiums</u>

14.    In his deposition, Dr. Dennis provided testimony regarding his market simulator and the steps he took to generate the claimed price premiums associated with the Challenged Claims.  However, following the steps provided by Dr. Dennis in his declaration,[29] Dr. Dennis' deposition testimony,[30] and Exhibit 12 and Exhibit 13 of the Dennis Deposition,[31] when generating the price for the product without the Challenged Claims, Dr. Dennis' produced simulator yields an error message.  Specifically, in both scenarios (i.e., the scenario to generate the 34% claimed price premium and the scenario to generate the 40%

_____

[29] Dennis Declaration, p. 29, para. 68.

[30] Dennis Deposition, pp. 223 – 224.

[31] In his deposition, Dr. Dennis marked up blank templates of his market simulator to demonstrate what the simulator would look like to generate (a) the 34% claimed price premium (Dennis Deposition, Exhibit 12) and (b) the 40% claimed price premium (Dennis Deposition, Exhibit 13).  (*See* Dennis Deposition, pp. 249 – 251.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

claimed price premium), Dr. Dennis' produced simulator yields the error message "Solution is larger than the tested range."[32]

15.    Because Dr. Dennis' produced simulator cannot generate prices outside the tested range (i.e., outside the $1.50 to $4.00 range), Dr. Dennis' produced simulator is incapable of reaching a claimed "market equilibrium" (i.e., a preference share of 50/50 between the product with the Challenged Claims and the product without the Challenged Claims).[33, 34] In other words, within Dr. Dennis' framework, Dr. Dennis' produced simulator fails to determine "how much of a discount is needed for" the product without the Challenged Claims.[35]  Furthermore, as demonstrated by Dr. Dennis' deposition testimony, any price estimate outside of the tested range (i.e., below the $1.50 price point) would be unreliable because "that would not be based on any actual survey data collected below the $1.50 price point."[36]  Thus, Dr. Dennis' produced simulator fails to provide reliable price premiums (and is inconsistent with Dr. Dennis' claimed price premiums of 34% and 40%).  (**Section VII**.)

_____

[32] Based upon Dr. Dennis' deposition testimony, the error message "Solution is larger than the tested range" appears to indicate that the generated product price (for the product without the Challenged Claims) is below $1.50.  However, according to Dr. Dennis, the "modeling is working between the $1.50 and $4.00 range" and any price points below the $1.50 price point "would not be based on any actual survey data."  (Dennis Deposition, pp. 226 – 227.)

[33] *See* Dennis Deposition, p. 224.

[34] After selecting "OK" on the error message "Solution is larger than the tested range", Dr. Dennis' produced simulator generates the following: (a) a 58.5% preference share for the product with the "Fat Free" / "Zero Calories" Challenged Claims and a 41.5% preference share for the product without the Challenged Claims; and (b) a 64.2% preference share for the product with the "0g Fat Per Serving" / "Zero Calories Per Serving" Challenged Claims and a 35.8% preference share for the product without the Challenged Claims.

[35] *See* Dennis Deposition, p. 224.

[36] Dennis Deposition, pp. 226 - 227.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

**2. Dr. Dennis' Claimed Percentage Price Premiums Are Inconsistent With Market Evidence And Fail Reasonableness Tests**

16.   Dr. Dennis' claimed percentage price premiums are inconsistent with market evidence and

fail reasonableness tests for at least the following reasons.

a.   <u>Dr. Dennis' Simulator Yields Results Inconsistent With Real-World Prices Of Parkay Spray and Parkay Squeeze</u>.  To test the accuracy of Dr. Dennis' simulator (and thus the reliability of Dr. Dennis' claimed price premiums), I compared the results from Dr. Dennis' simulator to the real-world prices of Parkay Spray and Parkay Squeeze.  Dr. Dennis' simulator generates significantly higher simulated prices of Parkay Spray relative to Parkay Squeeze (i.e., a significantly higher "price premium" of Parkay Spray relative to Parkay Squeeze) than what is observed in the real world.  (**Section VIII.A.**)

i.



ii.

The inconsistent results between Dr. Dennis' simulator and real-world prices of Parkay Spray and Parkay Squeeze call into question the reliability of Dr. Dennis' conjoint analysis and demonstrate that Dr. Dennis' calculated price premiums associated with the Challenged Claims are inflated and unreliable.

b.   <u>Dr. Dennis' Claimed Percentage Price Premiums Fail Reasonableness Tests</u>.  Dr. Dennis calculated claimed price premiums equal to 34% and 40% of the retail prices of the Challenged Products.  However, Dr. Dennis and Mr. Weir fail to evaluate the profitability of the Challenged Products to determine whether in the absence of the Challenged Claims, Defendant or retailers would have been able or willing to sell the Challenged Products at prices that were 34% to 40% lower than historical prices.  In addition, Dr. Dennis' own market simulator demonstrates that the Challenged Claims are relatively less important than numerous other product attributes.  Given the relative importance of numerous other product attributes (relative to the Challenged Claims), Dr. Dennis fails to explain how the Challenged Claims would account for 34% and 40% of the prices of the Challenged Products.[38]  (**Section VIII.B.**)

---

[37] In his declaration, Dr. Dennis states that his "analysis of real-world market pricing confirmed that the market pricing for the two products [Spray Bottle (8 oz.) and Squeeze Bottle (12 oz.)] is similar, as confirmed by the Defendant's market research and IRI sales data."  (Dennis Declaration, p. 21.  (Bracketed text added for clarification.))

[38] Dr. Dennis' "Variable Importance" chart in his market simulator indicates that the "Fat Free," "Zero Calories," "0g Fat Per Serving," and "Zero Calories Per Serving" claims account for only 2.7%, 3.6%, 3.5%, and 3.4% of the overall

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

    c.   <u>Percentage Price Premium Approach Assesses Claimed Damages On Price Differences Unrelated To The Challenged Claims</u>.  Mr. Weir proposed to calculate claimed price premium damages by applying a constant percentage price premium determined by Dr. Dennis to all Challenged Product sales (i.e., 34% for the March 21, 2009 – October 14, 2009 time period and 40% for the October 15, 2009 – present time period).  Dr. Dennis and Mr. Weir did not discuss, acknowledge, or investigate the implications of applying a single percentage price premium to all putative Class member purchases across (i) sales channels, (ii) different geographies, (iii) retailers, and (iv) promotional activity. Because of the significant variations in retail prices of the Challenged Products across these dimensions that are unrelated to the Challenged Claims, Dr. Dennis and Mr. Weir's percentage price premium approach would claim as damages some portion of the value generated by these dimensions unrelated to the Challenged Claims.[39] (**Section VIII.C**.)

    d.   <u>Dr. Dennis' Conjoint Analysis Is Not Tied To The Putative Class Period</u>.  According to Mr. Weir, "Dr. Dennis concludes that these price premiums apply to every sale of the Product, to every Class member, and the class period, respectively."[40]  However, survey techniques (such as conjoint analysis) generally measure the consumers' value of product attributes at the time the survey was conducted.  Thus, Dr. Dennis' calculated price premiums are based upon survey respondents' tastes and preferences regarding consumption of calories and fats in July 2018[41] (and do not consider consumers' tastes and preferences throughout the putative Class period which begins in March 2009 according to Mr. Weir's damages calculations).  (**Section VIII.D**.)

    **3.**   **<u>Dr. Dennis' Conjoint Analysis Yields Measures Of Willingness To Pay, Which Are Not A Reliable Estimate Of A Claimed Price Premium (If Any)</u>**

17.    Dr. Dennis characterized his market simulator analysis (following the conjoint survey) as providing "a statistically robust estimate of the <u>price premium</u> that purchasers paid as a result of the challenged claims as a fraction of the total price paid for the Parkay Spray

_____

total utility associated with the Parkay Spray product. Dr. Dennis fails to explain how the Challenged Claims would account for 34% and 40% of the prices of the Challenged Products.

[39] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[40] Weir Declaration, p. 19.

[41] Dennis Declaration, p. 25.

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

product."[42]   However, Dr. Dennis' characterization is incorrect.  Dr. Dennis' conjoint

survey and market simulator provide a measure of survey respondents' willingness to pay

for the Challenged Claims (a separate and distinct economic concept from the concept of

a price premium).  As a result, Dr. Dennis' claimed price premium measures do not

represent a measure of putative Class members' claimed economic harm associated with

the Challenged Claims.  The fact that Dr. Dennis' market simulator yields measures of

willingness to pay (and not price premiums) is demonstrated through the following.

a. <u>Willingness-To-Pay Measures Are Not Price Premiums</u>.  Dr. Dennis' proposed
   conjoint analysis approach, at best, would measure an average "willingness to pay"
   associated with the Challenged Claims rather than an actual <u>price premium</u> paid.[43]  The
   differences between consumers' willingness to pay and market prices can be
   demonstrated by considering an example of consumer preferences regarding disposable
   plastic water bottles.  (**Section IX.A**.)

   i. A convenience store may sell a bottle of water at $1.00 per bottle, which would be
      the price throughout the year.  On an ordinary day, a consumer may be willing to
      pay $1.00 for a bottle of water.  However, on a particularly hot day, the same
      consumer may be willing to pay $5.00 per bottle.

   ii. A claimed price premium method that treated willingness to pay as a price premium
       would yield a claimed price premium of $4.00 associated with sales on a hot day
       (i.e., $5.00 per bottle on a hot day – $1.00 per bottle on a regular day).  However,
       as described above, the consumer would pay the same $1.00 price regardless of the
       weather (and therefore would not pay a price premium even though the consumer
       would have been willing to pay a higher amount on a hot day).

   As this example demonstrates, measures of willingness to pay (i) differ from price
   premiums as an economic concept and (ii) may overstate price premiums.  Use of a
   willingness-to-pay measure as a claimed damages measure is inappropriate and likely
   would overcompensate putative Class members for their claimed economic harm.

b. <u>Sawtooth Software Documentation Describes Its Market Simulators As Yielding
   Measures Of Willingness To Pay (Rather Than Price Premiums)</u>.  Sawtooth Software,

---

[42] Dennis Declaration, p. 28.  (Emphasis added.]

[43] Sawtooth documentation specifically states that its market simulator concentrates solely on the demand side of the market and measures willingness to pay.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

the software suite that Dr. Dennis used to perform his conjoint analysis,[44] has published books, articles, and other written guides relating to the use of conjoint analysis. Sawtooth Software's published writings describe the results of conjoint analysis and market simulation as willingness to pay or consumer demand measures rather than price premiums, and further identify such willingness to pay measures as generally overstating price premiums. Hence, in order for a conjoint analysis and market simulation (like Dr. Dennis') to calculate a claimed price premium, it would have to include additional information or adjusted procedures relative to the procedures described by Sawtooth Software. However, Dr. Dennis did not include additional information or adjusted procedures relative to those described by Sawtooth Software, demonstrating that his conjoint survey and market simulator yielded at best a measure of willingness to pay and not a claimed price premium. (**Section IX.B.**)

c. <u>Dr. Dennis' Conjoint Analysis Did Not Incorporate Supply Factors</u>. In order for the conjoint analysis and market simulation performed by Dr. Dennis to have calculated a claimed price premium (rather than a measure of willingness to pay), Dr. Dennis would have had to perform additional analyses or steps beyond merely performing a standard conjoint analysis and market simulation. Namely, given that his survey focuses exclusively on the tastes and preferences of survey respondents (who represent consumers in his analysis), Dr. Dennis would have had to incorporate supply factors (beyond any supply factors that may be represented in a standard conjoint analysis). However, Plaintiffs' experts presented no evidence that the standard implementation of conjoint analysis was modified in any way to <u>account for</u> such supply considerations and thereby determine a claimed price premium. This can be seen from at least the following. (**Section IX.C.**)

  i. <u>Dr. Dennis' Conjoint Analysis Obtains And Relies Upon Evidence Of Potential Consumer Behavior But Not Of Potential Producer Or Retailer Behavior</u>. Market prices (and hence market price differences) are based upon the interaction of supply factors and demand factors in a market setting. Determining whether and how prices would change when a product's attributes and/or label claims change requires determining how the supply factors and the demand factors would interact. However, while conjoint analysis and market simulation can be used to provide insights and evidence regarding the likely behaviors of consumers in a market, such a survey does not elicit responses from producers of the evaluated goods regarding their (likely) behaviors in response to certain changed circumstances (e.g., removal of the Challenged Claims). Given that Dr. Dennis' conjoint analysis and market simulation does not elicit responses from producers, it cannot provide insight as to whether and how producers would adjust pricing in such a setting. Consequently, Dr. Dennis' conjoint analysis and market simulation do not represent a market-based price premium measure but rather a consumer-side "willingness to pay" measure (as discussed above).

_____

[44] *See*, *e.g.*, Dennis Declaration, pp. 27 – 28.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

ii. <u>Using Prices In A Survey Does Not Account Properly For Relevant Supply Considerations</u>. Mr. Weir claims that because Dr. Dennis' conjoint survey used price points based upon observed prices for the Challenged Products, it incorporated relevant supply factors that exist in the marketplace.[45] However, Mr. Weir's claim is incorrect.

- Standard conjoint analyses (properly implemented and which yield willingness to pay measures) utilize observed prices as an input. However, use of observed market prices is not sufficient for a conjoint survey and market simulator to yield reliable claimed price premium results.

- The observed market prices of Parkay Spray are determined by the interaction of the demand and supply conditions associated with Parkay Spray <u>with the Challenged Claims</u>. However, market prices of Parkay Spray <u>without the Challenged Claims</u> are <u>not</u> observed (considering Parkay Spray has always advertised the Challenged Claims). Therefore, the use of observed market prices for Parkay Spray with the Challenged Claims is insufficient to account for relevant supply factors that would have existed in the market for Parkay Spray absent the Challenged Claims. However, Mr. Weir fails to recognize the difference between supply factors that existed in the marketplace for Parkay Spray with the Challenged Claims and supply factors that would have existed in a marketplace for Parkay Spray absent the Challenged Claims.

- 

## C. **Evaluation Of Mr. Weir's _Full Refund Approach_**

18. In his report, Mr. Weir states that "[f]ull refund damages are easily calculated for any geography or time period."[47] However, Mr. Weir's methodology for calculating full refund claimed damages does not yield a reliable or relevant estimate of economic harm allegedly suffered by individual putative Class members on a Class-wide basis. (**Section X**.)

a. <u>Assumes Consumers Received No Value</u>. Accurately assessing economic injury suffered by a consumer purchasing the Challenged Product requires that Mr. Weir

_____

[45] Weir Declaration, p. 13.

[46] ███████████████████████████████████████████████

[47] Weir Declaration, p. 22.

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

determine the value paid versus value received by the consumer. The claimed full refund damages calculation specified by Mr. Weir ignores the value received by putative Class members from their purchase and use of Parkay Spray. Hence, the full retail price does not represent claimed economic harm.

b.  No Economic Causation To Challenged Claims. Measuring the claimed damages suffered by putative Class members requires identifying the economic losses that are attributable to the alleged wrongful conduct (i.e., caused by the Challenged Claims). There would be no correlation (or economic causation) between the claimed full refund damages discussed by Mr. Weir and any claimed economic injury attributable to the Challenged Claims (or suffered by putative Class members).

c.  No Allocation Approach Presented. Mr. Weir asserted that the claimed full refund damages approach could be implemented using Class-wide proof, but he has not provided any mechanism for allocating to individual putative Class members the portion of total retail sales associated with each individual putative Class member's purchase(s). Mr. Weir failed to acknowledge in his declaration that *any* type of allocation methodology divorced from actual individual purchase patterns will over-compensate some Class members and under-compensate other Class members.

19.  The details of my analyses and the bases for my opinions are contained in the remainder of this declaration.

## III.  QUALIFICATIONS AND EXPERIENCE

20.  I am a Managing Principal at Analysis Group, Inc. ("AG"). AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. Internationally, AG consists of more than 700 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

21.  My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients. Throughout my career I have provided these consulting services in class certification matters, antitrust cases, breach of contract cases, intellectual property cases, fraud-related cases, business tort cases, business interruption cases, and securities-related cases, among others. I have worked on engagements (or submitted

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

reports) relating to class certification issues numerous times, including but not limited to matters relating to beverages, fast food, non-stick cooking sprays, gas mileage, hand soap, facial cream, sunscreen, lipstick, foundation, and probiotics, among others.

22.     I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses.  Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity, assessments of profitability, assessments of reasonable royalties, and assessments of the competitive business environment.  I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams.  During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models.  I have provided expert testimony in deposition and trial settings numerous times.

23.     I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.  Attached as **Exhibit 1** is a true and correct copy of my current resume.  A listing of publications I have authored is contained in my resume.  Attached as **Exhibit 2** is a listing of my trial and deposition testimony experience.  My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

24.     AG is being compensated based upon hours incurred and the hourly rates of the personnel involved.  Payment to AG is not contingent upon my findings or the outcome of this matter.  AG is being compensated at a rate of $625 per hour for my time.  Hourly rates for other

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

staff at AG assisting me with this matter range from $215 to $570 per hour, depending

upon the level and experience of the staff involved.

## IV.    FACTS, DATA, AND INFORMATION RECEIVED

25.    The facts, data, and information available to me in forming my opinions are contained in

**Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits). Examples of

the types of information available to me include the following:

a.    legal documents (e.g., First Amended Class Action Complaint; Motion for Class Certification; Renewed Motion for Class Certification; Second Renewed Motion for Class Certification);

b.    declaration (e.g., Declaration of Colin B. Weir dated August 11, 2014; Declaration of Colin B. Weir dated July 9, 2018; Declaration and Expert Report of J. Michael Dennis, Ph.D. dated July 9, 2018);

c.    deposition transcripts (e.g., Deposition of Patrick Fitzgerald taken on September 4, 2014; Deposition of Karl Sears taken on June 26, 2014; Deposition of Steven Asnes taken on June 26, 2014; Deposition of Catherine Bartholomew taken on June 27, 2014; Deposition of Erin Allen taken on August 28, 2014; Deposition of Tammie Shawley taken on February 12, 2019; Deposition of Brian Smith taken on February 13, 2019; Deposition of Ofelia Frechette taken on February 22, 2019; Deposition of Shelley Harder taken on March 1, 2019; Deposition of Deana Marr taken on March 17, 2019; Deposition of J. Michael Dennis taken on February 14, 2019; Deposition of Colin Weir taken on March 7, 2019);

d.    documents produced by Conagra (e.g., Parkay Spray financial data; internal presentations; consumer studies);

e.    IRI retail sales and pricing data (e.g., retail dollar sales, unit sales, and average retail prices associated with Parkay Spray in various sales channels, geographic locations, and retailers); and

f.    information independently obtained (e.g., SEC filings; information from Conagra's website).

Contained in **Exhibit 4** are the names, company affiliations (if any), and positions of each

of the individuals whose deposition transcripts are cited in the text of my declaration.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

26.    My analyses and opinions are based upon the information available, standard economic

theory, and my education and training.  The information I am relying upon is information

typically relied upon by experts in my field.  I reserve the ability to (a) review documents,

deposition transcripts, expert reports, or other information produced by the parties to this

dispute and (b) supplement my opinions based upon that review, if appropriate.  I also

reserve the ability to use demonstrative exhibits and/or other information to explain and

illustrate my opinions.

## V.    OVERVIEW OF PARTIES

### A.  Named Plaintiffs

27.    An overview of each Named Plaintiff and their respective purchases of the Challenged

Products is provided below and in **Table 1**.[48]

_____

[48] It is my understanding that Named Plaintiff Betty Vazquez was not deposed, and thus is not included in my summary
of Named Plaintiffs.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

**Table 1**
**Summary Of Named Plaintiffs' Purchases Of The Challenged Products**

| Named Plaintiff | Frequency Of Purchases | Reasons For Purchase Unrelated To Challenged Claims | Use Of Parkay Spray | Evidence Of Purchase |
|---|---|---|---|---|
| Erin Allen | Total of 50 to 60 bottles (from 2009 through the filing of original complaint) | Flavor | Flavoring, topping | Did not keep receipts |
| Ofelia Frechette | 2 – 3 bottles per week (from 2002 through 2017) | Grandma used Parkay Spray; taste; convenient spray form | Non-stick cooking spray, topping, cooking and pouring | Did not keep receipts; paid in cash |
| Shelley Harder | Approximately one bottle a week (since January 2017) | Taste | Topping | Did not keep receipts |
| Deana Marr | One or two bottles weekly or once every two weeks (from March 2017 through late-2018) | - | Topping | Did not keep receipts |
| Tammie Shawley | Everything on the shelf (roughly 10 – 12 bottles) whenever it was on sale (from 2004 or 2005 through mid-2018) | Flavor | Flavoring, topping | Did not keep receipts |
| Brian Smith | Two or three times a year for a total of 6 bottles (from 2016 or 2017 through the summer of 2018) | Convenient spray form | Topping | Did not keep receipts |

### 1. <u>Erin Allen</u>

28.    Erin Allen is a resident of Dublin, California.[49] Ms. Allen first purchased Parkay Spray in

approximately 2009 and purchased a total of approximately 50 to 60 bottles before ceasing

to purchase Parkay Spray around the time that the original complaint was filed in this

matter.[50] Ms. Allen testified that she did not have receipts or other records reflecting her

purchases and could not recall the prices she paid for Parkay Spray.[51] Ms. Allen testified

_____

[49] Deposition of Erin Allen taken on August 28, 2014 ("Allen Deposition"), p. 60.

[50] Allen Deposition, pp. 7, 24 – 25, and 84 – 85.

[51] Allen Deposition, pp. 27 – 28 and 54.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

that she purchased Parkay Spray mainly because of the "zero fat / zero calories" labeling, but she also was hoping it would add flavor.[52]  Ms. Allen testified that she used Parkay Spray as a topping on foods, on a baking sheet to sauté and add flavor, and that she did not use it for cooking.[53]  Ms. Allen did not notice the "per serving" wording on the bottle.[54]

### 2.  Ofelia Frechette

29.    Ofelia Frechette is a resident of Hammond, Indiana.[55]  Ms. Frechette first purchased Parkay Spray in 2002 and purchased two to three bottles a week,[56] but does not have any receipts that show purchases of the products.[57]  Ms. Frechette purchased Parkay Spray because her grandma had used it, she liked the taste of it, and she liked that it was in a spray form that was "less messy [and] easier to use."[58]  Ms. Frechette testified that she used Parkay Spray one-third of the time for nonstick cooking spray, one-third of the time for topping, and one-third of the time for cooking and pouring.[59, 60]  Ms. Frechette did not recall purchasing Parkay Spray with the words "per serving" by the fat-free and the zero calorie reference.[61]

---

[52] Allen Deposition, pp. 21 and 29.  Ms. Allen testified that she was not happy that "it didn't add a flavor to it," but she admitted that she was hoping it would.  (Allen Deposition, p. 21.)

[53] Allen Deposition, pp. 7 – 8, 10, and 18 – 21.  Ms. Allen testified that she used Parkay Spray as a topping for zucchini, corn, squash, broccoli, popcorn, and toast.  (Allen Deposition, pp. 10, 13, 15 – 17, and 23.)  On a limited number of occasions, Ms. Allen used Parkay Spray when baking or in a frying pan, not as a cooking spray but more to sauté and add flavor to the cookies.  (Allen Deposition, pp. 10 and 18 – 21.)

[54] Allen Deposition, p. 86.

[55] Deposition of Ofelia Frechette taken on February 22, 2019 ("Frechette Deposition"), p. 8.

[56] Frechette Deposition, pp. 32 – 33.

[57] In addition, Ms. Frechette testified that she typically purchased Parkay Spray with cash.  (Frechette Deposition, pp. 72 – 73.)

[58] Frechette Deposition, pp. 50 – 51.

[59] Frechette Deposition, p. 41.

[60] Ms. Frechette testified that she would take the top off the Parkay Spray and pour it on mashed potatoes.  (Frechette Deposition, p. 39.)  Ms. Frechette testified that she would use Parkay Spray as a topping for popcorn and toast and as a cooking spray for baked goods such as cakes, cookies, muffins, and biscuits. (Frechette Deposition, pp. 35 – 37.)

[61] Frechette Deposition, p. 55.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Ms. Frechette stopped purchasing Parkay Spray (prior to her knowledge of the lawsuit[62])

because she was going vegan.[63]

### 3. **Shelley Harder**

30.    Shelley Harder is a resident of Indianapolis, Indiana.[64]  Ms. Harder first purchased Parkay

Spray in January 2017 and purchased approximately one bottle a week.[65]  She did not have

any receipts of purchases of the products.[66]  No one told Ms. Harder about Parkay Spray,

but she first saw it at a grocery store and decided to purchase it because she had been more

aware of the calories and fat content in products after joining Weight Watchers and she

thought Parkay Spray was zero fat and zero calories.[67]  She also liked the taste of the

product.[68]  Ms. Harder testified that she only used Parkay Spray for topping/pouring and

never for cooking.[69, 70]  Ms. Harder acknowledged that (a) she recalled the serving size of

Parkay Spray was five sprays (for topping), (b) she knew it said zero fat zero calories per

serving on the product, and (c) she did not recall any statement on the bottle saying it was

_____

[62] Frechette Deposition, pp. 27 – 28.

[63] Frechette Deposition, p. 49.

[64] Deposition of Shelley Harder taken on March 1, 2019 ("Harder Deposition"), p. 8.

[65] Harder Deposition, pp. 25 – 26.

[66] Harder Deposition, p. 64.

[67] Harder Deposition, pp. 41 – 42.

[68] Harder Deposition, p. 42.

[69] Harder Deposition, pp. 31 and 34.

[70] Ms. Harder testified that she would take the top off the Parkay Spray and pour it on "whatever [she] was eating that [she] felt needed butter on it".  (Harder Deposition, p. 28.  (Bracketed text added for clarification.))  Ms. Harder testified that she would use Parkay Spray as a topping for mashed potatoes, popcorn, toast, and vegetables such as brussels sprouts, corn, broccoli, cauliflower, and cabbage.  When she poured Parkay Spray on broccoli, for example, she would usually do three or four tablespoons.  (Harder Deposition, pp. 28 and 34 – 36.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

---

zero fat zero calories for the entire bottle.[71]  Ms. Harder did not recall the last time she

purchased or used Parkay Spray.[72]

### 4. __Deana Marr__

31.    Deana Marr is a resident of Buford, Georgia.[73]  Ms. Marr first purchased Parkay Spray in

March 2017.[74]  She purchased one or two bottles every time she went to the grocery store,

which was typically once every two weeks or sometimes once a week, and purchased

approximately 65 bottles total.[75]  Ms. Marr did not have any receipts of her purchases of

the products.[76]  Ms. Marr testified that the major reason why she decided to start purchasing

Parkay Spray was because her doctor told her that her cholesterol was high and she needed

to incorporate fat free and low calorie food into her diet.[77]  Ms. Marr testified that she only

used Parkay Spray for topping, but never used it for baking or as a cooking spray.[78]  Ms.

Marr did not recall whether the Parkay Spray she purchased said anything about serving

size or had "per serving" by the zero grams of fat and the zero calorie reference,[79] but she

testified that she believed the serving size for Parkay Spray as a topping to be one spray.[80]

---

[71] Harder Deposition, pp. 30 – 31.

[72] Harder Deposition, pp. 26 and 67.

[73] Deposition of Deana Marr taken on March 17, 2019 ("Marr Deposition (rough)"), p. 7.

[74] Marr Deposition (rough), pp. 16 and 30.

[75] Marr Deposition (rough), pp. 16 – 17.

[76] Marr Deposition (rough), pp. 77 – 78 and 120 – 121.

[77] Marr Deposition (rough), pp. 31 – 34.

[78] Marr Deposition (rough), pp. 17 – 18.  Ms. Marr testified that she used Parkay Spray as a topping on vegetables, potatoes, toasts, and popcorn.  (Marr Deposition (rough), p. 17.)

[79] Marr Deposition (rough), pp. 41 – 42.

[80] Marr Deposition (rough), p. 18.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Ms. Marr had stopped purchasing Parkay Spray in late-2018 after she saw the lawsuit and learned that Parkay Spray was not fat free and did have calories.[81]

### 5. **Tammie Shawley**

32.    Tammie Shawley is a resident of Ohio.[82]  Ms. Shawley first purchased Parkay Spray 14 years ago in 2004 or 2005.[83]  She used to purchase Parkay Spray when they were on sale, and would purchase everything on the shelf, roughly 10 to 12 bottles.[84]  She did not have any receipts of purchases of the products.[85]  Parkay Spray was first introduced to Ms. Shawley by one of the members in her Weight Watchers group.[86]  She decided to purchase it because she was looking for something that would add flavor to food and also is fat free.[87]  She also liked the taste of Parkay Spray.[88]  Ms. Shawley testified that she never used Parkay Spray as an actual cooking spray, but more of a flavoring and topping for food.[89, 90]  It usually took her "a day or two" to finish a bat of Parkay Spray.[91]  Ms. Shawley did not recall one way or the other if the Parkay Spray she purchased had "per serving" by the zero

_____

[81] Marr Deposition (rough), p. 16.

[82] Deposition of Tammie Shawley taken on February 12, 2019 ("Shawley Deposition"), p. 116.

[83] Shawley Deposition, pp. 25 and 54.

[84] Shawley Deposition, pp. 25 – 26.

[85] Shawley Deposition, p. 110.

[86] Shawley Deposition, p. 41.

[87] Shawley Deposition, p. 55.

[88] Shawley Deposition, p. 55.

[89] Shawley Deposition, pp. 27 – 28 and 47 – 48.

[90] Ms. Shawley testified that she would unscrew the lid off the Parkay Spray and pour it over baked potatoes, and she would spray it on toasts, about nine to ten sprays on each piece of bread.  (Shawley Deposition, pp. 27 – 28.)  Ms. Shawley also testified that she would use Parkay Spray as a topping for almost all vegetables and popcorn.  (Shawley Deposition, pp. 43 – 44.)

[91] Shawley Deposition, p. 27.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

grams of fat and the zero calorie reference.[92]  Ms. Shawley had stopped purchasing Parkay Spray since her knowledge of the lawsuit, which was around mid-2018, but she had been using the remaining Parkay Spray in her stockpile until about two months before her deposition.[93]

### 6. **Brian Smith**

33.    Brian Smith is a resident of Bay City, Michigan.[94]  Mr. Smith first purchased Parkay Spray in 2016 or 2017[95] and had purchased two or three times a year for a total of six bottles.[96] He did not have any receipts or records of purchases of the products.[97]  Mr. Smith testified that he decided to purchase Parkay Spray only because he thought the products contained zero fat and zero calorie.[98]  He thought the taste of Parkay Spray was okay, but he found the spray container convenient.[99]  Mr. Smith testified that he had only used Parkay Spray in two ways: (i) using it as a topping for corn on the grill and (ii) using it to cook grilled cheese sandwiches, though he did not consider Parkay Spray a cooking spray for grilled cheese because he considered products like PAM as a cooking spray.[100]  Mr. Smith did not

---

[92] Shawley Deposition, p. 15.

[93] Shawley Deposition, pp. 17 – 19 and 21 – 22.

[94] Deposition of Brian Smith taken on February 13, 2019 ("Smith Deposition"), p. 8.

[95] Smith Deposition, p. 17.

[96] Smith Deposition, p. 24.

[97] Smith Deposition, p. 70.

[98] Smith Deposition, pp. 39 – 40.

[99] Smith Deposition, p. 40.

[100] Smith Deposition, pp. 24 – 25, 27, and 35.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

recall if the Parkay Spray he purchased had "per serving" by the zero grams of fat and the zero calorie reference.[101]  Mr. Smith stopped using Parkay Spray in the summer of 2018.[102]

### B.  Conagra Brands, Inc.

34.    Conagra Brands, Inc., formerly known as ConAgra Foods, Inc. ("Conagra") is a Delaware corporation with its headquarters in Chicago, Illinois.[103]  Conagra was incorporated initially in 1919 and is one of North America's leading packaged food companies, with its branded and private branded foods found in 99% of U.S. households.  Conagra sells many recognized food brands including Banquet, Chef Boyardee, Hunt's, Marie Callender's, Orville Redenbacher's, and Slim Jim among many others.[104]  Conagra acquired several brands of oil-based products, margarines, and spreads from Nabisco Holdings Corporation in 1998, including Parkay, Blue Bonnet, and Fleischmann's, among others.[105]  Conagra currently sells several varieties of Parkay products, including Parkay Original Stick, Parkay Original Spread, Parkay Light Spread, Parkay Squeeze, and Parkay Spray.[106]

## VI.    DETERMINING WHETHER AND TO WHAT EXTENT A PUTATIVE CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS REQUIRES INDIVIDUALIZED INQUIRY

35.    From an economic and claimed damages perspective, accurately assessing whether and to what extent a putative Class member suffered economic injury as a result of the Challenged

_____

[101] Smith Deposition, p. 16 and 53.

[102] Smith Deposition, p. 80.

[103] Conagra Brands, Inc. Form 10-K for the fiscal year ended May 27, 2018 ("Conagra 2018 10-K"), pp. 1 and 17.

[104] ConAgra Foods, Inc. Form 10-K for the fiscal year ended May 25, 2014 ("Conagra 2014 10-K"), p. 1.

[105] "Company News; ConAgra Buys Several Margarine Brands from Nabisco," The New York Times, July 22, 1998. (http://www.nytimes.com/1998/07/22/business/company-news-conagra-buys-several-margarine-brands-from -nabisco.html, viewed on August 10, 2018.)

[106] "Parkay: Our Products."  (https://www.parkay.com/#block-parkay-ourproducts, viewed on August 10, 2018.) Parkay Spray was introduced in 2000.  (Deposition of Patrick Fitzgerald taken on June 23, 2014 ("Fitzgerald Deposition"), p. 107.)

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Claims requires an evaluation of (a) the price paid versus value received from purchase(s) of the Challenged Product(s) and (b) the extent to which that difference (if any) is attributable to the allegedly misleading marketing. In the present matter, performing such an evaluation requires individualized information specific to each putative Class member. This individualized information includes, *inter alia*:

a. reasons for purchasing the Challenged Product(s) (and whether related to the allegedly deceptive marketing);

b. use (and amounts used) of the Challenged Product(s);

c. knowledge and perceptions related to the Challenged Claims; and

d. the price(s) paid by the putative Class member for the Challenged Product(s) (and the extent to which the price paid may or may not have been greater than the value received by that individual, if at all, with the difference requiring a nexus to Named Plaintiffs' theory of liability).

36. In his declaration, Mr. Weir proposes to calculate damages by multiplying a claimed percentage price premium by the dollar sales of units sold.[107] As demonstrated by the evidence and analyses presented below, Mr. Weir's proposed "percentage price premium times dollar sales of units sold" approach using common proof will not yield a reliable measure of Class-wide claimed damages. This is because (a) there is no common proof measure of the quantity of the Challenged Products purchased by putative Class members who suffered economic harm and (b) there is no common proof measure of price (or percentage price premium). The above-mentioned circumstances surrounding each putative Class member's purchasing decision (and resulting benefits derived from each purchase) must be considered in order to determine whether and to what extent the individual was injured as a result of the alleged wrongful conduct.

_____

[107] Weir Declaration, p. 21.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

### A. **Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing The Challenged Products**

37.     From an economic and damages perspective, a person who purchased Parkay Spray for a reason or reasons other than the Challenged Claims (e.g., a person who bought solely because of the convenient spray form), and who would have purchased the same product or a similar product at the same price regardless of the allegedly misleading marketing, did not suffer economic injury.  In economic terms, that purchaser (under these circumstances) received a value that was commensurate with what was paid.  Because the purchase of the Challenged Product(s) was not motivated in a substantial way by the allegedly misleading marketing, such a consumer did not suffer economic injury.  Therefore, individualized inquiry and analyses regarding putative Class members' motivations in purchasing the Challenged Products may be determinative of whether individual putative Class members suffered economic injury with a nexus to the Challenged Claims.

38.     Documentary evidence and deposition testimony confirm that consumers purchase Parkay Spray for a variety of reasons unrelated to the Challenged Claims.  Reasons for purchasing Parkay Spray include Parkay Spray's taste, convenient spray form, price, and nutrition claims unrelated to the Challenged Claims (e.g., 0g Trans Fat, 0mg Cholesterol).[108]  The rationale behind each consumer's decision to purchase the Challenged Products likely varies across putative Class members.

a.   Fresh And Creamy Taste.  The Parkay Spray product label highlights the "Fresh & Creamy Taste" of Parkay Spray in a prominent position on the front of the product label.[109]  Mr. Patrick Fitzgerald (Senior Brand Manager, ConAgra Foods, Inc.) testified

_____

[108] Ms. Catherine Bartholomew testified that fat content is a purchase driver "for some of the consumers some of the time" when choosing margarines or spreads, but "[t]here are other drivers as well."  (Deposition of Catherine Bartholomew dated June 27, 2014 ("Bartholomew Deposition"), p. 273.)

[109] Unredacted Declaration of Lee M. Gordon in Support of Plaintiff's Motion for Class Certification, Exhibits 1 – 3.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

that taste was "probably the number one" (i.e., most important) product attribute of Parkay Spray to consumers.[110] Mr. Fitzgerald further testified that Parkay has a "fresh and creamy taste and there are consumers that that's exactly what they're looking for."[111]

b. <u>Convenient Spray Form</u>.  The importance of Parkay Spray's convenient spray form as a driver of consumer purchases is supported by at least the following deposition testimony and documentary evidence.

i. Ms. Catherine Bartholomew (Senior Director of Consumer Insights, ConAgra Foods, Inc.) testified that the spray form is "the most unique thing about [Parkay Spray]."[112]

ii. Mr. Fitzgerald testified that "the different forms within the different spreads categories are used differently for different reasons on different products."[113] Mr. Fitzgerald further testified that "[t]he usage occasions are different for soft tub products … than they are for spray," and depending upon the particular "usage occasion," soft tub products are "not nearly as convenient as spray."[114] Mr. Fitzgerald identified the convenience of the spray form and its allowance for portion control (due to the nature of how the product is applied) as important attributes of Parkay Spray to consumers.[115]

iii. According to an internal Conagra presentation dated 2010, the market segment in which Parkay competes is "[c]onvenience driven."  The same presentation identified the form of the product as an important consideration to consumers in each segment.[116]

_____

[110] Fitzgerald Deposition, pp. 104 – 105.

[111] Fitzgerald Deposition, pp. 220 – 221.  Mr. Fitzgerald further testified that "in many consumers eyes, [I Can't Believe It's Not Butter] tastes closer to butter than Parkay does, but they pay a premium for that" because "I Can't Believe It's Not Butter is a premium brand relative to Parkay."  (Bracketed text added for clarification.)

[112] Bartholomew Deposition, p. 273.  (Bracketed text added for clarification.)

[113] Fitzgerald Deposition, pp. 102 – 103.  For example, Mr. Fitzgerald testified that Parkay's tub products often are used as a topping for toast, muffins, and bagels due to superior "spreadability" compared to Parkay Spray.

[114] Fitzgerald Deposition, p. 223.

[115] Fitzgerald Deposition, pp. 103 – 105.  Regarding "portion control," Mr. Fitzgerald testified that "because of the nature of how [Parkay Spray] is applied, it is much more – it's controllable as opposed to so much easier to take a big dollop using a knife or something out of a tub."  (Bracketed text added for clarification.)

[116] "Table Spreads: Category Overview," Conagra presentation dated April 2010.  (Bartholomew Deposition, Exhibit 97.)  (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

     iv. An undated Conagra presentation stated that "convenience is just as important" as health to Parkay consumers.  The presentation stated that "[h]ealth is important, but convenience is top of mind" for Parkay consumers.[117]

  c.



Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

     d.  <u>Other Nutrition Claims</u>.  Parkay Spray is labeled with certain nutrition-related claims other than the Challenged Claims, including "0g Trans Fat Per Serving" and "0mg Cholesterol Per Serving."  Documentary evidence indicates that these undisputed claims are important purchase drivers for some consumers.

     i.  According to a Conagra presentation, "Heart-healthy foods" and "No trans fat" were among the "Top Consumer Health Concerns" as of March 2007.  The presentation stated that margarines and spreads "address consumers' health concerns" and "their shopping behavior reinforces this."  Based upon consumer research, the presentation stated that the "[t]op five things shoppers consider when deciding which margarine/spread to buy" are (in rank order) (1) trans fat, (2) cholesterol, (3) saturated fat, (4) fat, and (5) calories.[119]  The two highest-ranked considerations (i.e., trans fat and cholesterol) are the subject of Parkay Spray's <u>undisputed</u> nutrition claims, not the Challenged Claims.

     ii.  According to a study cited by Mr. Weir regarding consumer perception of nutrient content claims, "zero cholesterol" claims contribute more than "total fat" claims to consumers' overall judgment of food as healthful.[120]

39.    Because a significant number of purchasers of the Challenged Products could and did make purchases for reasons other than the Challenged Claims, it would be necessary to inquire as to why each putative Class member purchased the Challenged Product(s) in order to evaluate alleged injury, if any, with a nexus to the allegedly misleading marketing. Consumers who purchased Challenged Products solely (or in large part) for reasons other than the Challenged Claims were not injured (or, under the Named Plaintiffs' theory of liability, were not injured to the same degree, if at all) as consumers who purchased solely (or in large part) because of the Challenged Claims.  This aspect of the economic injury and causation analysis cannot be determined using common proof.    Mr. Weir's methodology to calculate claimed Class-wide damages are not reliable as his methodology

---

[119] "ConAgra Brand Tablespreads Portfolio," Conagra presentation.  (Bartholomew Deposition, Exhibit 109; CAGAL_007793 – 824 at 800.)

[120] "Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis," Drewnowski, Adam, et al., Public Health Nutrition: 13(5), 688 – 694 at 692.  (Weir 08/11/14 Declaration, Exhibit H.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

fails to recognize putative Class members' reasons for purchase (and that the value received

by many putative Class members is greater than or equal to the price paid).

**B.  Individual Inquiry Is Required To Determine Putative Class Members' Use (And
     Amounts Used) Of The Challenged Products**

40.    According to the Second Amended Complaint, "Plaintiffs were reasonably diligent

consumers looking for products that were fat-free and calorie free alternatives to butter."[121]

Plaintiffs further allege that Parkay Spray is a "butter substitute" because "it is being used

as a topping in place of butter"[122] and that Plaintiffs were unaware that Parkay Spray "did

not qualify as 'fat free' or 'calorie free' based on amounts customarily consumed."[123]  In

other words, Plaintiffs' allegations imply that <u>all</u> putative Class members were (a) looking

for "alternatives to butter" that were fat-free and calorie free and (b) utilized Parkay Spray

as a "butter substitute" (or in amounts that no longer qualified Parkay Spray as fat free or

calorie free).

41.    Individual putative Class members' use (and typical amounts used) of Parkay Spray may

affect whether an individual suffered harm with a nexus to the Challenged Claims.  For

example, a consumer may have used Parkay Spray consistent with the serving size

suggestions on the package.  These putative Class members have not been damaged.

Alternatively, a consumer who uses Parkay Spray for cooking purposes and/or topping

purposes (i.e., uses relatively small amounts of Parkay Spray) likely would place a lower

value (if any) on the Challenged Claims (relative to a consumer who uses relatively large

volumes of Parkay Spray).

_____

[121] Second Amended Complaint, p. 11.

[122] Second Renewed Motion For Class Certification, p. 1.

[123] Second Amended Complaint, p. 11.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

42.    Contrary to Plaintiffs' allegations, documentary evidence demonstrates that at least some

putative Class members use Parkay Spray as a cooking spray and/or for topping purposes

(i.e., in relatively small amounts) and may not have considered (or placed value on) the

Challenged Claims.    Specifically, documentary evidence demonstrates that (a) Conagra

advertises Parkay Spray to be used for cooking purposes and (b) consumers use spray-type

oil (such as Parkay Spray) products for cooking purposes.

a.    

b.    <u>Conagra Advertises Parkay Spray For Cooking Purposes</u>.  As shown in **Figure 2** below, Conagra advertises that Parkay Spray can be used for cooking and/or topping on the Nutrition Facts panel.  Specifically, Conagra advertises to use "1 Spray (0.2g)" of Parkay Spray "for Cooking" and "5 Sprays (1g)" of Parkay Spray "for Topping."

**Figure 2**
**Parkay Spray Nutrition Facts[124]**



c.    <u>Consumers Use Spray Oil Products (Such As Parkay Spray) For Cooking Purposes</u>.  On June 24, 2018, Dr. Dennis "conducted six in-depth interviews with buyers of spray butter products" and included notes for each respondent.[125]  Dr. Dennis' notes on his

_____

[124]  Walmart: Parkay Spray Oil Spray, 8 Ounce.  (https://www.walmart.com/ip/Parkay-Vegetable-Oil-Spray-8-Ounce/10447926, viewed on January 31, 2018.)  *See also* Campbell Deposition Exhibits 58, 60, and 61.

[125]  Dennis Declaration Attachment E: JM Dennis Notes On Cognitive Interviews For The Conjoint Survey ("Dennis Declaration Attachment E"), p. 1.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

cognitive interviews demonstrate that consumers use spray butter products for cooking purposes.

    i.    <u>Notes On Respondent #2, White Female Age 30 – 40</u>.  Dr. Dennis noted that Respondent #2 "used to buy spray butter" and "[w]as using margarine spray for cooking/frying eggs and stir-fry vegetables."[126]

    ii.    <u>Notes On Respondent #3, White Male Age 40 – 50</u>.  Dr. Dennis noted that Respondent #3 had used a spray product before and "prefers spray bottles to other products for his cooking."[127]

43.    Given that some consumers likely use Parkay Spray consistent with serving size suggestions, and given that some consumers use Parkay Spray for cooking purposes and/or topping purposes (i.e., in relatively small amounts), rather than in relatively large volumes, individual inquiry would be required to determine each consumer's use (and amounts used) of the Challenged Products.  As an illustration, from an economic and claimed damages perspective, putative Class members who used Parkay Spray as a cooking spray (and in relatively small amounts) may not have considered (or placed value on) the Challenged Claims.  Under the Named Plaintiffs' theory of liability, these consumers were not injured to the same degree (if at all) as consumers who used relatively large volumes (e.g., consumers who unscrew the lid to pour the Parkay Spray product over their food).  However, Mr. Weir's methodology for calculating claimed damages fails to consider individuals' use (and amounts used) of the Challenged Products, and thus fails to exclude individuals who have not been harmed with a nexus to the Challenged Claims.

_____

[126] Dennis Declaration Attachment E, p. 3.

[127] Dennis Declaration Attachment E, p. 5.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

### C. __Individual Inquiry Is Required To Determine Putative Class Members'__ __Knowledge And Perceptions Related To The Challenged Claims__

44.    Individual putative Class members' knowledge and perceptions relating to the Challenged

Claims may affect the determination of whether an individual purchaser suffered injury

with a nexus to the alleged wrongful conduct.  Different putative Class members may have

different knowledge and perceptions relating to the "Fat Free" / "0g Fat Per Serving" and

"Zero Calories" / "0 Calories Per Serving" claims depending upon: (a) whether the

individual consumer was aware of the FDA's nutritional labeling requirements

(specifically the FDA's rounding rules for declaring nutrients), (b) whether the individual

consumer reviewed the ingredients of Parkay Spray (listed on the front or back of the

Parkay Spray bottle), and/or (c) whether the individual consumer was aware of the

allegations regarding the Challenged Claims from news reports.

a.    FDA's Nutritional Labeling Requirements.  According to the FDA's Guide to Nutrition
Labeling and Education Act (NLEA) Requirements, the rounding rules for declaring
nutrients include: (i) express calories per serving as zero if there are less than 5 calories
per serving and (ii) express the total fat per serving as zero if there are less than 0.5g of
fat per serving.[128]  It is likely that at least some putative Class members had knowledge
of the FDA's nutritional labeling requirements and rounding rules for declaring
nutrients.

b.    Ingredients Of Parkay Spray Listed On The Front And Back Of The Bottle.  According
to the Second Renewed Motion for Class Certification, Plaintiff claims that 44%
vegetable oil "is pure fat" and that sweet cream buttermilk "is 5% fat by weight."[129]
As shown in **Figure 3** below, (i) the front of the Parkay Spray bottle indicates that
Parkay Spray contains "44% Vegetable Oil Spread" and (ii) the back of the Parkay
Spray bottle indicates that Parkay Spray contains soybean oil and buttermilk (and milk
and soy).  Given the listed ingredients on both the front and back of the Parkay Spray
bottle, at least some putative Class members likely were aware that Parkay Spray
contained vegetable oil, soybean oil, and buttermilk.  Furthermore, it is likely that many

---

[128] U.S. Food & Drug Administration: Guide to Nutrition Labeling and Education Act (NLEA) Requirements –
Attachment 7: Rounding Rules for Declaring Nutrients (https://www.fda.gov/ICECI/Inspections/InspectionGuides/uc
m114098.htm, viewed on February 6, 2019.)

[129] Second Renewed Motion For Class Certification, p. 3.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

consumers have knowledge regarding the nutrients of the listed ingredients (e.g., that vegetable oil and buttermilk contain fat).

**Figure 3**
**Parkay Spray Listed Ingredients[130]**



c. <u>News Articles Report Allegations Regarding The Challenged Claims</u>.  Individual consumers may have knowledge of the allegations regarding the Challenged Claims if they reviewed news articles that discuss the Parkay Spray lawsuit.  For example, (i) the Huffington Post and (ii) Business Wire published articles that discussed the Parkay lawsuit and the allegations regarding the Challenged Claims.

i. <u>Huffington Post Article</u>.  A Huffington Post article entitled "Parkay Spray Lawsuit: False Advertising Case Over Butter Alternative Could Affect 'Millions'" was published on March 26, 2013.  The article notes, "ConAgra [allegedly] uses an unrealistic serving size – up to 5 spray – to conceal the true amount of fat and calories in a reasonable portion of the spray.  An 8-ounce bottle contains 832 calories and 93 grams of fat, the suit claims, which means that even a small serving size packs a few calories."[131]  According to SimilarWeb (a website that provides web analytics services for businesses[132]), in the last six months (from February 4, 2019), the Huffington Post website (huffingtonpost.com) had approximately 130.22 million visits.[133]

ii. <u>Business Wire Article</u>.  A Business Wire article entitled "Lawsuit: ConAgra Misled Consumers about Health Benefits of Parkay Spray" was published on March 21,

---

[130] Walmart: Parkay Spray Oil Spray, 8 Ounce.  (https://www.walmart.com/ip/Parkay-Vegetable-Oil-Spray-8-Ounce/10447926, viewed on January 31, 2018.)  *See also* Campbell Deposition Exhibits 58, 60, and 61.

[131] Huffington Post: Parkay Spray Lawsuit: False Advertising Case Over Butter Alternative Could Affect 'Millions' dated March 26, 2013.  (https://www.huffingtonpost.com/2013/03/26/parkay-spray-lawsuit_n_2956709.html, viewed on February 4, 2019.)  (Bracketed text added for clarification.)

[132] Wikipedia: SimilarWeb.  (https://en.wikipedia.org/wiki/SimilarWeb, viewed on February 4, 2019.)

[133] SimilarWeb hufftingtonpost.com January 2019 Overview: Traffic Overview Total Visits.  (https://www.similarweb. com/ website/huffingtonpost.com, viewed on February 4, 2019.)

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

2013. The article notes a lawsuit was filed "alleging that ConAgra Foods, Inc. []
deceptively marketed Parkay Spray, a sprayable margarine product, as 'fat free,'
and '0 calories' to entice health-conscious customers, despite the product not
meeting federal requirements to qualify for those claims." According to
SimilarWeb (a website that provides web analytics services for businesses[134]), in
the last six months (from February 4, 2019), the Business Wire website
(businesswire.com) had approximately 5.38 million visits.[135]

45. From an economic and damages perspective, putative Class members who were not misled
by the Challenged Claims (i.e., those whose knowledge and perceptions were in line with
the actual product they received) did not suffer economic injury. Such putative Class
members received a value that was commensurate with what was paid, and a common
proof approach would not isolate these putative Class members from the claimed damages
calculation. Hence, individual putative Class members' knowledge and perceptions
relating to the Challenged Claims would be an important inquiry relevant to evaluating and
quantifying claimed injury, if any. However, Mr. Weir's methodology for calculating
claimed damages fails to exclude individuals who were not misled by the Challenged
Claims.

### D.  Individual Inquiry Is Required To Determine The Specific Price Paid For Parkay Spray By Each Putative Class Member

46. Knowing the prices paid by individual putative Class members is an important factor in
evaluating whether (and to what extent) an individual Class member suffered economic
harm. However, analyses of retail pricing data indicate that there is not a single (i.e.,
uniform) purchase price that can be used to evaluate claimed damages on a Class-wide
basis. Rather, the data demonstrate that there are wide variations in retail prices associated

---

[134] Wikipedia: SimilarWeb. (https://en.wikipedia.org/wiki/SimilarWeb, viewed on February 4, 2019.)

[135] SimilarWeb businesswire.com January 2019 Overview: Traffic Overview Total Visits. (https://www.similarweb. com/ website/businesswire.com, viewed on February 4, 2019.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

with the Challenged Products (and wide variations in the aggregate quantities purchased at various retail prices). Without individualized inquiry, one cannot determine the specific price(s) an individual putative Class member paid for the Challenged Product(s) or the extent to which the price paid may or may not have been greater than the value received by that individual – rendering attempts to quantify claimed damages on a Class-wide basis inaccurate and unreliable.

47. Analyses of retail pricing data indicate that the prices putative Class members paid for Parkay Spray differ depending upon the circumstances surrounding their purchases, including sales channel, retailer, date of purchase, promotional activity, and the geographic location among other factors. Because of the wide variations in the retail prices of Challenged Products, putative Class members' claimed damages cannot be evaluated and quantified reliably on a Class-wide basis using common proof (or using just one average price).

### 1. Description Of Data

48. In conducting my analyses, I used two separate pricing datasets from IRI for Parkay Spray[136] that covers the U.S. as a whole and various states and regions. The IRI datasets contain (a) total unit sales, total dollar sales, and average retail prices; (b) promotion-related unit sales, dollar sales, and prices (i.e., on-sale prices); and (c) non-promotion-related unit sales, dollar sales, and prices (i.e., full prices).[137] An overview of retail sales data generated by IRI (such as that used in this matter) is provided in **Appendix A**.

_____

[136] Parkay Spray is available in only one package size (8 oz.).

[137] The second IRI dataset does not include non-promotion-related dollar sales or prices, nor does it contain promotion-related dollar sales. However, these metrics can be backed out using the other data metrics available.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

49.    The first IRI dataset includes the following sales channels on an annual basis over the
period from the week ending January 5, 2009 through the week ending September 7,
2014:[138] (a) grocery stores (e.g., Albertsons, Giant Eagle, and Kroger); (b) drug stores (e.g.,
CVS); (c) mass merchandisers (i.e., Target and Kmart);[139] and (d) military commissaries
(i.e., DeCA and NEXCOM).  In addition, the first IRI dataset includes "multi-outlet" sales
and pricing data, which is aggregated to include at least Walmart sales in addition to the
total sales in other channels listed above.[140]  The total annual unit sales of Parkay Spray in
various U.S. sales channels (as contained in the first IRI dataset) over the period from
January 2009 to September 2014 are provided in **Table 2**.[141]  (**Exhibit 6B**.)



_____
[138] IRI provided data on approximately a calendar year basis (i.e., 52-week periods).  For example, annual data for
2009 is labeled "Calendar Year 2009 Ending 01-03-10."  Annual data for 2014 appears to represent a partial year
ending September 7, 2014.  IRI also provided certain data on a weekly basis.

[139] Sales of Parkay Spray at Target stores ceased in 2011 based upon the IRI data.

[140] ███████████████████████████████████████████████████████████████(Fitzgerald
Deposition, Exhibit 41; CAGAL_001847 – 857 at 849.))

[141] The IRI data also include the dollar stores sales channel.  However, the data indicates that there were no sales of
Parkay Spray in the dollar stores sales channel during the period covered by the data.

[142] ████████████████████████████████████████████████████████████████████████

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

50.    The second IRI dataset includes the following sales channels over the period from the four

weeks ending June 30, 2013 through the four weeks ending July 22, 2018: (a) grocery

stores (e.g., Albertsons, Giant Eagle, and Kroger); (b) mass merchandisers (i.e., Target,

Kmart, Walmart); and (c) military commissaries (i.e., DeCA and NEXCOM).  The total

unit sales of Parkay Spray in various U.S. sales channels (as contained in the second IRI

dataset) on an annual basis from June 2013 through July 2018 are provided in **Table 3**.[143]

(**Exhibit 6A**.)



2.  <u>**Analyses Performed Regarding Retail Prices Of Parkay Spray**</u>

51.    

---

[143] The IRI data also include drug stores, dollar stores, and club stores.  However, the data indicate that were no sales of Parkay Spray in these sales channels during the June 2013 through July 2018 period.  In addition, the IRI data also includes "Multi-Outlet" sales (i.e., the total of sales across all channels).

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

52.

53.

---

[144] The first IRI dataset (ranging from January 5, 2009 – September 7, 2014) includes state specific information.  The second IRI dataset (ranging from June 2013 through July 2018) only includes information pertaining to eight regions and is not state specific.

[145] **Exhibit 6B** contains the annual average retail prices of Parkay Spray in each sales channel during the period from January 2009 – September 2014.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

ii.

---

[146] The second IRI dataset (ranging from June 2013 through July 2018) only includes information pertaining to eight regions and is not state specific.

[147] The IRI dataset includes the following 27 states: Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Vermont, Virginia, Washington, and West Virginia. State-specific data were not available for Alabama, Alaska, District of Columbia, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Mississippi, Montana, Nebraska, Oregon, Rhode Island, Tennessee, Wisconsin, and Wyoming.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019





Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

---

150 *See* Deposition of Steven Asnes taken on June 26, 2014 ("Asnes Deposition"), p. 43 and Deposition of Karl Sears taken on June 26, 2014 ("Sears Deposition"), p. 53.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____



Declaration of Keith R. Ugone, Ph.D.
March 30, 2019



**iv.**

56.

---

[152] **Exhibit 10B** contains the annual average retail prices of Parkay Spray by retailer for mass merchandisers during the period from January 2009 to week ending January 1, 2012.  (Sales of Parkay Spray at Target stores ceased in mid-2011 in the first IRI dataset.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019



Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

3. **Summary**

58.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

██████████████████████████████████████████████████████████

██████████████████████████████    Individual inquiry would be required to separate

putative Class members that purchased at everyday prices as compared to those that

purchased at promoted prices.

59.    There are many individual variables affecting prices and many individual actual prices paid

– all of which negate the ability of a common proof approach to yield a reliable and accurate

estimate of claimed damages on a Class-wide basis.  The aforementioned conclusion also

applies to any proposed monetary remedy using an aggregation of total expenditures by

putative Class members (with the inference that such an aggregation would then be

distributed back down to individual putative Class members).

### E.  Dr. Dennis' Simulator Supports The Requirement Of Individualized Inquiry

60.    In his deposition, Dr. Dennis testified that in the simulator, if a price of $2.50 is assigned

to the product with the Challenged Claims and the product without the Challenged Claims,

"what the simulator will do initially for you is show you a forecast for the market share for

each of those two products."[155]  Dr. Dennis further testified "[i]n this particular example

because consumers value these two claims as evidenced from the survey, the preference

share split, you will see there, would be approximately 71 to 72 percent market share for

the products with the claims, you know, [and] 28 to 29 percent for the product without it"

as shown in **Figure 9** below.[156]  In other words, Dr. Dennis' simulator indicates that if the

---

[154] █████████████████████████████████████████████████
██████████████████████████████ (**Exhibit 11A**.)

[155] Dennis Deposition, pp. 223 – 224.

[156] Dennis Deposition, pp. 223 – 224.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Challenged Claims (Fat Free / Zero Calories) were removed, 27.9% of consumers would

continue to purchase Parkay Spray at the same price (i.e., at a price of $2.50 as assumed

by Dr. Dennis).[157]

**Figure 9**
**Dr. Dennis' Simulated Market Shares For Product With The Challenged Claims**
**Priced At $2.50 And Product Without The Challenged Claims Priced At $2.50**



61.     As evidenced by analysis of Dr. Dennis' simulator and Dr. Dennis' deposition testimony,

under Dr. Dennis' framework, a substantial portion of consumers (27.9%) would purchase

Parkay Spray at the same price regardless of the Challenged Claims.  From an economic

and damages perspective, these consumers did not suffer economic injury and received

value that was commensurate with the price paid.  Thus, Dr. Dennis' own simulator

demonstrates that individualized inquiry and analyses regarding putative Class members'

motivations in purchasing the Challenged Products would be required to determine whether

_____

[157] The same analysis was performed for a product with the Challenged Claims 0g Fat Per Serving and Zero Calories
Per Serving and a product without these Challenged Claims.  Dr. Dennis' simulator indicates that if the Challenged
Claims (0g Fat Per Serving / Zero Calories Per Serving) were removed, 22.1% of consumers would continue to
purchase Parkay Spray at a price of $2.50.  (**Exhibit 12**.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

individual putative Class members suffered economic injury with a nexus to the

Challenged Claims.

## VII.  DR. DENNIS' MARKET SIMULATOR FAILS TO REPRODUCE DR. DENNIS' CLAIMED PRICE PREMIUMS

62.  In his declaration, Dr. Dennis opines that (a) the price premium attributable to the "Fat

Free" / "Zero Calories" Challenged Claims is equal to $0.85 or 34% of the $2.50 assumed

price[158] and (b) the price premium attributable to the "0g Fat Per Serving" / "Zero Calories

Per Serving" Challenged Claims is equal to $1.00 or 40% of the $2.50 assumed price.[159]

In his deposition, Dr. Dennis provided testimony regarding his market simulator and the

steps he took to generate the claimed price premiums associated with the Challenged

Claims.  Dr. Dennis testified to the following.

   a.  In the market simulator, "the two products are identical in every way except one has
       the two [C]hallenged [C]laims."[160]

   b.  In the exercise Dr. Dennis performed, he gave the two products a price of $2.50.[161] Dr.
       Dennis testified that the simulator will initially "show you a forecast for the market
       share for each of those two products.  In this particular example... the preference share
       split, you will see there, would be approximately 71 to 72 percent market share for the
       products with the claims [and] 28 to 29 percent for the product without it."[162]

   c.  The market simulator will determine "how much of a discount is needed for" the
       product without the Challenged Claims "to have a market equilibrium [preference share
       of 50/50] between the two products."[163]  The market simulator "will actually output at
       the bottom of [the simulator] screen what" the "market clearing price point would be
       for that product [ ] without the [C]hallenged [C]laims."[164]

_____

[158] 34% = Price Premium / Product Price = $0.85 / $2.50.  (Dennis Declaration, p. 30.)

[159] 40% = Price Premium / Product Price = $1.00 / $2.50.  (Dennis Declaration, p. 30.)

[160] Dennis Deposition, p. 223.

[161] Dennis Deposition, pp. 223 – 224.

[162] Dennis Deposition, pp. 223 – 224.  *See also* "Share of Preference" in **Figure 12** below.

[163] Dennis Deposition, p. 224.

[164] Dennis Deposition, p. 224.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

63.    In his deposition, Dr. Dennis marked up blank templates of his market simulator to

demonstrate what the simulator would look like to generate (a) the 34 percent price

premium, as shown in **Figure 10** below (Dennis Deposition, Exhibit 12)[165] and (b) the 40

percent price premium, as shown in **Figure 11** below (Dennis Deposition, Exhibit 13).[166]

**Figure 10**
**Selected Attributes By Dr. Dennis To Estimate A 34% Claimed Price Premium**
**Dennis Deposition, Exhibit 12**



[165] Dennis Deposition, pp. 249 – 250.

[166] Dennis Deposition, pp. 250 – 251.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

---

**Figure 11**
**Selected Attributes By Dr. Dennis To Estimate A 40% Claimed Price Premium**
**Dennis Deposition, Exhibit 13[167]**



64.    To replicate Dr. Dennis' claimed price premiums, I follow the steps provided by Dr. Dennis

in his declaration,[168] Dr. Dennis' deposition testimony, and Exhibit 12 and Exhibit 13 of

the Dennis Deposition (as shown above).   However, when generating the price for the

product without the Challenged Claims (i.e., pushing the "Price for Option 2" button in Dr.

Dennis' produced simulator),[169] the simulator yields an error message.   Specifically, in

both scenarios (i.e., the scenario to generate the 34% claimed price premium and the

scenario to generate the 40% claimed price premium), Dr. Dennis' produced simulator

---

[167] It appears Dr. Dennis' mistakenly selected both 40% Vegetable Oil Spread and 60% Vegetable Oil Spread attributes for the two product profits (i.e., "Option 1" and "Option 2").  In his report, Dr. Dennis notes that he selected the attribute 40% Vegetable Oil Spread for the two product profiles.  (Dennis Declaration, p. 29.)

[168] *See* Dennis Declaration, p. 29, para. 68.

[169] *See* Dennis Deposition, p. 224.

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

yields the error message "Solution is larger than the tested range," as shown in **Figure 12**

and **Figure 13** below.

**Figure 12**
**Dr. Dennis' Produced Simulator Fails To Reproduce 34% Claimed Price Premium**



**Figure 13**
**Dr. Dennis' Produced Simulator Fails To Reproduce 40% Claimed Price Premium**



65.    Based upon Dr. Dennis' deposition testimony, the error message "Solution is larger than

the tested range" appears to indicate that the generated product price (for the product

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

without the Challenged Claims) is below $1.50 (i.e., below the lower bound of the $1.50 to $4.00 tested range of prices in his conjoint survey[170]).  However, Dr. Dennis testified that his simulator cannot produce price estimates below $1.50 because the "modeling is working between the $1.50 and $4.00 range."

> Q.  So this simulator… wouldn't allow you to put in a product price for option one that is below $1.50; correct?
>
> A.  That's right.  That will return an error message.  Because back to your first question and just tying this all together, that **the modeling is working between this $1.50 and $4.00 range**.  Could it potentially keep on drawing that curve **below the $1.50**, well, **that would not be based on any actual survey data collected below the $1.50 price point.**  So this is the way the conjoint surveys are designed, and **that's why the selection of the price points are so critical** – one of the many reasons why the price point selection is very important for conjoint surveys.[171]

66.    Because Dr. Dennis' produced simulator cannot generate prices below the $1.50 price point, Dr. Dennis' produced simulator is incapable of reaching "market equilibrium [preference share of 50/50] between the two products."[172, 173]  In other words, Dr. Dennis' market simulator fails to determine "how much of a discount is needed for" the product without the Challenged Claims. [174]   Furthermore, as demonstrated by Dr. Dennis' deposition testimony, any price estimate below the $1.50 price point would be unreliable because "that would not be based on any actual survey data collected below the $1.50 price

_____

[170] Dennis Declaration, p. 19.

[171] Dennis Deposition, pp. 226 - 227.

[172] *See* Dennis Deposition, p. 224.

[173] After selecting "OK" on the error message "Solution is larger than the tested range", Dr. Dennis' produced simulator generates the following: (a) a 58.5% preference share for the product with the "Fat Free" / "Zero Calories" Challenged Claims and a 41.5% preference share for the product without the Challenged Claims; and (b) a 64.2% preference share for the product with the "0g Fat Per Serving" / "Zero Calories Per Serving" Challenged Claims and a 35.8% preference share for the product without the Challenged Claims.  (*See* **Exhibit 12**.)

[174] *See* Dennis Deposition, p. 224.

point."[175]  Thus, Dr. Dennis' market simulator fails to produce reliable price premiums (and is inconsistent with Dr. Dennis' claimed price premiums of 34% and 40%[176]).

## VIII.  DR. DENNIS' CLAIMED PERCENTAGE PRICE PREMIUMS ARE INCONSISTENT WITH MARKET EVIDENCE AND FAIL REASONABLENESS TESTS

67.  In his declaration, Dr. Dennis claimed that the "design of [his] conjoint survey and [his] market simulator allowed [him] to calculate the price premium attributable (if any) to the challenged claims for the marginal consumer" or "the additional price that the marginal consumer would pay for the product with one or more of the challenged claims."[177] However, Dr. Dennis' claimed percentage price premiums are inconsistent with market evidence and fail reasonableness tests for the following reasons.

    a.  Dr. Dennis' market simulator yields results inconsistent with real-world prices of Parkay Spray and Parkay Squeeze.

    b.  Dr. Dennis' claimed percentage price premiums fail reasonableness tests.

    c.  Plaintiffs' experts' claimed percentage price premium approach assesses claimed damages on price differences unrelated to the Challenged Claims.

    d.  Dr. Dennis' claimed price premiums are not tied to the putative Class Period (i.e., Dr. Dennis' claimed price premiums fail to account for consumers' tastes and preferences throughout the putative Class period).

---

[175] Dennis Deposition, pp. 226 - 227.

[176] After selecting "OK" on the error message "Solution is larger than the tested range," Dr. Dennis' produced simulator automatically defaults to the minimum price point of $1.50 for "Option 2" in both scenarios, as shown in **Exhibit 12**.  Given the price of "Option 2" defaults to $1.50 in both scenarios (within Dr. Dennis' framework), (a) the claimed price premium attributable to the "Fat Free" / "Zero Calories" Challenged Claims would be equal to $1.00 or 40% of the $2.50 assumed price, and (b) the claimed price premium attributable to the "0g Fat Per Serving" / "Zero Calories Per Serving" Challenged Claims would be equal to $1.00 or 40% of the $2.50 assumed price.  However, it is worth noting that the generated price of "Option 2" will not yield accurate price premiums because the simulator fails to reach market equilibrium (i.e., preference share of 50/50) between the two products.

[177] Dennis Declaration, p. 28.  (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

### A. Dr. Dennis' Market Simulator Yields Results Inconsistent With Real-World Prices Of Parkay Spray and Parkay Squeeze

68.    Dr. Dennis stated that the "price premium survey results presented in [his] declaration are calculated using a market simulator" [178] which Dr. Dennis described as "a 'choice laboratory' for testing real world possibilities (e.g., the price premium paid estimates for products with and without the [C]hallenged [C]laims)."[179]  However, Dr. Dennis fails to conduct any reasonableness checks to test the capability of the simulator to simulate real world prices.  In other words, Dr. Dennis (and Mr. Weir) assumed, without support, that the market simulator is capable of producing reliable results for the "price" that consumers would have paid for the hypothetical products (without the Challenged Claims).

69.    As demonstrated by an article cited by Dr. Dennis entitled "The Role Of Conjoint Surveys In Reasonable Royalty Cases,"[180] one way to test the accuracy of the results generated by Dr. Dennis' market simulator is comparing simulated prices (generated by the simulator) of features available in the real world to the real-world market prices for these features.

> In a conjoint survey that is aimed at determining price (as opposed to median or average WTP [i.e., willingness to pay]), results can be tested using real world evidence.  Conjoint analysis generates part-worths for every level of every attribute in the study.  While there might not be market evidence available on consumer WTP for all features, there may be market evidence for some features, and an opposing expert can compare prices to the conjoint results for the feature for which market evidence is available.[181]

---

[178] Dennis Declaration, p. 28.  (Bracketed text added for clarification.)

[179] Dennis Declaration, p. 29.

[180] Dr. Dennis relied upon the article for the explanation of the "no buy" option used in Dr. Dennis' conjoint survey. (Dennis Declaration, p. 28 Footnote 25.)

[181] Lisa Cameron, Michael Cragg, and Daniel McFadden, "The Role Of Conjoint Surveys In Reasonable Royalty Cases," Law360, October 16, 2013.   (https://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases, viewed on February 11, 2019.) (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

70.    In his declaration, Dr. Dennis states that his "price premium survey included market-based price points for both the spray and squeeze bottle buttery topping products based on actual real-world prices that consumers have paid for the products."[182]  Dr. Dennis further notes that in his conjoint survey, one of the attributes included is product type which "has two levels: Spray Bottle (8 oz), [and] Squeeze Bottle (12 oz)."[183]  Dr. Dennis testified that his "survey does have information in it relative to the value that consumers place on the spray as a delivery mechanism versus the squeeze bottle."[184] Because real world prices are available for Parkay Spray and Parkay Squeeze products (and because these products are included in Dr. Dennis' simulator), I compared the real-world prices of Parkay Spray and Parkay Squeeze to the prices indicated by Dr. Dennis' simulations for Parkay Spray and Parkay Squeeze.[185]  Specifically, to test the accuracy of Dr. Dennis' simulator (and thus the reliability of Dr. Dennis' simulated results), I perform the following steps:

a.    analyze real-world prices of Parkay Spray and Parkay Squeeze;

b.    simulate the price of Parkay Spray using Dr. Dennis' market simulator; and

c.    compare the simulated prices (and simulated price differences) of Parkay Spray and Parkay Squeeze (generated by Dr. Dennis' market simulator) to real-world prices (and real-world price differences) of Parkay Spray and Parkay Squeeze.

**1.    <u>Analysis Of Real-World Prices Of Parkay Spray And Parkay Squeeze</u>**

71.    In his declaration, Dr. Dennis states that his "analysis of real-world market pricing confirmed that the market pricing for the two products [Spray Bottle (8 oz.) and Squeeze

_____

[182] Dennis Declaration, p. 15.

[183] Dennis Declaration, p. 21.

[184] Dennis Deposition, p. 116.

[185] Note: These price comparisons are performed between Parkay Spray 8 oz. products and Parkay Squeeze 12 oz. products.  In other words, these price comparisons compare the prices per unit (not prices per ounce).

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Bottle (12 oz.)] is similar, as confirmed by the Defendant's market research and IRI sales data."[186]  To analyze the real-world prices of Parkay Spray and Parkay Squeeze, I used Parkay Spray and Parkay Squeeze annual retail sales and prices from IRI for the U.S. as a whole (reported in 4-week time periods).[187]



Declaration of Keith R. Ugone, Ph.D.
March 30, 2019



**2. Simulate Prices Of Parkay Spray And Parkay Squeeze Products Using Dr. Dennis' Simulator**

72.    I use Dr. Dennis' market simulator tool and the methodology used by Dr. Dennis to compare the prices of Parkay Spray and Parkay Squeeze products.  In his conjoint survey, Dr. Dennis "included a variety of health and non-health claims… that are not challenged by the Plaintiff [*sic*] but that appear on the Parkay Spray product or on competitor products."[191]  To calculate the claimed price premiums of the Challenged Claims, Dr. Dennis created two Parkay Spray product profiles (with and without the Challenged

---

[191] Dennis Declaration, p. 14.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Claims) and selected the attribute levels "based on the Parkay Spray product packaging

itself."[192]  Consistent with Dr. Dennis' methodology of selecting attribute levels, I select

the applicable health and non-health attributes (included in Dr. Dennis' conjoint survey)

for Parkay Spray and Parkay Squeeze based upon the products' packaging, as shown in

**Table 4** below.[193, 194]

---

[192] Dennis Declaration, p. 29.

[193] Because the real-world prices of Parkay Spray and Parkay Squeeze were observed by Dr. Dennis in 2018, the Challenged Claims "0g Fat Per Serving" and "Zero Calories Per Serving" were used in Dr. Dennis' simulator.

[194] Dr. Dennis selected the following attributes for the two Parkay Spray product profiles: (i) Parkay brand, (ii) Spray Bottle 8 oz., (iii) Fresh and Creamy Taste, (iv) 0g Trans Fat Per Serving, (v) 0mg Cholesterol Per Serving, and (vi) 40% Vegetable Oil Spread.  For one of the product profiles, Dr. Dennis also included the Challenged Claims.  (Dennis Declaration, p. 29.)  In the Parkay Spray v. Parkay Squeeze comparison, I select the same product attributes for the Parkay Spray product profile as Dr. Dennis.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

**Table 4**
**Assumed Attributes Of Parkay Spray And Parkay Squeeze**
**In Dr. Dennis' Simulator**

| Parkay Spray Attributes | | Parkay Squeeze Attributes | |
|---|---|---|---|
|  | |  | |
| Brand | Parkay | Brand | Parkay |
| Product Type | Spray Bottle (8 oz.) | Product Type | Squeeze Bottle (12 oz.) |
| Product Benefits Description on Front of Package | Fresh and Creamy Taste | Product Benefits Description on Front of Package | Fresh and Creamy Taste |
| Nutrition Description on Front of Package | - 0g Fat Per Serving<br>- Zero Calories Per Serving<br>- 0g Trans Fat Per Serving<br>- 0mg Cholesterol Per Serving<br>- 40% Vegetable Oil Spread | Nutrition Description on Front of Package | - 0g Trans Fat Per Serving<br>- 0mg Cholesterol Per Serving<br>- 60% Vegetable Oil Spread |

73.     In Dr. Dennis' simulator, a price point for one of the products in the comparison must be assumed in order to simulate the price of the other product.  To calculate the claimed price premiums, Dr. Dennis claimed to use "the conservative price point observed in the marketplace with real-world pricing."[195]  In designing the conjoint survey, Dr. Dennis stated that he considered "advertised pricing and actual retail and wholesale transaction data" for Conagra's products and "a market scan of the leading brands available in brick-

_____

[195] Dennis Declaration, p. 29.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

and-mortar retail stores."[196]  In his declaration, Dr. Dennis included images of retail prices of Parkay Spray and Parkay Squeeze at stores located in Gulfport, Mississippi and Biloxi, Mississippi.[197]  For illustrative purposes, the real-world price of Parkay Squeeze observed by Dr. Dennis in (a) the grocery store in Gulfport, Mississippi and (b) the Walmart in Biloxi, Mississippi are used as inputs in Dr. Dennis' conjoint results to simulate the price of Parkay Spray.[198]

a.  <u>Grocery Store in Gulfport, Mississippi</u>.  As presented in **Figure 15** below, Dr. Dennis observed that the real-world price of Parkay Squeeze was $2.29 and the real-world price of Parkay Spray was $2.47 in a grocery store located in Gulfport, Mississippi.  I use the $2.29 real-world price of Parkay Squeeze (observed by Dr. Dennis) in Dr. Dennis' simulator to generate the price of Parkay Spray, as shown in **Figure 16** below.  Assuming a price of $2.29 for Parkay Squeeze, Dr. Dennis' simulator generates a simulated price of $3.52 for Parkay Spray.[199]

**Figure 15**
**Dr. Dennis' Observed Real-World Prices In "Winn-Dixie"; "ROUSE'S Grocery" in Gulfport, MS[200]**



---

[196] Dennis Declaration, p. 15.  Dr. Dennis noted that for the market scan information, he "collected information from the Biloxi-Gulfport area of Mississippi owing to Defendant's market research indicating that the majority of Parkay consumers are in the Southern region of the U.S."  (Dennis Declaration, p. 15, Footnote 17.)

[197] Dr. Dennis noted that he "collected information from the Biloxi-Gulfport area of Mississippi owing to Defendant's market research indicating that the majority of Parkay consumers are in the Southern region of the U.S."  (Dennis Declaration, p. 15, Footnote 17.)

[198] Dr. Dennis testified "for the local market scan data that [he has] for Biloxi, Mississippi, [he] asked a family member to go to a store for [him] and take some pictures for [him] of the products.  (Dennis Deposition, p. 23.)

[199] In Dr. Dennis' simulator, if the "None of These" boxes is selected, Dr. Dennis' simulator generates a simulated price of $3.34 for Parkay Spray.

[200] Market Scan Of Pricing, First Image (Image 1) Titled: "Winn-Dixie is in Gulfport, MS: ROUSE'S grocery in Gulfport, Mississippi."  (Dennis Declaration, Attachment D, p. 1.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

**Figure 16**
**Prices For Parkay Spray Versus Parkay Squeeze Calculated Using Dr. Dennis'**
**Market Simulator (Assuming A $2.29 Price Of Parkay Squeeze)**



b.  <u>Walmart in Biloxi, Mississippi</u>.  As presented in **Figure 17** below, Dr. Dennis observed that the real-world price of Parkay Spray was $2.08 and the real-world price of Parkay Squeeze was $2.08 in a Walmart located in Biloxi, Mississippi.  I use the $2.08 real-world price of Parkay Squeeze (observed by Dr. Dennis) in Dr. Dennis' simulator to generate the price of Parkay Spray, as shown in **Figure 18** below.  Assuming a price of $2.08 for Parkay Squeeze, Dr. Dennis' simulator generates a simulated price of $3.49 for Parkay Spray.[201]

---

[201] In Dr. Dennis' simulator, if the "None of These" boxes is selected, Dr. Dennis' simulator generates a simulated price of $3.30 for Parkay Spray.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

---

**Figure 17**
**Dr. Dennis' Observed Real-World Prices In A Biloxi, MS Walmart[202]**



**Figure 18**
**Prices For Parkay Spray Versus Parkay Squeeze Calculated Using Dr. Dennis'**
**Market Simulator (Assuming A $2.08 Price Of Parkay Squeeze)**

| Butter Substitute Survey - Market Simulator | | | | | | research now | SSI |
|---|---|---|---|---|---|---|---|
| Intro | Clear Filters | | | | | | |

| Select Respondents | | | | |
|---|---|---|---|---|
| Age: ☐ 18-34  ☐ 35-54  ☐ 55-74  ☐ 75 or older   Geo: ☐ California  ☐ Non-California   Brand: ☐ Parkay  ☐ ICBINB   Gender: ☐ Male  ☐ Female   Time Spent in Survey: ☐ Exclude Bottom 10% | | | | |
| N = 933 | | | | |

| Simulate Market | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Price for Option 1 | Option 1 ☐ | Price for Option 2 | Option 2 ☐ | Option 3 ☐ | Option 4 ☐ | Option 5 ☐ | None of These ☐ |
| Share of Preference | | 50.0% | | 50.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Lower / Upper | | 46.8% - 53.2% | | 46.8% - 53.2% | 0% - 0% | 0% - 0% | 0% - 0% | 0% - 0% |
| Brand | | Parkay | | Parkay | | | | |
| Product Type | | Spray Bottle (8 oz) | | Squeeze Bottle (12 oz) | | | | |
| Fresh and Creamy Taste | | ☑ | | ☐ | | | | |
| 100% Taste | | ☐ | | ☐ | | | | |
| Country Fresh Taste | | ☐ | | ☐ | | | | |
| Great for Cooking and Topping | | ☐ | | ☐ | | | | |
| Perfect for Topping and Cooking | | ☐ | | ☐ | | | | |
| Buttery Burst | | ☐ | | ☐ | | | | |
| Delicious Butter Taste | | ☐ | | ☐ | | | | |
| Fat Free | | ☐ | | ☐ | | | | |
| 0g Fat | | ☐ | | ☐ | | | | |
| 0g Fat Per Serving | | ☑ | | ☐ | | | | |
| Zero Calories | | ☐ | | ☐ | | | | |
| Zero Calories Per Serving | | ☑ | | ☐ | | | | |
| 0 Calories Per Serving | | ☐ | | ☐ | | | | |
| 0g Trans Fat Per Serving | | ☑ | | ☑ | | | | |
| 0mg Cholesterol Per Serving | | ☑ | | ☑ | | | | |
| 40% Vegetable Oil Spread | | ☑ | | ☐ | | | | |
| 60% Vegetable Oil Spread | | ☐ | | ☑ | | | | |
| Price | | $3.49 | | $2.08 | | | | |
| Min/Max | | $1.50 / $4.00 | | $1.50 / $4.00 | | | | |

---

[202] Market Scan Of Pricing, Second Image (Image 2) Titled: "Walmart is in Biloxi, MS."   (Dennis Declaration, Attachment D, p. 1.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

### 3. Comparison Of The Results From Dr. Dennis' Market Simulator To Real-World Prices Of Parkay Spray and Parkay Squeeze

74.     To test the accuracy of Dr. Dennis' market simulator (and thus the reliability of Dr. Dennis' claimed price premiums), I compared the results from Dr. Dennis' market simulator to the real-world prices of Parkay Spray and Parkay Squeeze.  Specifically, I compared the simulated prices of Parkay Spray (generated by Dr. Dennis' market simulator) to the real-world prices of Parkay Spray observed by Dr. Dennis.  In addition, I compared the price difference (or "price premium") of Parkay Spray relative to Parkay Squeeze that Dr. Dennis' simulator calculates to the actual real-world price difference (or real-world price premium, if any) of Parkay Spray relative to Parkay Squeeze.

a.     Grocery Store in Gulfport, Mississippi.  **Table 5** below presents the (i) real-world prices (and price differences) of Parkay Spray and Parkay Squeeze observed by Dr. Dennis in a grocery store located in Gulfport, Mississippi and (ii) the results from Dr. Dennis' simulator.

i.     In Dr. Dennis' simulator, if a $2.29 price of Parkay Squeeze is assumed (to match Dr. Dennis' observed real-world price of Parkay Squeeze), Dr. Dennis' simulator generates a simulated price of $3.52 for Parkay Spray, as shown in **Table 5** below (and **Figure 16** above).  However, this simulated price of $3.52 is significantly higher than the observed real-world price of $2.47 (observed by Dr. Dennis).

ii.     As shown in **Table 5**, based upon Dr. Dennis' observed real-world prices, the price of Parkay Spray is $0.18 higher than the price of Parkay Squeeze.[203]  However, based upon Dr. Dennis' simulator, the simulated price of Parkay Spray is $1.23 higher than the price of Parkay Squeeze.  In other words, Dr. Dennis' simulator generates a significantly higher "price premium" of Parkay Spray relative to Parkay Squeeze than what is observed in the real world.

_____

[203] Calculation: $0.18 = $2.47 – $2.29.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

**Table 5**
**Comparison Of Dr. Dennis' Simulator Results To Real-World Prices Observed By**
**Dr. Dennis In A Gulfport, MS Grocery Store**

| Dennis Report, Attachment D: Market Scan Of Pricing | | |
|---|---|---|
| Market Price Of Parkay Spray | [A] | $2.47 |
| Market Price Of Parkay Squeeze | [B] | $2.29 |
| **Market Price Difference Of Parkay Spray And Parkay Squeeze** | **[C] = [A] – [B]** | **$0.18** |
| Results From Dr. Dennis' Simulator | | |
| *Dr. Dennis' Simulator: Set Price Of Parkay Squeeze To Market Price Of $2.29* | | |
| Simulated Price Of Parkay Spray | [D] | $3.52 |
| Market Price Of Parkay Squeeze | [B] | $2.29 |
| **Simulated Price Difference Of Parkay Spray And Parkay Squeeze** | **[E] = [D] – [B]** | **$1.23** |

b. <u>Walmart in Biloxi, Mississippi</u>. **Table 6** below presents the (i) real-world prices (and price differences) of Parkay Spray and Parkay Squeeze observed by Dr. Dennis in a Walmart located in Biloxi, Mississippi and (ii) the results from Dr. Dennis' simulator.

  i. In Dr. Dennis' simulator, if a $2.08 price of Parkay Squeeze is assumed (to match Dr. Dennis' observed real-world price of Parkay Squeeze), Dr. Dennis' simulator generates a simulated price of $3.49 for Parkay Spray, as shown in **Table 6** below (and **Figure 18** above). However, this simulated price of $3.49 is significantly higher than the observed real-world price of $2.08 (observed by Dr. Dennis).

  ii. As shown in **Table 6**, based upon Dr. Dennis' observed real-world prices, the price of Parkay Spray is equal to the price of Parkay Squeeze.[204] However, based upon Dr. Dennis' simulator, the simulated price of Parkay Spray is $1.41 higher than the price of Parkay Squeeze. In other words, Dr. Dennis' simulator generates a significantly higher "price premium" of Parkay Spray relative to Parkay Squeeze than what is observed in the real world. (Parkay Spray and Parkay Squeeze had the same observed prices at Walmart.)

_____

[204] Calculation: $0.18 = $2.49 – $2.29.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

**Table 6**
**Comparison Of Dr. Dennis' Simulator Results To Real-World Prices Observed By**
**Dr. Dennis In A Biloxi, MS Walmart**

| Dennis Report, Attachment D: Market Scan Of Pricing | | |
|---|---|---|
| Market Price Of Parkay Spray | [A] | $2.08 |
| Market Price Of Parkay Squeeze | [B] | $2.08 |
| **Market Price Difference Of Parkay Spray And Parkay Squeeze** | **[C] = [A] – [B]** | **$0.00** |
| Results From Dr. Dennis Simulator | | |
| *Dr. Dennis' Simulator: Set Price Of Parkay Squeeze To Market Price Of $2.08* | | |
| Simulated Price Of Parkay Spray | [D] | $3.49 |
| Market Price Of Parkay Squeeze | [B] | $2.08 |
| **Simulated Price Difference Of Parkay Spray And Parkay Squeeze** | **[E] = [D] – [B]** | **$1.41** |

75.    In both of the illustrative examples above, Dr. Dennis' simulator generates a significantly

higher "price premium" of Parkay Spray relative to Parkay Squeeze than what is observed

in the real world. In addition, contrary to the results from Dr. Dennis' simulator (which

show that Parkay Spray is priced $1.23 – $1.41 <u>higher</u> than Parkay Squeeze), ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████ [205]

(**Exhibit 13**.) The comparison of Dr. Dennis' simulator results to real-world market

evidence suggests that the outcomes generated by Dr. Dennis' simulator are far different

from the real-world outcomes.

76.    Furthermore, in the real world Parkay Spray products advertise the Challenged Claims

whereas Parkay Squeeze products do <u>not</u> advertise the Challenged Claims. In Dr. Dennis'

simulator, the Challenged Claims (0g Fat Per Serving and Zero Calories Per Serving) were

selected for Parkay Spray, but were not selected for Parkay Squeeze (to match the products'

---

[205]  ████████████████████████████████████████████████████
████████████████████████████████████████████

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

packaging).[206]  Dr. Dennis' simulator generates <u>significantly</u> higher simulated prices of

Parkay Spray (relative to Parkay Squeeze) because the Challenged Claims were selected

for Parkay Spray (but are not selected for Parkay Squeeze) in Dr. Dennis' simulator.

However, as discussed in **Section VIII.A.1**, ███████████████████████████████████

████████████████████████████████████████████████████████  ██   ███

████████████████████████████████████████████████████████████████

██████████████████ Dr. Dennis' calculated price premiums associated with the

Challenged Claims are inflated and unreliable.  Because Dr. Dennis' conjoint analysis and

market simulation cannot generate reasonably accurate real world prices for Parkay

Squeeze, there is no confirmatory evidence that the market simulator can generate a

reasonably accurate price premium associated with the Challenged Claims.

## B.  <u>Dr. Dennis' Claimed Percentage Price Premiums Fail Reasonableness Tests</u>

77.     Dr. Dennis calculated claimed price premiums equal to 34% and 40% of the prices of the

Challenged Products.[208]  However, Dr. Dennis' claimed percentage price premiums fail

reasonableness tests because (a) Dr. Dennis (and Mr. Weir) fail to evaluate the profitability

of the Challenged Products and (b) Dr. Dennis' own market simulator demonstrates that

the Challenged Claims are relatively less important than numerous other product attributes.

_____

[206] The Parkay Spray 8 oz. products and Parkay Squeeze 12 oz. products differ in sizes (and product type).  In Dr.
Dennis' market simulator, the only other different attribute between Parkay Spray and Parkay Squeeze is the %
Vegetable Oil Spread attribute.

[207] Dr. Dennis states that his "analysis of real-world market pricing confirmed that the market pricing for the two
products [Spray Bottle (8 oz.) and Squeeze Bottle (12 oz.)] is similar, as confirmed by the Defendant's market research
and IRI sales data."  (Dennis Declaration, p. 21.  (Bracketed text added for clarification.))

[208] Dennis Declaration, p. 30.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

### 1.  <u>Dr. Dennis And Mr. Weir Fail To Evaluate The Profitability Of The Challenged Products</u>

78.     Dr. Dennis and Mr. Weir implicitly assume that in the absence of the Challenged Claims, Conagra would continue to sell the same quantities of Parkay Spray at prices that were 34% to 40% lower than historical prices. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

79.     However, Dr. Dennis and Mr. Weir fail to evaluate the profitability of the Challenged Products.  In his deposition, Dr. Dennis testified that he (a) has no support that Conagra would be willing to sell Parkay Spray at the implied lower prices and (b) failed to consider Conagra's profit margin for Parkay Spray.

> Q.  Is it part of your opinion that ConAgra would have been willing to sell Parkay Spray for a 34 percent and 40 percent respectively lower price premium?
> A.  … I don't have an evidence-based perspective on ConAgra executive decision-making.[211]
>
> …

_____

[209] Parkay Spray P&L Summary FY08 – FY14.  (PTF000061.)

[210] ████████████████████████████████████████████████████
████████████████████████████

[211] Dennis Deposition, p. 185.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

     Q. Did you consider at all ConAgra's profit margin for Parkay Spray in
       concluding the price premium amounts?
     A. That was not a factor in my calculations. My calculations are based on the
       survey data that I collected.

     Q. Do you have an opinion as to how the proper price reductions would
       affect ConAgra's profit margin for Parkay Spray?
     A. I personally don't.[212]

80.    As demonstrated above in **Section VI.D**, ████████████████████████████

█████████████  (**Figure 5** and **Exhibit 8**.)  Named Plaintiffs' claimed price

premium values (i.e., 34% and 40%) imply that, in the absence of the Challenged Claims,

the Challenged Products would have been sold at significantly lower average retail prices

by state than the historical prices.

81.    **Table** 8 presents the minimum and maximum average retail prices by state in the absence

of the Challenged Claims implied by Plaintiffs' claimed price premium values.



82.    Dr. Dennis (and Mr. Weir) fail to evaluate the profitability of the Challenged Products to

determine whether in the absence of the Challenged Claims, Defendant or retailers would

---

[212] Dennis Deposition, pp. 189 – 190.

[213] Average prices in the absence of the Challenged Claims for 2009 are calculated using a 34% claimed price premium
factor.  ████████████████████████████ Average prices in the absence of the
Challenged Claims for 2010 – 2014 are calculated using a 40% claimed price premium factor.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

have been able or willing to sell the Challenged Products at prices that were 34% to 40%

lower than historical prices.  Given the magnitude of the claimed price premiums, it is

likely that Conagra would not continue to sell the same quantities of Parkay Spray (if at

all).

### 2.  Dr. Dennis' Own Market Simulator Demonstrates That The Challenged Claims Are Relatively Less Important Than Numerous Other Product Attributes

83.    As part of his market simulation, Dr. Dennis calculated the "Variable Importance"

(measured as the average percent of total utility) for each variable included in his survey:

brand, product type (spray bottle or squeeze bottle), price, product benefits description, and

nutrition description.  Dr. Dennis' "Variable Importance" chart in his market simulator

demonstrates that *brand*, *price*, and *product type* are by far the most important product

attributes, accounting for 22.2%, 17.5%, and 10.2% of overall total utility, respectively.[214]

In contrast, the "Fat Free," "Zero Calories," "0g Fat Per Serving," and "Zero Calories Per

Serving" claims account for only 2.7%, 3.6%, 3.5%, and 3.4% of the overall total utility.[215]

84.    Thus, Dr. Dennis' own market simulator demonstrates that the Challenged Claims are

relatively less important than numerous other product attributes.  Given the relative

importance of numerous other product attributes (relative to the Challenged Claims), Dr.

Dennis fails to explain how the Challenged Claims would account for 34% and 40% of the

prices of the Challenged Products.

_____

[214] In addition, Dr. Dennis' market simulator shows that the "40% Vegetable Oil Spread" / "60% Vegetable Oil Spread" claims account for 4.4% of overall total utility, the "0mg Cholesterol Per Serving" claim accounts for 3.6% of overall total utility, and the 0g Trans Fat Per Serving" claim accounts for 3.9% of overall total utility.  (Dennis' Butter Substitute Survey – Market Simulator. (DENNIS000063.))

[215] Dennis' Butter Substitute Survey – Market Simulator. (DENNIS000063.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

### C. <u>Plaintiffs' Experts' Claimed Percentage Price Premium Approach Assesses Claimed Damages On Price Differences Unrelated To The Challenged Claims</u>

85.    Mr. Weir proposed to calculate damages by multiplying a claimed "*%Price Premium Factor: Claim*" by dollar sales of the Challenged Products during the putative Class Period.[216]  Based upon his conjoint analysis, Dr. Dennis opined to two percentage price premiums:

> That is, for the challenged claims used by the Defendant during the 2007-2009 time period, the price premium attributable to the challenged claims is 34%.  For the October 2009-[present] time frame, the price premium is 40%.[217]

In his declaration, Mr. Weir states that his calculation "can be performed on a class-wide basis, Nationwide, for California, or across different geographies, and for any defined time period, including the proposed Class Period(s) in this litigation."[218]  However, even under Mr. Weir's assertions regarding such calculations, his proposed calculations would extrapolate the results of a single conjoint survey to <u>all</u> Challenged Product sales made across <u>all</u> retailers during the <u>entirety</u> of the putative Class Period.

86.    As discussed in **Section VI.D** above,  Consequently, Mr. Weir's claimed price premium damages attributable to the Challenged Claims vary across Challenged Product purchases due to

---

[216] Weir Declaration, p. 21.

[217] Dennis Declaration, p. 30.  (Bracketed text added for clarification.)

[218] Weir Declaration, p. 21.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

variation in prices <u>unrelated to the alleged wrongful conduct</u> (and, hence, result in an

inflation of claimed damages), as demonstrated by Mr. Weir's deposition testimony.[219]

> Q. So the Parkay Spray if it's sold at Walmart and it's sold at Kroger… and
> if there's a price difference between the Kroger price and the Walmart
> price – wouldn't that entire price difference potentially be attributable
> to the different characteristics of Walmart and Kroger as retailers as
> opposed to just the labeling claim?
> A. So I'm not suggesting that the price difference at Walmart and Kroger
> is attributable to the label claim.[220]

87.    Based upon the analyses performed, ████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████

    a.



Because Dr. Dennis and Mr. Weir rely upon a percentage price premium approach,
they inappropriately would allocate some portion of the price difference across sales
channels to the alleged misrepresentation. In the aforementioned example, Mr. Weir
would attribute 40% of the $0.32 price difference between grocery stores and mass
merchandisers (i.e., $0.13) per unit to the Challenged Claims.[221] Mr. Weir provides no
basis for his assumption that individuals who purchased the Challenged Products at a
grocery store would place a larger premium (on a dollar basis) on the Challenged

_____

[219] Mr. Weir claims that the "price premium percentage calculated by Dr. Dennis applies to all Class Members market-
wide regardless of the absolute price they paid, and regardless of any individual Class Member's subjective valuation
of the Product." (Weir Declaration, p. 19.) However, for reasons discussed here and throughout my declaration, there
is no reason to believe there would have been constant percentage price premiums (34% for the 2007 – October 14,
2009 period and 40% for the October 15, 2009 – present time period) for all purchases of the Challenged Products.

[220] Weir Deposition, p. 244.

[221] Calculation: $0.128 = 40% * $0.32.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

Claims than individuals who purchased the same product from a mass merchandiser store.

b.  

Because Dr. Dennis and Mr. Weir rely upon a percentage price premium approach, they inappropriately would allocate some portion of the price difference across geographic locations to the alleged misrepresentation. In the aforementioned example, Mr. Weir would attribute 40% of the $0.90 price difference between New Jersey grocery stores and Michigan grocery stores (i.e., $0.36) per unit to the Challenged Claims.[222]  Mr. Weir provides no basis for his assumption that individuals who purchased the Challenged Products at grocery stores in New Jersey would place a larger premium (on a dollar basis) on the Challenged Claims than individuals who purchased the same product at grocery stores in Michigan.

c.  

Because Dr. Dennis and Mr. Weir rely upon a percentage price premium approach, they inappropriately would allocate some portion of the price difference across retailers to the alleged misrepresentation. In the aforementioned example, Mr. Weir would attribute 40% of the $1.29 price difference between Giant Eagle grocery stores and Weis Corp grocery stores (i.e., $0.52) per unit to the Challenged Claims.[223] Mr. Weir provides no basis for his assumption that individuals who purchased the Challenged Products at Giant Eagle grocery stores would place a larger premium (on a dollar basis)

_____

[222] Calculation: $0.36 = 40% * $0.90.

[223] Calculation: $0.516 = 40% * $1.29.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

on the Challenged Claims than individuals who purchased the same product at Weis Corp grocery stores.

d. 

Because Dr. Dennis and Mr. Weir rely upon a percentage price premium approach, they inappropriately would allocate some portion of the price difference (due to discounts) to the alleged misrepresentation. In the aforementioned example, Mr. Weir would attribute 40% of the $0.31 price difference between non-promoted and promoted prices (i.e., $0.12) per unit to the Challenged Claims.[224] Mr. Weir has provided no justification or analysis that a Challenged Product sold with considerable discounts contains the same proportional price premium attributable to the Challenged Claims as a Challenged Product being sold at the regular (non-promoted) price.

88. Mr. Weir (and Dr. Dennis) failed to analyze any of the relevant price variations summarized above when concluding it would be appropriate or reliable to extrapolate the results of Dr. Dennis' conjoint analysis to the entire putative Class (i.e., using a common proof approach). Prices paid by the putative Class members for the Challenged Products vary across numerous dimensions that are unrelated to the Challenged Claims. Because of this variation, Mr. Weir's (and Dr. Dennis') use of a single claimed percentage price premium applicable to all purchases of the Challenged Products (i.e., 34% for the March 21, 2009 – October 14, 2009 time period and 40% for the October 15, 2009 – present time period) inappropriately would claim as damages some portion of the value generated by these unrelated dimensions.[225] The failure to address price variations as indicated by real world

_____

[224] Calculation: $0.124 = 40% * $0.31.

[225] Mr. Weir applied (a) a 34% claimed price premium from March 21, 2009 to October 14, 2009 and (b) a 40% claimed price premium from October 15, 2009 to present. Mr. Weir assumed that the transition between the two sets of label claims was instantaneous. However, it is likely that both labels may have (at some point) been on the shelf at

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

data negates Mr. Weir's and Dr. Dennis' proposed approach to measuring a Class-wide

price premium and Class-wide damages.

### D.  Dr. Dennis' Claimed Price Premiums Are Not Tied To The Putative Class Period

89.    Dr. Dennis opines that the price premium "attributable to the challenged claims" used "by

the Defendant during the 2007 – October 2009 time period" is 34% and for the "October

2009 – [present] time frame, the price premium is 40%."[226]  According to Mr. Weir, "Dr.

Dennis concludes that these price premiums apply to every sale of the Product, to every

Class member, and the class period, respectively."[227]  However, survey techniques (such

as conjoint analysis) generally measure the consumers' value of product attributes at the

time the survey was conducted.  Thus, Dr. Dennis' calculated price premiums are based

upon survey respondents' tastes and preferences regarding consumption of calories and

fats in July 2018[228] (and fail to account for consumers' tastes and preferences throughout

the putative Class period).

90.    By applying the claimed price premiums to "every sale of the Product, to every Class

member, and the class period,"[229] Dr. Dennis (and Mr. Weir) assume that consumers'

preferences and any alleged price premium have been constant during the putative Class

Period (i.e., 2007 – present).  Specifically, Dr. Dennis testified that (a) he assumed that the

respondents he surveyed in July 2018 are representative of all Class members and (b) he

did not do any work to confirm if his claimed price premium values would apply

_____

the same time.  Mr. Weir did not account for the transition time periods during which products containing old and new
labels were both available.

[226] Dennis Declaration, p. 30.

[227] Weir Declaration, p. 19.

[228] Dennis Declaration, p. 25.  *See also* Dennis Deposition, pp. 228 – 229.

[229] Weir Declaration, p. 19.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

throughout the Class Period (outside of asking respondents if they purchased Parkay Spray

in the past 10 years).

> Q. So if the survey is being given to people, it was run in June and maybe July 2018; correct?
> A. That's right.

> Q. So how can it then talk about how respondents valued the label statements in 2008 or 2009 or any time period between then and 2018?
> A. Well, I make an assumption… based on my expertise that these respondents that I'm survey now, these are – I should say, back in July 2018 – that they're a representative class – they're a representative sample of the class... I did ask the respondents if they purchased these products in the past 10 years.

> Q. Other than asking a screener question for whether people bought a spray-type buttery product within the past 10 years, is there any other work that you did to confirm that you could apply these values in a look-back way?
> A. Any other work, I would just – no any other work…[230]

91.  As evidenced by Named Plaintiff Ofelia Frechette's deposition testimony and Mr. Weir's

declaration, consumer preferences change over time.

a.  <u>Deposition Testimony Of Named Plaintiff Ofelia Frechette</u>.  Ms. Frechette testified that over the 2002 through 2017 time period when she was purchasing Parkay Spray, she was trying to become increasingly healthier.

> Q. Between 2002 and 2017, were your food and beverage habits pretty much the same?
> A. Yes and no… I cut out a lot of stuff, you know, as time went by.

> Q. Would it be fair to say, you were trying to be increasingly healthier [ ] over that time period?
> A. Yes.

> Q. So did you eat less healthy in 2002 and then increasingly cut out [ ] foods?
> A. Yes.[231]

_____

[230] Dennis Deposition, pp. 228 – 229.

[231] Frechette Deposition, pp. 79 – 80.

Thus, Dr. Dennis' calculated price premiums would be overstated for consumers who become increasingly healthier in later years of the putative Class period (given Dr. Dennis' calculated price premiums are based upon survey respondents' tastes and preferences regarding consumption of calories and fats in July 2018).

b. <u>Weir Declaration</u>.    In his declaration, Mr. Weir acknowledged that consumer preferences changed over time.    Specifically, Mr. Weir stated that "[m]any major grocery retailers identify a willingness to adjust prices in response to changing economic conditions and consumer preferences."[232]  Thus, Mr. Weir's own declaration provides an example that contradicts the implicit assumption of constant consumer preferences during the putative Class Period.

## IX.    DR. DENNIS' CONJOINT ANALYSIS YIELDS MEASURES OF WILLINGNESS TO PAY, WHICH ARE NOT A RELIABLE ESTIMATE OF A CLAIMED PRICE PREMIUM (IF ANY)

92.    Dr. Dennis characterized his market simulator analysis (following the conjoint survey) as providing "a statistically robust estimate of the <u>price premium</u> that purchasers paid as a result of the challenged claims as a fraction of the total price paid for the Parkay Spray product."[233]  However, Dr. Dennis' characterization is incorrect.  Instead, Dr. Dennis' conjoint survey and market simulator attempts to measure survey respondents' willingness to pay for the Challenged Claims, which is a separate and distinct economic concept from the concept of a price premium.  As a result, Dr. Dennis' claimed price premium measures do not represent a measure of putative Class members' claimed economic harm associated with the Challenged Claims.

93.    The fact that Dr. Dennis' market simulator yields measures of willingness to pay (and not price premiums) is demonstrated through the following.

a.    Willingness to pay is different than a price premium.

b.    The software system Dr. Dennis used represents conjoint surveys and its market simulators as yielding measures of willingness to pay (demonstrating that Dr. Dennis

---

[232] Weir Declaration, p. 13.

[233] Dennis Declaration, p. 28.  (Emphasis added.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

would need to alter the procedures in some manner in order to obtain a price premium rather than a willingness to pay).

c.  Dr. Dennis did not alter the conjoint survey and market simulator procedure in any way that would transform willingness to pay measures into price premiums.

### A.  **Willingness-To-Pay Measures Are Not Price Premiums**

94.  Willingness-to-pay is a measure of the maximum price for which a given consumer would be willing to purchase a product.[234]  In the context of attempting to measure the value of a product feature or attribute (such as the Challenged Claims), willingness-to-pay may be thought of as the largest additional amount for which a given consumer would be willing to buy a product with the attribute (as compared to a product without the attribute). However, this measure provides limited information regarding the actual market price for a product (or the price premium for an attribute) because according to basic economic theory, market price is determined by the interaction of supply and demand factors.

95.  The differences between consumers' willingness to pay and market prices can be demonstrated by considering an example of consumer preferences regarding disposable plastic water bottles.  A convenience store may sell a bottle of water at $1.00 per bottle, which would be the price throughout the year.  On an ordinary day, a consumer may be willing to pay $1.00 for a bottle of water, whereas on a particularly hot day, the same consumer may be willing to pay $5.00 per bottle.  In this example, a claimed price premium method that treated willingness to pay as a price premium would yield a claimed price premium of $4.00 associated with sales on a hot day (i.e., $5.00 per bottle on a hot day – $1.00 per bottle on a regular day).  However, as described above, the consumer would pay

_____

[234] "Willingness to pay – definition and meaning."  Market Business News article.  (https://marketbusinessnews.com/ financial-glossary/willingness-pay-definition-meaning/, viewed on February 21, 2019.)

the same $1.00 price regardless of the weather (and therefore would not pay a price premium even though the consumer would have been willing to pay a higher amount on a hot day).

96.    This example illustrates the difference between willingness-to-pay measures and price premiums.  Moreover, this example demonstrates that focusing on willingness-to-pay measures may overstate price premiums because of the failure to adequately account for supply factors.  A claimed damages model predicated on measures of willingness to pay for the Challenged Claims likely would overstate the economic harm that Named Plaintiffs allege putative Class members have suffered.

### B.    Sawtooth Software Documentation Describes Its Market Simulators As Yielding Measures Of Willingness To Pay (Rather Than Price Premiums)

97.    Sawtooth Software, the software suite that Dr. Dennis used to perform his conjoint analysis,[235] has published books, articles, and other written guides relating to the use of conjoint analysis.  Sawtooth Software's published writings describe the results of conjoint analysis and market simulation as willingness to pay or consumer demand measures rather than price premiums, and further identify such willingness to pay measures as generally overstating price premiums.  Hence, in order for a conjoint analysis and market simulation (like Dr. Dennis') to calculate a claimed price premium, it would have to include additional information or adjusted procedures relative to the procedures described by Sawtooth Software.

98.    Examples of works by Sawtooth Software that describe the results of conjoint analysis and market simulation as measures of willingness to pay include the following.

---

[235] *See*, *e.g.*, Dennis Declaration, pp. 27 – 28.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

      a.  <u>Article From Sawtooth Software Research Paper Series</u>.  A 2001 article from the Sawtooth Software Research Paper Series advocates the use of market simulation to perform willingness to pay analyses.[236]

      b.  <u>Book By Bryan Orme, President Of Sawtooth Software</u>.  Sawtooth Software promotes and offers for sale on its website a book entitled "Getting Started with Conjoint Analysis" by Bryan Orme.[237]  In this work, Mr. Orme described conjoint analysis and market simulators as yielding consumer demand measures or measures of willingness to pay.

         i.  In Chapter 9 of his book ("Interpreting the Results of Conjoint Analysis"), Mr. Orme stated that "[t]he results of conjoint analysis may be used to assess the price elasticity [of demand] of products and services.  It also may be used to assess buyer price sensitivity and willingness to pay."[238]

        ii.  In Chapter 10 of his book ("Market Simulators for Conjoint Analysis"), Mr. Orme described market simulators as allowing for the estimation of demand curves and consumer price elasticities.[239]  Also in this chapter, Mr. Orme states regarding "share of preference" predictions that they "usually should not be interpreted as market shares, but as relative indications of preference," further demonstrating that conjoint surveys and market simulators do not provide market outcomes but rather consumer preference measures.[240]

      c.  <u>2017 Book Published By Sawtooth Software</u>.  A 2017 book by Bryan Orme and Keith Chrzan and published by Sawtooth Software describes use of a market simulation procedure to calculate measures of willingness to pay ("WTP").

             Finally, one can use conjoint simulations to find WTP.  To do this, we simulate a set of competing products A and B.  Product A possesses the feature and has the current price.  Product B lacks the feature and we set

---

[236] Orme, Bryan K. (2001) "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions."  Sawtooth Software Research Paper Series, p. 4.  (Downloaded from https://www. sawtoothsoftware.com/download/techpap/monetary.pdf on March 3, 2019.)

[237] "Getting Started with Conjoint Analysis – Strategies for Product Design and Pricing Research." SawtoothSoftware.com webpage.  (https://www.sawtoothsoftware.com/products/conjoint-choice-analysis/getting-started-with-conjoint-analysis, viewed on February 21, 2019.)

[238] Orme, Bryan (2010) "Interpreting the Results of Conjoint Analysis."  Chapter 9 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*.  Second Edition, Research Publishers LLC, p. 84. (Downloaded from https://www.sawtoothsoftware.com/download/techpap/interpca.pdf on March 3, 2019.  Bracketed text added for clarification.)

[239] Orme, Bryan (2010) "Market Simulators for Conjoint Analysis."  Chapter 10 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*.  Second Edition, Research Publishers LLC, p. 95. (Downloaded from https://www.sawtoothsoftware.com/download/techpap/introsim.pdf on March 3, 2019.)

[240] Orme, Bryan (2010) "Market Simulators for Conjoint Analysis."  Chapter 10 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*.  Second Edition, Research Publishers LLC, p. 102. (Downloaded from https://www.sawtoothsoftware.com/download/techpap/introsim.pdf on March 3, 2019.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

its price so that A and B each have 50% share. The difference in price that equalizes the shares is an estimate of WTP.[241]

99.    These statements from works by Sawtooth Software demonstrate that market simulation procedures following conjoint surveys calculate measures of willingness to pay. Further, an article included in the proceedings of a 2013 Sawtooth Software conference explicitly states that WTP measures do not represent a price premium (i.e., a change in equilibrium market prices) but instead overstates such price premiums.

> The problem with both the WTP [Willingness to Pay] and WTB [Willingness to Buy] measures is that they are not equilibrium outcomes. WTP measures only a shift in the demand curve and not what the change in equilibrium price will be as the feature is added or enhanced….
>
> In general, the WTP measure will overstate the change in equilibrium price and profits….[242]

100.    In light of these statements regarding conjoint analysis, market simulators, and willingness to pay measures, a conjoint analysis and market simulation performed according to the standard procedures and designs would not yield a claimed price premium. In order to derive a claimed price premium from a conjoint survey and analysis (such as that presented by Dr. Dennis), additional steps must be performed or additional information must be incorporated. As discussed below, Dr. Dennis did not perform any such additional steps.

### C.  Dr. Dennis' Conjoint Analysis Did Not Incorporate Supply Factors

101.    The above statements demonstrate that that conjoint analysis and market simulation yield measures of willingness to pay rather than price premiums. Given these statements, in

---

[241] Orme, Bryan K. and Keith Chrzan (2017) "Willingness to Pay." Chapter 13 in *Becoming An Expert In Conjoint Analysis – Choice Modelling for Pros*" Sawtooth Software, Inc., p. 194.

[242] Allenby, Greg, et al., "Using Conjoint Analysis to Determine the Market Value of Product Features." Proceedings of Sawtooth Software Conference, October 2013, p. 342. (https://www.sawtoothsoftware.com/download/techpap/2013Proceedings.pdf, viewed on March 28, 2019.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

order for the conjoint analysis and market simulation performed by Dr. Dennis to have calculated a claimed price premium (rather than a measure of willingness to pay), Dr. Dennis would have had to perform additional analyses or steps beyond merely performing a standard conjoint analysis and market simulation. Namely, given that his survey focuses exclusively on the tastes and preferences of survey respondents, who represent consumers in his analysis, Dr. Dennis would have had to incorporate supply factors (beyond any supply factors that may be represented in a standard conjoint analysis).

102. Plaintiffs' experts stated that they <u>discussed</u> various supply factors and that Dr. Dennis <u>considered</u> various supply factors when designing and performing his conjoint analysis.[243] However, whether Plaintiffs' experts <u>discussed</u> or <u>considered</u> supply factors is irrelevant to determining whether Plaintiffs' experts' proposed damages methodology <u>incorporated</u> supply factors. This distinction is especially relevant with regards to whether supply factors were incorporated in a manner that could change the "willingness to pay" measures generated by standard conjoint analysis techniques into price premium measures as represented by Plaintiffs' experts. However, Plaintiffs' experts presented no evidence that the standard implementation of conjoint analysis was modified in any way to <u>account for</u> such supply considerations and thereby determine a claimed price premium. This can be seen from at least the following.

   a. Dr. Dennis' conjoint analysis obtains and relies upon evidence of potential consumer behavior but not of potential producer or retailer behavior.

   b. Using prices as used by Dr. Dennis in a survey does not account properly for relevant supply considerations.

_____

[243] Weir Declaration, pp. 12 – 17. *See also* Dennis Declaration, p. 7.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

**1. Dr. Dennis' Conjoint Analysis Obtains And Relies Upon Evidence Of Potential Consumer Behavior But Not Of Potential Producer Or Retailer Behavior**

103.    As discussed above, market prices (and hence market price differences) are based upon the interaction of supply factors and demand factors in a market setting.  Accordingly, determining whether and how prices would change when a product's attributes and/or label claims change requires determining how both the supply factors and the demand factors would change.  The conjoint analysis and market simulation performed by Dr. Dennis does not determine how supply factors would change, and therefore it is incapable of determining whether and to what extent market prices for the Challenged Products would have been different absent the use of the Challenged Claims.

104.    Conjoint analysis is a survey technique in which respondents are asked questions regarding which product (out of a set of products and respective prices) they would be most likely to purchase.  Such a technique (properly implemented) can be used to provide insights and evidence regarding the likely behaviors of consumers in a market.  However, such a survey does not elicit responses from producers regarding their (likely) behaviors in response to certain changed circumstances (e.g., removal of the Challenged Claims and/or changes in demand conditions).[244]

105.    Given that Dr. Dennis' conjoint analysis and market simulation does not elicit responses from producers, it cannot provide insight as to whether and how producers would adjust pricing in such a setting.  Accordingly, a conjoint analysis such as that presented by Named Plaintiffs' experts does not represent a market-based price premium measure but rather a consumer-side "willingness to pay" measure (as discussed above).

_____

[244] Named Plaintiffs' experts contend that use of claimed market prices as part of the survey and simulator are sufficient to account for supply factors.  These contentions are incorrect, as discussed in **Section IX.C.2** in my report.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

### 2. Using Prices As Used By Dr. Dennis In A Survey Does Not Account Properly For Relevant Supply Considerations

106.    Mr. Weir claims that because Dr. Dennis' conjoint survey used price points based upon historical prices for the Challenged Products, it incorporated relevant supply factors that exist in the marketplace.[245]  However, Mr. Weir's claim is incorrect, as demonstrated by the following.

    a.    Standard Conjoint Analyses Utilize Prices That Reflect Market Prices.  As discussed above, in order for Dr. Dennis' conjoint analysis and market simulator to calculate a claimed price premium rather than a willingness to pay, Dr. Dennis would have to perform his analysis in a way that differed from standard conjoint analyses and market simulators.  Using observed market prices in the survey does not represent such a difference because standard conjoint analyses utilize market prices as well (and yet still obtain measures of willingness to pay and not price premiums).

        i.    For example, a Sawtooth Software research paper states that "[a]ttribute levels should cover the full range of possibilities for existing products as well as products that may not yet exist, but that you want to investigate."[246]  Regarding selections of prices for use in conjoint analysis, this statement indicates that prices should be selected to reflect the prices of the products in the market.  In other words, the use of observed market prices is standard practice for conjoint analysis.

        ii.    From an economic perspective, the use of observed market prices is appropriate in order to improve the likelihood that survey participants' responses provide guidance as to consumer behavior (though not price premiums) around those prices.  A conjoint analysis attempting to measure consumers' willingness to pay for a products' features or attributes would not provide such guidance if it was performed at a range of prices that do not reflect the prices respondents see in the marketplace.

    Given that market prices already are part of standard conjoint analysis and market simulation, Mr. Weir's statement that their use accounts for supply factors is incorrect and insufficient to transform the results of Dr. Dennis' analysis into a claimed price premium.

    b.    ███████████████████████████████████████████  Mr. Weir claims that using observed market prices accounts

_____

[245] Weir Declaration, p. 13.

[246] Orme, Bryan K. (2002) "Formulating Attributes and Levels in Conjoint Analysis."  Sawtooth Software Research Paper Series, p. 2.  (Downloaded from https://www.sawtoothsoftware.com/download/techpap/formatt.pdf on March 4, 2019.)

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

for supply factors that were present in the marketplace.[247]    However, Mr. Weir's statement incorrectly describes Dr. Dennis' conjoint analysis and market simulator as using price points based upon observed market prices.



Hence, even under Mr. Weir's (incorrect) claims that use of market prices accounts for supply factors, Dr. Dennis' use of prices of $2.50 or higher would not account for supply factors (and therefore his market simulators would not yield price premiums).

c.  <u>Observed Market Prices For Parkay Spray With The Challenged Claims Does Not Account For Supply Factors For Parkay Spray Absent The Challenged Claims</u>.  The observed market prices of Parkay Spray are determined by a combination of the demand and supply of the Parkay Spray <u>with the Challenged Claims</u>.  However, market prices of Parkay Spray <u>without the Challenged Claims</u> are <u>not</u> observed (considering Parkay Spray has always advertised the Challenged Claims), as demonstrated by Mr. Weir's deposition testimony.

> Q.  The sales data that is in this case always includes the price of the product with the [C]hallenged [C]laims, correct?
> A.  That's correct.

_____

[247] Weir Declaration, p. 13.

[248] Dennis Declaration, pp. 19 and 29.  Dr. Dennis used (a) six price points in his conjoint survey ($1.50, $2.00, $2.50, $3.00, $3.50, $4.00) and (b) a $2.50 price in his market simulations.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019
_____

> Q. There is no sales data for the product without the [C]hallenged [C]laims because the [C]hallenged [C]laims have been on the product throughout the putative [C]lass period, correct?
> A. To the best of my understanding.[249]

Mr. Weir fails to recognize the difference between supply factors that existed in the market for Parkay Spray with the Challenged Claims and supply factors that would have existed in a market for Parkay Spray absent the Challenged Claims.

## X.   MR. WEIR'S FULL REFUND APPROACH DOES NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS

107.   In the alternative to a claimed price premium approach, Mr. Weir opined, "[f]ull refund damages are easily calculated for any geography or time period" and referred to Table 1 in his declaration which he stated "summarizes the total sales, and thus full refund amounts, on a nationwide basis, and for California."[250]  However, the calculation of claimed full refund damages specified by Mr. Weir does not provide a reliable or relevant measure of economic injury (if any) suffered by putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

a.   <u>No Adjustment For Value Received By Consumers</u>.  The claimed full refund damages calculation discussed by Mr. Weir does not appropriately take into account the value received by each putative Class member from the purchase and use of Parkay Spray. With respect to a full refund of purchase price paid, accurately assessing economic injury suffered by a consumer purchasing the Challenged Product requires that Mr. Weir deduct from the purchase price the value actually received by the consumer.  The claimed full refund damages calculation specified by Mr. Weir cannot yield a reliable or relevant estimate of the harm (if any) suffered by a putative Class member as it aggregates the total retail dollar sales associated with Parkay Spray without apportioning (i.e., isolating) the amount attributable to the Challenged Claims or without apportioning (i.e., separating out) the benefits a putative Class member actually received.

b.   <u>Total Retail Sales That Were Not Caused By The Challenged Claims</u>.  Measuring the claimed damages suffered by putative Class members requires identifying the economic losses that are attributable to the alleged wrongful conduct.  Simply aggregating total retail sales represents a mathematical calculation, but not an approach

_____

[249] Weir Deposition, p. 228.

[250] Weir Declaration, p. 22.

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

for measuring claimed economic injury (or a claimed damages calculation). For example, if putative Class members chose to purchase Parkay Spray based upon considerations unrelated to the Challenged Claims, they did not suffer harm because of the Challenged Claims. There would be no correlation between the calculation discussed by Mr. Weir and any claimed economic injury attributable to the Challenged Claims (or suffered by putative Class members).

c. <u>Allocation Of Claimed Full Refund Damages Would Require Individual Inquiry And Receipts</u>. Mr. Weir discussed calculating total retail sales associated with Parkay Spray. However, Mr. Weir has not provided a mechanism for allocating to individual putative Class members the portion associated with each individual Class member's purchase(s).[251] Any such allocation would require individual inquiry for at least the following reasons.

i. <u>Putative Class Members Purchased The Challenged Product At Different Prices</u>. As discussed throughout my declaration, there are significant variations in the prices paid by individual putative Class members based upon a number of factors including sales channel, retailer, date of purchase, geographic location, and whether the product was purchased on promotion or at an everyday price. Hence, there is no single "purchase price paid" that Mr. Weir could use to evaluate claimed damages for all putative Class members on a Class-wide basis or to allocate aggregated claimed full refund damages to individual putative Class members. Mr. Weir failed to acknowledge in his declaration that *any* type of allocation methodology divorced from actual individual purchase patterns will over-compensate some Class members and under-compensate other Class members.

ii. <u>Putative Class Members Likely Do Not Have Proof Of Purchases</u>. To the extent that the claimed full refund damages discussed by Mr. Weir would require each consumer to provide proof of purchase, individual inquiry would be necessary to obtain information relating to the purchase price paid and the quantity of Parkay Spray purchased by each putative Class member. Further complicating any attempt to use such measures is the fact that many putative Class members (including the Named Plaintiffs) did not retain receipts relating to their purchases of Parkay Spray. Hence, any approach to allocating total retail sales among putative Class members is unlikely to be correlated with actual prices paid or quantity purchased.

108. Based upon the above considerations, the claimed full refund damages approach discussed in the Weir Declaration is not reliable or relevant to calculating claimed damages in this matter on a Class-wide basis. As discussed throughout my declaration, evaluating the

_____

[251] For example, the Weir Declaration does not state whether two putative Class members who purchased Parkay Spray at different purchase prices (a) have suffered identical claimed damages under the full refund approach and (b) would warrant some as-yet-unspecified proportional distribution of the aggregate retail sales.

CONFIDENTIAL

Declaration of Keith R. Ugone, Ph.D.
March 30, 2019

_____

claimed economic loss suffered by each putative Class member requires individualized

inquiry into the circumstances of each putative Class member's purchase.

\* \* \* \* \* \*

109.    My analyses, observations, and opinions contained in this declaration are based upon

information available to date.  I reserve the ability to review documents, deposition

transcripts, or other information still to be produced by the Parties to this dispute and to

supplement my opinions based upon that review.


I declare under the penalty of perjury under the laws of the United States that the foregoing
is true and correct.

Executed in Dallas, Texas on March 30, 2019.


Keith R. Ugone, Ph.D.